1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF WEST VIRGINIA

3    Biogen International GMBH
     and Biogen MA, Inc.,
4

5              Plaintiffs,

6              vs.                    CIVIL ACTION NO.

7                                     1:17-cv-116

8    Mylan Pharmaceuticals,           VOLUME I
     Inc.,
9              Defendant.

10                           - - -

11                         TRANSCRIPT

12        of proceedings had in the bench trial of the

13   above-styled action on February 4, 2020, before Honorable Irene

14   M. Keeley, District Judge, at Clarksburg, West Virginia.

15                           - - -

16        APPEARANCES:

17        On behalf of the Plaintiffs:

18        Andrew E. Renison
          Mark J. Feldstein
19        James B. Monroe
          Jeanette M. Roorda
20        Lauren J. Dowty
          Li Feng
21        Paul W. Browning
          Sanya Sukduang
22        Aaron G. Clay
          Eric J. Fues
23        John E. Nappi
          Laura P. Masurovsky
24        Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
          901 New York Avenue, NW
25        Washington, D.C.   20001
          202.408.4000

```
1
     APPEARANCES, CONTINUED:
2
          On behalf of the Plaintiffs (cont'd):
3
          Sandra K. Law
4         Schrader, Companion, Duff & Law, PLLC
          401 Main Street
5         Wheeling, WV  26003
          304.233.3390
6

7         On behalf of the Defendant:

8         Brandon M. White
          Michael A. Chajon
9         Shannon M. Bloodworth
          Perkins Coie, LLP
10        700 13th Street, N.W., Suite 600
          Washington, D.C.  20005
11        202.654.6206

12        Courtney M. Prochnow
          Perkins Coie, LLP
13        633 W. 5th Street, Suite 5850
          Los Angeles, CA  90071-1539
14        310.788.3284

15        David L. Anstaett
          Emily J. Greb
16        Perkins Coie, LLP
          33 East Main Street, Suite 201
17        Madison, WI  53703
          608.663.5408
18
          Gordon H. Copland
19        William J. O'Brien
          Steptoe & Johnson, PLLC
20        400 White Oaks Boulevard
          Bridgeport, WV  26330
21        304.933.8162

22        Adam S. Ennis
          Steptoe & Johnson, PLLC
23        11 Grandview Circle, Suite 200
          Cannonsburg, PA  15317
24        724.749.3180

25        Proceedings recorded utilizing realtime translation.
          Transcript produced by computer-aided transcription.
```

1                          INDEX TO WITNESSES

2     DEFENDANT'S WITNESSES:                                  PAGE

3

4     BENJAMIN GREENBERG

5     Direct Examination
      By Ms. Bloodworth                                        99

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         INDEX TO EXHIBITS

2

3    DEFENDANT'S TRIAL EXHIBITS:

4                                                 PAGE

5     DTX 1000                                    117

6     DTX 1001                                    119

7     DTX 1073                                    179

8     DTX 1039                                    181

9     DTX 1102                                    160

10    DTX 1104                                    155

11    DTX 1133                                    173

12    DTX 1135                                    159

13    DTX 1136                                    121

14    DTX 1636                                    103

15

16   DEFENDANT'S DEMONSTRATIVE EXHIBITS:

17    DDX 1000                                    216

18    DDX 1066                                    211

19    DDX 1100                                    115

20    DDX 1124                                    123

21    DDX 1157                                    195

22    DDX 1161                                    202

23

24

25

1  JOINT TRIAL EXHIBITS:

2   JTX 2153                                        188

3   JTX 2158                                        169

4   JTX 2165                                        145

5   JTX 2167                                        223

6   JTX 2168                                        171

7   JTX 2178                                        125
    JTX 2179                                        121
8
    JTX 2204                                        128
9
    JTX 2214                                        134
10
    JTX 2216                                        128
11
    JTX 2218                                        129
12  JTX 2221                                        135

13   JTX 2222                                        137

14   JTX 2233                                        128

15   JTX 2235                                        224

16

17

18

19

20

21

22

23

24

25

```
 1                            Tuesday Morning Session,

 2                            February 4, 2020, 9:30 a.m.

 3                                  - - -

 4           THE COURT:  Thank you.  Good morning.  It's been so

 5   many years since I've been down here, I didn't know what I was

 6   doing this morning.  Didn't know where the parking lot was,

 7   thought there was a secured entrance and there wasn't.  And so,

 8   anyway, it's good to be here with you all.

 9           And has there been any -- I know we have an updated

10   witness list, but is there anything that we need to take up

11   before opening statements?

12           MR. ANSTAETT:  Your Honor, David Anstaett of Perkins

13   Coie on behalf of Mylan Pharmaceuticals.  We did have one issue

14   we would like to raise with the Court.  Our understanding is

15   that Biogen has two fact witnesses in the case, and we would

16   like to request that those fact witnesses be sequestered aside

17   from when they are testifying.

18           THE COURT:  If there are any fact witnesses on either

19   side in the courtroom, the rule has been invoked and you must

20   leave at this time and await the time when you're called to

21   testify.

22           Are they in the courtroom?

23           MR. MONROE:  I don't believe they are, Your Honor.

24           THE COURT:  That's fine.  That takes care of that

25   one.  And are there any other issues?
```

1            MR. MONROE:  Yes, Your Honor.  We just wanted to

2     remind the Court that the parallel proceeding in the patent

3     office, the IPR proceeding --

4            THE COURT:  February 6.

5            MR. MONROE:  Correct.  Decision could come down any

6     moment.

7            THE COURT:  We may get a ruling from them before Iowa

8     gets a ruling.

9            MR. MONROE:  Based on patent office procedures, it is

10    very possible it could come down as we're speaking to you this

11    morning.  So we just wanted to alert the Court to that and, if

12    that were to happen, ask if we could have a recess so that we

13    could review the decision and meet and confer to talk about

14    potential impact on the proceedings.

15           THE COURT:  No problem.  Certainly.  No problem at

16    all.

17           Anything else?

18           MR. MONROE:  No, Your Honor.

19           THE COURT:  In that case, how do you wish to proceed?

20    I know we have burdens and all here.  Who wants to open?

21           MR. ANSTAETT:  So, Your Honor, I believe we will open

22    first, and I will do that.  I don't know if you would like to

23    hear formal appearances.  Mr. Copland was going to introduce

24    folks.

25           MR. COPLAND:  Yes, Your Honor.  Good morning.  As you

1  know, I'm Gordon Copland appearing for Mylan.

2          THE COURT:  I was just afraid all the appearances

3  might take 15 minutes.

4          MR. COPLAND:  For today, Your Honor, it will be David

5  Anstaett, Shannon Bloodworth, and Courtney Prochnow.

6          THE COURT:  And for Biogen?

7          MS. LAW:  Your Honor, Sandra Law and James Monroe,

8  Paul Browning, and Li Feng.

9          THE COURT:  Thank you very much.  You may proceed.

10          MR. MONROE:  Your Honor, we do have hard copies of

11  the slides to pass out, if that would be acceptable.

12          THE COURT:  That will be fine.

13          MR. MONROE:  We were attempting to avoid interrupting

14  at the very beginning of the trial.  We would like to note

15  there appears to be a disagreement with respect to obligations

16  to provide demonstratives in advance of the opening and also

17  the witnesses.

18          We received a set of opening demonstratives from

19  defendants yesterday that were numbered up to 49, but we only

20  got 35 pages.  So we asked what are those other pages, and they

21  said they're just blowups that they were going to show over the

22  exhibits.

23          What we're seeing now in this set of slides is they

24  actually have titles and they're nice things they're presenting

25  to you in a packet that we did not see.  And that's also

 1   particularly problematic for their first witness because we

 2   received a set of slides, 111 slides, numbered to 111, but we

 3   only received 58 slides.

 4           So we assume, for the next witness, we're going to

 5   get a huge number of slides or Your Honor will get a packet

 6   with titles set up, blowouts we've never had an opportunity to

 7   review.

 8           THE COURT:  Well, it's a firm rule that they have to

 9   have an opportunity to review them.

10           MR. ANSTAETT:  I can respond to that, Your Honor.

11   Let me give you an example.  If you'll look in your -- what I

12   just handed up.  If you look at, for example, Slide 7, there's

13   a title there that says "Kolbach 1992."

14           THE COURT:  Slide 7 is the last number?  The last

15   number in the DDX would be 7?

16           MR. ANSTAETT:  Precisely.

17           THE COURT:  I'm there.

18           MR. ANSTAETT:  So, as you can see, that's simply a

19   blowup of the demonstrative of an article.  The title is not

20   descriptive or argumentative; it just gives the name of the

21   author and the year.

22           And the pretrial order which I have here says as

23   follows:

24           "A party will provide demonstrative exhibits to be

25   used in connection with direct examination by 6:00 p.m. the

1  night before their intended use, and objections will be

2  provided no later than 7:30 p.m. the night before their

3  intended use.  Parties shall meet and confer by 8:30 p.m. the

4  night before their intended use."

5         Then in paragraph 25 it says this:

6         "These provisions do not apply to demonstratives

7  intended for use in closing statements, created during

8  testimony, or demonstratives to be used for cross-examination,

9  none of which need to be provided to the other side in advance

10 of their use."

11        And here's the key part:

12        "In addition, blowups or highlights of exhibits or

13 parts of exhibits or testimony are not required to be provided

14 to the other side in advance of their use.  Moreover, slides

15 that constitute only blowups or highlights of exhibits are not

16 required to be provided to the other side in advance of their

17 use."

18        And so this is precisely what's contemplated by the

19 pretrial order in this case.

20        THE COURT:  But I do believe that, during the -- at

21 the conclusion of the pretrial conference, I did state that I

22 expected the parties to exchange any demonstratives they were

23 going to use in opening statements.

24        MR. ANSTAETT:  And we did.  I mean, I understand

25 that, Your Honor.  We relied on that language in the pretrial

1   order.  And again --

2           THE COURT:  So wait a minute.  What was my statement

3   on record during the final pretrial conference?

4           MR. ANSTAETT:  I fully acknowledge that that was --

5           THE COURT:  Hot air, I guess?

6           MR. ANSTAETT:  I'm sorry.

7           THE COURT:  Hot air?

8           MR. ANSTAETT:  Oh, of course not, Your Honor.

9           THE COURT:  Okay.  Well, then, why didn't you do it?

10          MR. ANSTAETT:  Because, Your Honor, we didn't think

11  what you said was inconsistent with the pretrial order.  And,

12  frankly, I think, as we go through these, there will be no

13  dispute whatsoever that these are simply blowups, as explicitly

14  stated in the pretrial order, of exhibits that we intend to

15  use.

16          THE COURT:  The local rules of this court indicate

17  that a judge may, at his or her discretion, modify the local

18  rules.  And everything that I said with regard to the exchange

19  of exhibits is based on my experience of a blood war over "I

20  didn't see Exhibit 14; you gave me 13," which is what is

21  happening this morning, which is why "all" is of some

22  significance.

23          Now the question is is there any way in which Biogen

24  would be prejudiced?  And I think the answer is probably not,

25  if not no.

1          MR. MONROE:  Your Honor, I think two issues.  One,

2     I'd like to point out that, with respect to the concept of

3     these are just blowups, a lot of the slides that we were

4     provided last night were also blowups.  So they selectively

5     chose -- for example, Slide 13 in your binder shows a blowup

6     out of a document.  But then Slides 14 and 15, we didn't get,

7     which show blowups.  So there wasn't really a consistent -- we

8     raised the issue, and they did not say this is --

9          THE COURT:  Wait a minute.  Slide 14, Kappos 2005

10    poster, even I know what this is.  It's not a surprise.

11         MR. MONROE:  We haven't had a chance to go through

12    all the slides yet, Your Honor.  I'm trying to provide these

13    quickly.  Slide 15, for example, they're doing blowups.

14         My point is they did blowups for other documents, but

15    then for others they didn't provide us with those blowups.

16         And I think for the opening, I would agree with Your

17    Honor.  I think we're going to be fine for the opening.  This

18    is not evidence per se.

19         THE COURT:  Well, it's not evidence.

20         MR. MONROE:  We're concerned that they are providing

21    you with a packet they haven't seen.

22         THE COURT:  They won't do it again.

23         MR. MONROE:  Our concern is for the first witness --

24         THE COURT:  For both sides going forward -- sorry to

25    override you, but I need to move this forward -- all exhibits

```
 1   that you intend to use the following day.  A-L-L.  Look it up

 2   in Webster's.  It means everything.  And that's what I want to

 3   be exchanged by both sides.  Okay?

 4              MR. MONROE:  Could I ask for one thing, Your Honor,

 5   which is --

 6              THE COURT:  Don't push.

 7              MR. MONROE:  I'm hoping this isn't pushing.

 8   Dr. Greenberg is their first witness, Your Honor, and their

 9   only witness in their case in chief, and they clearly have 111

10   slides, and there's only 58 -- they didn't give 58 of those.

11              Can they provide them now so we can be looking at

12   them in advance of this?

13              MR. ANSTAETT:  Yes, absolutely.

14              THE COURT:  Why don't each of you designate one

15   lawyer to provide it to the other lawyer.  That way nobody will

16   be wondering who's preparing to provide those and who's to

17   receive them.

18              So who will provide them?

19              MR. ANSTAETT:  For our side, we will designate

20   Ms. Greb to play that role, Your Honor.

21              THE COURT:  Ms. Greb.

22              And who will receive them for Biogen?

23              MR. MONROE:  Mark Feldstein, Your Honor.  We now have

24   it.  They have now provided it to Mr. Feldstein.

25              Just to confirm so there's no confusion, consistent
```

 1   with the rules, this would be simply our affirmative

 2   demonstratives, not cross-examination items that we might use,

 3   blowups of cross-examination documents and things like that.

 4           THE COURT:  I'm sorry.  Was that a question?

 5           MR. MONROE:  Yes.

 6           THE COURT:  And you want -- you want to make sure

 7   that you don't have to provide your documents that are used for

 8   impeachment purposes only?

 9           MR. MONROE:  Correct.  And they don't either, either

10   party.

11           THE COURT:  Right.  But to the extent you try to get

12   in a document, get it into evidence with someone on

13   cross-examination, that's a different kettle of fish.  Okay?

14   For impeachment purposes only, you do not have to provide that.

15   Neither side does.  But anything substantive that you would

16   say, "Well, Judge, this witness is here.  In the effort to be

17   expeditious and reasonable, we want to move this into

18   evidence," and the other side said, "Oh, it's not

19   cross-examination, and we haven't seen it," I do not want that

20   scenario.  Okay?

21           So just by way of a basis point for all of you to

22   understand, I am an old trial lawyer and an old trial judge.

23   Okay?  And it seems to me that, after a lot of years of

24   experience, the best way to move this thing forward is to have

25   as little fighting between the sides.  I don't want a Battle of

 1   the Somme over this, and I want you to cooperate; because,

 2   otherwise, I will have to intervene, and neither side's going

 3   to be happy with that.

 4            So reasonableness and efficiency and cooperation

 5   would be the hallmarks as far as I'm concerned here.  Okay?

 6   And if you -- I think, if you can proceed in that manner, even

 7   if it may violate somebody's sensibilities about the -- this is

 8   not exactly what the words in the pretrial order or the local

 9   rules say, we'll all get along better.  Okay?

10            MR. ANSTAETT:  Understood, Your Honor.  Thank you

11   very much.

12            THE COURT:  Appreciate it.

13            MR. ANSTAETT:  Good morning, Your Honor.  As I said,

14   my name is David Anstaett and, together with my colleagues, we

15   represent Mylan Pharmaceuticals.

16            This case involves a single patent and presents two

17   core questions.  First, whether the asserted claims of the '514

18   patent are obvious.  And, second, does the '514 patent satisfy

19   the written description and enablement requirements?

20            And the answers are that the patent is obvious and,

21   if not, if not, then it entirely fails to satisfy the written

22   description and enablement requirements.

23            Now, the '514 patent has narrow claims directed to a

24   specific dose of a specific drug to treat a specific disease.

25   And they recite nothing more than what skilled artisans would

1   readily arrive at through routine optimization in view of the

2   substantial prior art.  And, if the numerous disclosures in the

3   prior art somehow would not have rendered the claims obvious,

4   then there is nothing in the patent specifications that could

5   satisfy the written description and enablement requirements.

6          So let's start with the '514 patent.  It has

7   essentially three elements.  It claims a method of treating

8   multiple sclerosis with a therapeutically effective amount of

9   dimethyl fumarate where that therapeutically effective amount

10  is about 480 milligrams per day.

11         And the first issue is whether the treatment method

12  recited in the '514 patent would have been obvious to skilled

13  artisans at the priority date in February of 2007.  The

14  evidence will show it was, indeed, obvious.

15         So let's start with dimethyl fumarate or DMF, as the

16  parties will call it throughout the case.

17         There's no dispute that DMF was a well-known compound

18  at the priority date.  It was in the prior art at the priority

19  date.  The '514 patent is not a composition patent.  Biogen

20  does not claim to have discovered dimethyl fumarate.  Dimethyl

21  fumarate was well known in the prior art.

22         I think there's also no real dispute that it was well

23  known in the prior art before the priority date that dimethyl

24  fumarate was effective for treating multiple sclerosis.

25         By the priority date, DMF had been successfully used

1    in at least two clinical trials to treat patients with multiple

2    sclerosis, and its use had even been claimed in prior art

3    patents for exactly that purpose.  And we see that here.

4          These are Claims 1 and 2 of the '376 patent, which

5    claim dimethyl fumarate for the therapy of autoimmune diseases,

6    such as multiple sclerosis.  And this is one of the patents

7    that was originally asserted by Biogen against Mylan in this

8    case, but it has now expired.  And it's prior art to the '514

9    patent.

10         This is the '999 patent, another patent originally

11   asserted against Mylan in this case, and it too has expired.

12   And, as you can see, it's titled "Dimethyl fumarate for the

13   treatment of multiple sclerosis," and it was filed in July

14   2002, years before the priority date of the '514 patent.

15         So treating patients with -- MS patients with DMF was

16   known in the prior art, and it was patented.

17         So that just leaves the therapeutically effective

18   dose of about 480 milligrams per day.  And here too the prior

19   art disclosed an effective dose range running from

20   360 milligrams to 720 milligrams per day administered in three

21   equal doses taken throughout the day.  And precisely

22   480 milligrams of dimethyl fumarate per day had successfully

23   been used in the prior art to treat psoriasis.  And, like MS,

24   psoriasis is an autoimmune disease, and it has an immunological

25   pathway that is similar to MS.

1           Now, at the priority date it was also well known that

2   DMF caused certain unpleasant side effects, including

3   gastrointestinal side effects.  And given basic drug

4   development principles at a likely effective dose range in MS

5   disclosed in the prior art, skilled artisans would have been

6   motivated to find the minimum effective dose of DMF to treat MS

7   using routine optimization, both to minimize side effects and

8   because lowered dosing allowed twice-a-day dosing rather than

9   three-times-a-day dosing, and that would improve patient

10  compliance and patient convenience.

11          480 milligrams was an obvious choice for dosing DMF

12  in multiple sclerosis, one that skilled artisans could

13  successfully arrive at through routine optimization in light of

14  the prior art.

15          Now, I'd like to walk through some of the key prior

16  art that the Court will hear about during the course of the

17  trial, but first let me say a few words about multiple

18  sclerosis.

19          So it's an autoimmune disease of the central nervous

20  system, and in MS a patient's immune system attacks the

21  patient's own nervous system cells.  Specifically, it attacks a

22  substance called myelin that usually forms a protective sheath

23  around nerve fibers resulting in damage that's called

24  demyelination.  Without that protective layer of myelin, signal

25  transduction and information flow is impaired and the nerve

1  cells become damaged.

2  And the areas of demyelination is called lesions or

3  plaques, and the Court will hear throughout the course of the

4  trial a lot of talk about these lesions.  And this damage can

5  manifest in a wide array of physical symptoms in MS patients,

6  such as vision changes, numbness, muscle weakness, loss of

7  bladder and bowel control, fatigue, and depression.

8  Now, the most common type of MS is called

9  "relapsing-remitting multiple sclerosis."  And the parties will

10  refer to that as RRMS.

11  Patients with RRMS experience defined relapses or

12  exacerbations followed by partial to full recovery of

13  neurological deficits over weeks and months.  And

14  Dr. Greenberg, our expert, will go into more detail.  But, with

15  that brief background on the disease, I'd like to turn now to

16  the prior art.

17  So, long before the priority date of the '514 patent,

18  DMF was successfully used to treat psoriasis.  And, like MS,

19  psoriasis is an autoimmune disease; and, as I've said,

20  autoimmune diseases are ones in which, rather than attacking a

21  foreign agent like a virus, the immune system becomes confused

22  and mistakenly attacks the self and it attacks part of a

23  person's own body.  And in the case of psoriasis, the immune

24  system mistakenly attacks the skin.  It attacks skin cells.

25  And in the case of MS, the immune system mistakenly attacks

1   central nervous system cells.

2           Well, more than a decade before the priority date,

3   skilled artisans had successfully used DMF to treat psoriasis

4   using a 240-milligram dose of DMF given twice a day.  So that's

5   a 480-milligram total daily dose.

6           This use of DMF was reported in the Nieboer paper

7   published in 1990.  A company called Fumapharm, that Biogen

8   would later go on to acquire, went on and marketed a product

9   called Fumaderm in Europe for the treatment of psoriasis.  And

10  Fumaderm is a mixture of four fumaric acid salts, but it was

11  well known in the prior art that, of the four, DMF was the

12  active component.

13          In fact, Nieboer, 1990, reported just that.  One aim

14  of the Nieboer study was to test 480 milligrams a day of DMF to

15  treat patients with psoriasis.  Another aim of that study was

16  to determine whether it made any difference if the

17  480 milligrams of DMF was delivered alone as a monotherapy or

18  in combination with the other fumaric acid salts in Fumaderm.

19          And in that study Nieboer concluded that the Fumaderm

20  mixture had no significantly better effect than monotherapy

21  with DMF alone.  And that's the second highlighted portion we

22  see here on this slide.

23          And as we go through the prior art, Your Honor, the

24  Court will note that, whenever milligram doses of Fumaderm are

25  being reported in the clinical trials, the prior art reports

1  the dose of DMF in Fumaderm, not the dose of the other

2  components.  And that's another indication that skilled

3  artisans clearly recognized that DMF was the relevant active

4  component of Fumaderm.

5       Two years later, in 1992, the Kolbach paper, which we

6  see here, likewise described a successful use of a

7  480 milligram dose of DMF to treat psoriasis.  And it also

8  reported this:  It reported that no significant differences

9  could be found between DMF monotherapy on the one hand and

10  therapy with a Fumaderm mixture of fumaric acid salts on the

11  other when equivalent doses of DMF were taken.  Again, it was

12  the DMF that was doing the work, and 480 milligrams of DMF was

13  effective for treating psoriasis.

14       Now, why are we talking about psoriasis?  Well,

15  neurologists who treat MS patients took note of the successful

16  use of DMF to treat psoriasis, and that's because psoriasis and

17  MS share similar immunological pathways.  And the prior art

18  expressly makes that link between DMF's successful use to treat

19  psoriasis and the motivation to use DMF to treat MS.  That

20  motivation, as we'll see in a moment, is made explicit in

21  multiple prior art references.

22       Before I get to that, let me say a word about the

23  immunology that's discussed in these references.

24       As Mylan's expert, Dr. Greenberg, will explain,

25  before the priority date, a prevailing theory of immune

1    dysfunction in both psoriasis and MS was that there's an

2    imbalance of what are called T helper cells in the immune

3    system.  And, very broadly speaking, Th1 cells are

4    proinflammatory cells, and Th2 cells are anti-inflammatory

5    cells.

6            In an autoimmune diseases, the Th1 cells predominate

7    and inflammation gets out of control, causing damage to the

8    affected organ.  And we see that here in a little animation

9    we've made.

10           And, as I mentioned earlier, in psoriasis the

11   affected organ is the skin; in multiple sclerosis the affected

12   organ is the central nervous system.

13           Now, promoting a shift in the immune response from

14   proinflammatory Th1 cells to anti-inflammatory Th2 cells was

15   believed to be beneficial in the treatment of both psoriasis

16   and MS.  Again, we see that just with a little animation here.

17   And it was thought that DMF could achieve that in both

18   diseases.  And Dr. Greenberg will explain how that works.

19           Now, we see this motivation in the prior art here in

20   a number of publications from Dr. Schimrigk and others before

21   the priority date.  They're looking to the successful use of

22   DMF to treat psoriasis as express motivation to explore the use

23   of DMF to treat MS because of the similarities in the two

24   diseases' immunological pathways.  And these are all

25   observations in publications in the 2004 to 2005 time frame

1    before the priority date of the '514 patent.

2              And, Your Honor, it was not just Dr. Schimrigk and

3    colleagues who drew a connection between the use of DMF to

4    treat psoriasis and its use to treat MS.  Dr. Kappos, a very

5    well-respected MS specialist who Biogen hired to lead its

6    Phase 2 clinical trial of DMF to treat MS, also recognized the

7    link between DMF's use in psoriasis and its use in MS.  And he

8    himself drew that link in the prior art.  And what we see here

9    is what we refer to as the Kappos 2005 poster.

10             In June 2005 Dr. Kappos informed skilled artisans at

11   the 15th Meeting of the European Neurological Society that

12   fumaric acid esters had been used in Germany for the treatment

13   of psoriasis.  The efficacy of fumaric acid esters in psoriasis

14   is thought to be mediated in part by their immunomodulatory

15   activity, suggesting that these agents may also be effective in

16   MS.  And, notably, Biogen's Dr. O'Neill, one of the '514

17   patent's named inventors, was a coauthor of this poster.

18             So Biogen's criticism that you may hear from time to

19   time during the course of this trial, that skilled artisans

20   would not look to psoriasis literature on DMF for motivation

21   relating to the treatment of MS, is contrary to the prior art

22   that taught just that.

23             I just mentioned Dr. Schimrigk.  I want to talk about

24   his prior art study because it's an important one.

25             In 2004 Dr. Schimrigk ran a pilot clinical trial in

1   which he treated MS patients with DMF, dosed as Fumaderm, and

2   measured its impact using MRI.

3          And here on this slide we see the Schimrigk study

4   design.

5          So ten patients with RRMS were administered DMF,

6   dosed as Fumaderm.  There was a six-week baseline period with

7   no treatment at all, followed by an 18-week period in which

8   patients ultimately received 720 milligrams of DMF, again dosed

9   as Fumaderm.

10         But, as we can see here in the study design,

11  720 milligrams was actually only given for a portion of that

12  18-week period because the dose was slowly titrated up to

13  720 milligrams to minimize gastrointestinal side effects.  And

14  you see the kind of ramp there.  That's the titration period.

15         And then, next, there was a four-week washout period

16  in which the patients received no medication at all.  And

17  following that washout period, patients were titrated up to a

18  360-milligram dose daily of DMF, which was given for more than

19  ten months.

20         Here we see in an abstract, published in the journal

21  "Multiple Sclerosis" in conjunction with a major MS meeting in

22  October of 2004, Dr. Schimrigk's team reported their results.

23         According to the authors, significant results were

24  seen starting after the 12th week of treatment with DMF.

25  Overall, the DMF therapy significantly reduced the number and

1    volume of gadolinium-enhancing lesions over 70 weeks of

2    treatment.  Gadolinium-enhancing lesions refer to what is seen

3    on MRI when a clinician injects a contrast agent called

4    gadolinium into a patient's veins.  And, if there's active

5    inflammation going on, the contrast will highlight that area on

6    a brain scan.

7            And it represents active inflammatory disease, and

8    it's an important measure of MS disease activity.

9            So the Schimrigk prior art study suggested to skilled

10   artisans that a dose range of 360 to 720 milligrams per day of

11   DMF was a promising new treatment for relapsing-remitting

12   multiple sclerosis.

13           Now, the Court will hear Biogen criticize the

14   Schimrigk study because it was small.  It involved ten

15   patients, and several didn't complete the entire study for

16   various reasons.  But before this litigation and before the

17   priority date, Biogen did rely on the results of the Schimrigk

18   study.

19           In prior art publications, Dr. Kappos and Dr. O'Neill

20   described the Schimrigk study as one of the bases for Biogen's

21   decision to conduct its own Phase 2 trial of DMF in MS.

22           This is another excerpt from the Kappos 2005 poster

23   that I mentioned earlier, in which Dr. Kappos and Dr. O'Neill

24   recognized a link between the use of DMF in psoriasis and its

25   use in MS.  And as we can see here on this slide, in that same

1   poster describing Biogen's planned Phase 2 study of DMF in MS,

2   they also referenced Dr. Schimrigk's successful use of DMF

3   dosed as Fumaderm to treat MS.

4           Now, the Kappos 2005 poster is also important because

5   it describes the design of Biogen's Phase 2 clinical trial of

6   DMF in MS.  And in the poster, as we can see here, skilled

7   artisans learned that Biogen gave DMF the name BG-12.  And so

8   the Court will hear, through the course of the trial, the

9   parties refer to BG-12.  That's Biogen's DMF product.

10          And they also learned, as we see on this slide, that

11  in the Phase 2 trial approximately 250 patients will be

12  randomized to receive either placebo 120 milligrams per day,

13  360 milligrams per day, and 720 or -- or 720 milligrams per day

14  of DMF.

15          And they learn that, like the Schimrigk study, the

16  study's primary end point will be an MRI end point, the total

17  number of new gadolinium-enhancing lesions at weeks 12, 16, 20,

18  and 24 of the study.  And Dr. Kappos, as I've said, is the

19  chair of the Phase 2 study steering committee.

20          Now, Your Honor, we flash forward here to January of

21  2006.  And in January of 2006, we get the first announcement of

22  Biogen's Phase 2 trial results.  In January 2006 Biogen issued

23  a press release announcing that its Phase 2 trial using DMF to

24  treat patients with relapsing-remitting MS met its primary end

25  point and was successful.

1          So I want to recap what skilled artisans knew as of

2    January 2006.

3          First, DMF is the relative active component in

4    Fumaderm, which has been successfully used to treat psoriasis.

5    Second, DMF monotherapy at a dose of 480 milligrams per day is

6    successful in treating psoriasis in autoimmune disease with

7    an -- important immunological similarities to MS.

8          Third, DMF in a range of 360 milligrams per day to

9    720 milligrams per day successfully treated MS in

10   Dr. Schimrigk's 2004 pilot study.

11         And, fourth, Biogen's Phase 2 trial of DMF

12   monotherapy in approximately 250 patients met its primary

13   efficacy end point, leading to a statistically significant

14   reduction in the total number of gadolinium-enhancing brain

15   lesions as measured by MRI with six months of treatment versus

16   placebo.

17         We don't know from the press release which dose or

18   doses worked, but we know there were only three doses tested.

19   And just like Dr. Schimrigk's study, Biogen tested doses of 360

20   and 720 milligrams per day.

21         And one other thing is notable, Your Honor.  No one

22   anywhere in the art proposed testing DMF doses higher than

23   720 milligrams per day in MS or psoriasis.

24         Now, Your Honor, because questions have been raised

25   in this case about the prior art status of certain

1    publications, I want to briefly discuss at this point the

2    difference between Section 102(a) prior art and Section 102(b)

3    prior art.  All the prior art that I discussed up to this point

4    is section 102(b) prior art, and that's important because it

5    means Biogen can't get rid of it.

6           Under pre-AIA Section 102(b), we see that here, "A

7    person shall be entitled to a patent unless the invention was

8    patented or described in a printed publication in this or a

9    foreign country or in public use or on sale in this country

10   more than one year prior to the date of the application for

11   patent in the United States."

12          So a reference that is prior art under Section 102(b)

13   remains a prior art reference regardless of whose work it is or

14   whether the inventor claims to have conceived the invention at

15   an earlier date and diligently reduced it to practice.

16          All of the references, as I say, that I've discussed

17   so far are Section 102(b) prior art because they predate the

18   priority application in this case by -- which was filed on

19   February 8, 2007, by more than one year.

20          So that means Biogen can't remove these references as

21   prior art by arguing wrongly, we contend, that the Kappos

22   Phase 2 trial was solely the work of Dr. O'Neill or that he

23   conceived the invention earlier than the application filing

24   date and diligently reduced it to practice.

25          So as of January 2006, prior art teaches that skilled

1    artisans were motivated to use DMF to treat MS and reasonably

2    expected it would be effective for that purpose.  And the prior

3    art directed skilled artisans to a dose range in which DMF has

4    shown efficacy in MS running from 360 milligrams to

5    720 milligrams per day.

6            Now, Your Honor, we think this is more than

7    sufficient to make out a case of prima facie obviousness.  And

8    I won't belabor the law, Your Honor, but here are a couple of

9    cases we think are important discussing the relevant legal

10   principle.

11           This is the federal circuit noting that "For decades,

12   it has recognized that, where the general conditions of a claim

13   are disclosed in the prior art, it is not inventive to discover

14   the optimum or workable ranges by routine experimentation.  A

15   more specific application of that general principle is that a

16   prima facie case of obviousness typically exists when the

17   ranges of a claimed composition overlap the ranges disclosed in

18   the prior art."  That's the DuPont case from 2018.

19           And then just this year, in January, the federal

20   circuit issued another opinion applying the same principles,

21   noting that "The normal desire of scientists or artisans to

22   improve upon what is already generally known provides the

23   motivation to determine where in a disclosed set of ranges is

24   the optimum combination."

25           Now, Your Honor, prima facie obviousness also squares

1    with the patent office's finding in a previous IPR -- not

2    Mylan's pending IPR, but a previous IPR actually filed by a

3    hedge fund -- that the '514 patent claims are prima facie

4    obvious.

5            Now, the patent was ultimately upheld in that

6    proceeding because the petitioner there failed to put in any

7    evidence -- any evidence -- rebutting Biogen's secondary

8    considerations arguments.  And that's certainly not going to be

9    the case here, Your Honor.

10           We will rebut that evidence, and I'll address

11   secondary considerations a bit later.  But the point here is

12   that the PTAB has concluded once already that the '514 patent

13   claims are prima facie obvious.

14           Now, I want to make just a couple of additional

15   points on motivation which drive the obviousness conclusion

16   home.

17           First, skilled artisans are motivated to find the

18   minimum effective dose of a drug.  And finding the minimum

19   effective dose was a particular concern with DMF because it was

20   well known to have side effects, including unpleasant

21   gastrointestinal side effects.

22           Second, DMF was traditionally dosed three times per

23   day in 120 milligram doses.  For example, the 720 milligram

24   dose would be administered as two 120-milligram doses given at

25   three points during the day.  Skilled artisans knew that the

1  requirement for such frequent dosing negatively impacts patient

2  compliance with their treatment regimens.

3        And that's especially true in MS, where patients can

4  go long periods of time between relapses, where they don't

5  experience any disease symptoms.  And simply put, Your Honor,

6  patients prefer less-frequent dosing.  Skilled artisans knew

7  that, and it was a motivation.  A lower dose of DMF of

8  480 milligrams per day would allow for twice-a-day dosing,

9  leading to improved patient convenience and compliance.

10        Now, Your Honor, I'd like to turn to two additional

11  publications that are prior art under Section 102(a).  And this

12  is Section 102(a) art because it was published within --

13  within -- one year or less of the '514 application filing date,

14  and that's, again, February 8, 2007.  And all of this art that

15  I'm about to discuss relates to the Kappos Phase 2 trial of DMF

16  in MS.

17        Now, all of this, we say, is properly considered

18  prior art, and I'll explain why in a bit.  But none of the

19  Section 102(a) art that I'm about to discuss is necessary to

20  make out a case of obviousness.  The prior art under 102(b)

21  that I've already discussed is more than sufficient for that

22  purpose.

23        So having said that, let me start with the -- with an

24  abstract published in May of 2006 in the Journal of Neurology

25  in conjunction with a meeting of the European Neurological

1    Society, one of the largest associations of neurologists in the

2    world.

3              The abstract lists 14 different authors.  And the

4    first listed author is Dr. Kappos.  Dr. O'Neill is also an

5    author.  But it's Section 102(a) prior art on its face because

6    it lists numerous authors besides Dr. O'Neill.  And like the

7    January 2006 press release, the abstract discusses the

8    successful Phase 2 trial of DMF in MS, but it adds more detail.

9              The abstract confirms that the 720-milligram daily

10   dose of DMF was effective.  It also reports that DMF

11   significantly reduces brain lesion activity in a dose-dependent

12   manner as measured by MRI in patients with RRMS over 24 weeks

13   of treatment.  And that's more motivation, Your Honor, for

14   skilled artisans to explore, through a routine optimization,

15   the minimum effective dose.

16             Now, the second piece of 102(a) prior art is the

17   Kappos 2006 slide presentation.  And these are slides that

18   Dr. Kappos -- not Dr. O'Neill, but Dr. Kappos -- presented at

19   the same meeting of European neurologists on May 30th, 2006.

20             And like the abstract, the slide presentation lists

21   14 different authors.  And so it's Section 102(a) prior art on

22   its face.  And the Kappos slides provide even more detail about

23   the Phase 2 trial and its outcome.

24             So, first, in the presentation, Dr. Kappos notes

25   that -- and we see that on the slide here -- "Fumaric acid

1    therapy has shown efficacy in immune disorders, including

2    psoriasis."  He cites the Nieboer 1990 study in which

3    480 milligrams of DMF monotherapy was successfully used to

4    treat psoriasis.

5              He then cites and shows the results of

6    Dr. Schimrigk's study which used 360- and 720-milligram daily

7    doses of DMF, dosed as Fumaderm, to treat MS.

8              So when the Court hears Biogen criticizing the prior

9    art psoriasis studies and criticizing Dr. Schimrigk's MS

10   studies during this trial in the context of litigation, we ask

11   that it remember what Dr. Kappos said about these same studies

12   in 2006 when presenting Biogen's Phase 2 trial results to one

13   of the largest conferences of neurologists in the world.

14             So, Your Honor, this slide reports the Phase 2 study

15   finding on the MRI-based primary end point.  As I've said,

16   patients were randomized to one of four treatment groups, or

17   treatment arms, in the study.  There was a placebo group and

18   groups receiving 120 milligrams QD -- so that's daily -- 120

19   milligrams TID -- so that's three times a day, so

20   360 milligrams per day -- and 240 milligrams TID, again, three

21   times a day, so that's 720 milligrams per day.

22             And the result for the group of patients randomized

23   to the 720-milligrams-per-day treatment group, which we see on

24   the far right in the slide, reached statistical significance on

25   the primary end point.  But according to this slide, the other

1   two DMF groups, 120 milligrams and 360 milligrams, did not.

2          But there's another slide in the Kappos presentation

3   that is critical for understanding these results.  In the slide

4   that we see here on the left, which is from Dr. Kappos's

5   presentation, we see the baseline patient characteristics of

6   the patients in the four arms of the study.

7          And the Court will hear from Dr. Greenberg that one

8   thing on this slide jumps out immediately to a skilled artisan.

9   There was a failure of randomization.

10         At baseline, before they entered the study, patients

11  in the 360-milligram-per-day group had more than three times

12  the number of gadolinium-enhancing lesions on average than the

13  patients in the placebo group.

14         And we see that in Dr. Kappos's slide in the bottom

15  row.  That's what we've got boxed there in the yellow box.  And

16  we've made a bar graph to illustrate the difference, which is

17  there on the right.

18         So the patients in the placebo group -- in the

19  placebo group -- had a mean number of .8 gad-enhancing lesions

20  at baseline when they entered the study.  The patients in the

21  120-milligram group and the 720-milligram groups had a mean

22  number of 1.2 gad-enhancing lesions at baseline.

23         But the patients in the 360-milligram-per-day group

24  had a mean of 2.5 gad-enhancing lesions at baseline.  And the

25  Court will hear that that means that, on average, their MS was

1   more active.  They had a higher level of disease activity

2   coming into the study than did the patients in the other

3   groups.

4          And Dr. Greenberg will explain that current MRI

5   disease activity is predictive of future disease activity.  And

6   this imbalance, Your Honor, is particularly striking because it

7   directly impacts the study's primary end point, which was a

8   gad-enhancing lesion MRI primary end point.

9          Now, the Court will also hear from Dr. Greenberg that

10  skilled artisans, when viewing these results, could easily

11  account for the failure of randomization by making either one

12  of two simple calculations.  And one of those calculations is

13  shown here.  And Dr. Greenberg will go through it.

14         And when the calculations are made, skilled artisans

15  would fully expect that the 360-milligram-per-day dose of DMF

16  also showed efficacy similar to that of the 720-milligram dose

17  in treating MS in the Phase 2 trial.  So the Kappos Phase 2

18  trial is further evidence of the '514 patent's obviousness.

19         Now, at this point, I want to very briefly address

20  Biogen's argument that the Section 102(a) Kappos Phase 2 study

21  references they published within a year of the priority date

22  are not prior art because they are solely the work of

23  Dr. O'Neill.

24         As I mentioned earlier, these references each list

25  many other authors than Dr. O'Neill, most prominently,

1    Dr. Kappos is the first listed author on these publications.

2    And it was Dr. Kappos who made the public presentation at the

3    European Neurological Society meeting in Switzerland.  And

4    because of this, Biogen -- Biogen has the burden of showing

5    that the disclosures in these references are nevertheless

6    Dr. O'Neill's original work and his alone.

7              Biogen cannot make that showing.

8              First, as I'll discuss a bit later, the evidence will

9    show that Dr. O'Neill did not decide which doses would be

10   included in the Phase 2 trial.  Both of his preferred options

11   were rejected by Biogen's clinical trial review board.

12   Biogen's commercial group, not Dr. O'Neill, drove the decision

13   about which doses to include in the Phase 2 study.

14             Second, contemporaneous publications themselves

15   describe the authors' respective roles in the Phase 2 trial

16   and, in particular, the very significant role played by

17   Dr. Kappos, who had the ultimate decision-making authority on

18   whether to submit that study for publication or not.

19             And I want to emphasize, Your Honor, the question

20   here is not -- the question here is not whether Dr. O'Neill

21   conceived of the 480-milligram dose.  There isn't even a

22   480-milligram dose in the Phase 2 study.

23             The question is whether this entire Phase 2 trial is

24   solely Dr. O'Neill's original work rather than the work of

25   Dr. O'Neill and others, like Dr. Kappos.  And Biogen, we think,

1    will be unable to carry its burden to show that the Phase 2

2    study was solely Dr. O'Neill's work.

3                So, Your Honor, having gone through some of the

4    significant prior art, I'd now like to talk about secondary

5    considerations of nonobviousness.  And this is just a summary

6    on this slide of some of the points we'll make when it comes

7    time for us to rebut Biogen's purported evidence of secondary

8    considerations.

9                Now, to attempt to overcome Mylan's strong prima

10   facie showing of obviousness, Biogen argues unexpected results.

11   And, here, the Kappos Phase 2 trial is important for another

12   reason.

13               Biogen's unexpected results argument hinges in large

14   part on the erroneous belief that the 360-milligram-per-day

15   dose of DMF showed no efficacy in the Kappos Phase 2 trial.

16   And based on that premise, Biogen has argued that skilled

17   artisans would not have expected a 480-milligram-per-day dose

18   to show efficacy at all or at least not efficacy comparable to

19   the 720-milligram-day dose in the larger Phase 3 studies that

20   followed.

21               But as we just went over, that's a false premise.  If

22   you account for the much higher mean baseline lesion activity

23   of the patients in the 360-milligram-per-day dosing group in

24   the Phase 2 trial, as skilled artisans would indeed have done,

25   then you see that the 360-milligram-per-day dose and the

1    720-milligram-per-day dose have comparable efficacy.

2           And of course you also have Dr. Schimrigk's study in

3    the prior art and his study results using 360 milligrams and

4    720 milligrams per day of DMF dosed as Fumaderm in MS.  And, in

5    light of that, the fact that the 480-milligram dose showed

6    efficacy comparable to the 720-milligram-a-day dose in the

7    later Phase 3 trials would be expected.

8           Now, importantly, Your Honor, the baseline lesion

9    imbalance and its impact was recognized by skilled artisans.

10   Indeed, it was recognized by Dr. Kappos himself.  In a paper

11   published in 2008 describing the results of the Phase 2 trial.

12          Specifically, Dr. Kappos first notes that the

13   720-milligram-per-day dose had met the primary end point.  Then

14   he goes on.  Patients in the BG-12

15   120-milligrams-three-times-daily groups -- so that's the

16   360-milligram-a-day group -- had a higher baseline

17   gad-enhancing lesion count compared with other treatment

18   groups, which explained the absence of a more pronounced

19   reduction in new gad-enhancing lesions in this group.

20          Now, Your Honor, this paper was published in 2008.

21   It's after the priority date.  And so, because of that, we

22   don't rely on it to show prima facie obviousness.  But it does

23   show how skilled artisans would have interpreted the data

24   presented in the Kappos slides.

25          They would recognize that significant baseline lesion

1    imbalance in the 360-milligram-per-day dosing group, and they

2    would have interpreted it in the same way that Mylan's expert,

3    Dr. Greenberg, does.  And it was published -- this -- Kappos

4    2008 article was published long before the results of either of

5    Biogen's Phase 3 trials of 480 milligrams per day was

6    available.  So those results weren't available when Kappos 2008

7    was published.

8         Dr. Kappos wasn't the only one to publish on the

9    baseline lesion imbalance.  This is a book chapter authored by

10   Drs. Ralf Gold and Robert Fox.  Dr. Gold is one of the

11   clinicians involved in the Kappos Phase 2 study.  And he's a

12   coauthor of the 2006 Kappos abstract and of the 2006 Kappos

13   slide presentation.  And he was also the lead investigator on

14   Biogen's defined Phase 3 clinical trial.

15        Dr. Fox was the lead investigator of Biogen's CONFIRM

16   Phase 3 clinical trial.  And in this chapter, Drs. Fox and Gold

17   note that the 360-milligram-per-day group in the Phase 2 trial

18   had a 76-percent higher mean number of gad-enhancing lesions at

19   baseline, which may have obscured a treatment effect.

20        If the primary outcome is redisplayed as percent

21   reduction from each group's baseline-enhancing lesion activity,

22   a dose response becomes more apparent.  And you see they cite

23   Figure 31.4 for that proposition.

24        And here on this slide we see that figure.  So on the

25   left, we see the baseline lesion imbalance.  Those are the

1   black bars.  And the results without adjusting for the baseline

2   lesion imbalance, those are the gray bars in the box on the

3   right.

4           And then, on the right, Drs. Fox and Gold show the

5   results when you correct for the baseline lesion imbalance by

6   assessing the percent reduction in lesions compared with each

7   group's baseline.  And you see, when you do that, the dose

8   response in the 360-milligram-per-day group.

9           Now, this paper too was published after the priority

10  date.  So we don't rely on it to show obviousness.  But it does

11  show how a skilled artisan would have interpreted the baseline

12  lesion data presented in the Kappos 2006 slides.

13          Now, Biogen has another unexpected results argument.

14  They contend that the magnitude of efficacy that the

15  480-per-milligram-per-day dose displayed in Phase 3 trials on a

16  clinical outcome measures -- not MRI now, but a clinical

17  outcome measure -- annualized relapse rate was unexpected in

18  view of the Phase 2 trial results.  But the evidence will show

19  that Biogen is wrong about that too.

20          According to Biogen, the Phase 2 results would have

21  led skilled artisans to believe that DMF would have efficacy in

22  terms of reducing relapses comparable to other

23  disease-modifying therapies that were on the market at the

24  time, but the Phase 3 trial showed it actually performed better

25  than those therapies in reducing relapses.

1          Well, there are several problems with that theory.

2          The first is that the Phase 2 study was not designed

3   to draw reliable conclusions about annualized relapse rate.

4   The evidence will clearly show that the Phase 2 study was not

5   adequately powered to assess that end point.

6          And we see that in the Kappos slides itself here in

7   the yellow box, "Study was not powered for this end point."

8   That's where they're talking about annualized relapse rate.

9          In fact, according to the Phase 2 study, the lowest

10  dose tested, 120 milligrams per day, showed the greatest

11  percentage reduction in annualized relapse rate compared to

12  placebo.  But Biogen ignores that inconvenient result in

13  claiming that the annualized relapse rate findings in the

14  Kappos Phase 2 study are reliable.

15         Now, second, the Kappos Phase 2 study was a six-month

16  study.  By contrast, the Phase 3 studies on which Biogen relies

17  for their comparison each lasted for two full years and

18  involved far more patients than the Kappos Phase 2 study.

19         And in those studies, annualized relapse rate, or the

20  proportion of patients who had relapse by two years, was the

21  primary end point.  They were statistically powered to assess

22  that end point compared to placebo.

23         Skilled artisans do not draw scientifically reliable

24  conclusions about the expected magnitude of efficacy of a drug

25  by comparing a six-month Phase 2 study that is not powered to

1   assess annualized relapse rate to much longer Phase 3 studies

2   which are designed to do just that.

3          And in any event, Your Honor, any difference between

4   the Phase 2 and 3 trials in terms of annualized relapse rate

5   represents a difference in degree, not a difference in kind as

6   the law requires.

7          In terms of secondary considerations, Biogen also

8   argues a long-felt but unmet need for a safe and effective oral

9   MS treatment.  That argument is insubstantial.  The fact that

10  Biogen's Tecfidera -- that's the brand name for their DMF

11  product -- was the first oral MS treatment to receive FDA

12  approval is not the relevant legal question.

13         The law does not require FDA approval of a drug

14  before it can satisfy a long-felt unmet need.  What matters is

15  that the prior art, including the Schimrigk study and the

16  January 2006 Biogen press release, disclosed the effective and

17  safe treatment of MS with oral DMF.  And under those

18  circumstances, the law, as we see here in the Novartis case,

19  says you can't show a long-felt but unmet need.

20         Let me address commercial success, another secondary

21  consideration, Your Honor.

22         We also expect Biogen to argue that Tecfidera has

23  been a commercial success and that the market performance

24  supposedly supports nonobviousness.  But the evidence will show

25  there are also several flaws with that argument.

1              First, the federal circuit has explained that

2      commercial success carries little weight when the market

3      performance of a product is attributable to monopoly power or

4      other economic coercion or to other factors unrelated to patent

5      validity.  And the Court will hear that this type of market

6      power was present here.

7              Namely, Biogen held intellectual property that

8      disincentivized potential competitors from developing the

9      claimed treatment methods.  Specifically, as of the priority

10     date, Biogen held patent rights covering Tecfidera.  That's the

11     '376 patent that I mentioned at the very outset that was

12     asserted against Mylan in this case but has now expired.

13             And Biogen had applied for the '999 patent in July

14     2002, which ultimately issued with claims that broadly covered

15     DMF formulations for the treatment of MS.  And they acted as a

16     strong disincentive to competition.

17             Now, beyond that threshold issue, Biogen fails to

18     consider other facts that negate the required nexus between

19     Tecfidera's market performance and the asserted claims of the

20     '514 patent.  Biogen fails to consider aspects of Tecfidera

21     that drove marketplace performance but were known in the prior

22     art already or were covered by Biogen's other patents on

23     Tecfidera.  And, therefore, that can't be attributed to the

24     '514 patent.

25             And Biogen minimizes other drivers of Tecfidera

1    sales, such as discounts and allowances and Biogen's extensive

2    marketing and promotion of Tecfidera.  So, as a result, the

3    market performance of Tecfidera cannot provide meaningful

4    evidence of nonobviousness and, certainly, evidence sufficient

5    to outweigh Mylan's strong prima facie showing of obviousness.

6        And, Your Honor, the last one I'll just mention very

7    briefly.  I don't even know if they're going to assert it in

8    this case.  But copying can be a secondary consideration of

9    nonobviousness.  But that is not relevant here.

10       The federal circuit has held that, in the

11   Hatch-Waxman context, including with method-of-treatment

12   patents such as those at issue here, copying is not probative

13   of nonobviousness because a showing of bioequivalence is

14   required of generic drugs to receive FDA approval.

15       Your Honor, I want to turn now to Mylan's written

16   description and enablement defenses.  And these represent

17   additional independent reasons that the '514 patent claims are

18   invalid.  And those defenses are best understood in the context

19   of how the '514 patent came into being.

20       It's an interesting story in and of itself, and it

21   goes a long way to explaining why you can read the '514 patent

22   specification from front to back and find only a single,

23   solitary reference in that entire specification to a

24   480-milligram dose of DMF.

25       The evidence will clearly show that the patent

```
 1   application to which the '514 patent claims priority was never
 2   intended to cover a method of treating MS with a
 3   therapeutically effective 480-milligram dose of DMF.  It was
 4   directed to methods of screening for new drugs.
 5          And that helps explain why it fails to satisfy the
 6   written description and enablement requirements.  Indeed, as
 7   I'll explain, the evidence will show that, for commercial
 8   reasons, Biogen, as opposed to Dr. O'Neill, had little interest
 9   in pursuing a 480-milligram dose of DMF to treat MS and had
10   opted instead to pursue a higher dose of 720 milligrams.
11          And, certainly, Your Honor, if the wealth of prior
12   art that we've been over this morning does not render the '514
13   patent claims obvious, then the scant disclosure in this patent
14   specification does not provide legally adequate written
15   description or enablement.
16          So the history here goes all the way back to when
17   Biogen was planning the Phase 2 study of DMF in MS.  The
18   evidence will show that Biogen was considering four potential
19   dosing regimens for the Phase 2 trial.  And we see them here in
20   a presentation that Dr. O'Neill made to Biogen's clinical trial
21   review board.  Parties sometimes call that the CTRB.
22          Biogen's CTRB had the ultimate authority to review
23   and approve proposed clinical trial designs.  And Dr. O'Neill,
24   one of the inventors, wanted to include a 480-milligram dose of
25   DMF in the Phase 2 trial.  And we see that here in Options 1
```

1    and 2.  Each of those options included a 480-milligram dose.

2    And the evidence will show that Option 1 was Dr. O'Neill's

3    preferred choice.

4          But at the meeting of the CTRB, they rejected

5    Dr. O'Neill's preferred options.  We see that in the CTRB

6    meeting minutes here.  There were different interests within

7    Biogen, research and commercial, with competing agendas for the

8    Phase 2 trial.  And, ultimately, Dr. O'Neill, representing the

9    research group, lost out to Biogen's commercial group.

10          Dr. O'Neill's proposal to include a 480-milligram

11   daily dose in the Phase 2 trial was rejected.  He didn't have

12   the authority to select the doses that went into that trial.

13   That authority lay elsewhere in Biogen.  And so this is how we

14   end up with the doses that go into the Phase 2 trial of 120,

15   360, and 720, but not 480.

16          Why was Dr. O'Neill's preferred choice rejected?

17          The Court will hear at this same time Biogen was

18   pursuing a DMF product for use in treating psoriasis.  And the

19   last thing they wanted was a study showing that a lower dose

20   than 720 milligrams per day of DMF was effective in treating MS

21   because that could undercut the price that they could charge

22   for DMF in psoriasis and in MS.  Biogen knew that higher doses

23   meant higher prices.

24          And here are a couple of documents that the Court

25   will see in evidence in the deposition testimony of one of

1    Biogen's employees.

2             This is an email from John Oram, "your man for

3    commercial," as he describes himself, in January 2004, the

4    month before the CTRB meeting.  In this email he suggests,

5    among other things, testing higher doses in MS.  "Higher dose;

6    higher price."

7             This is an email from September 2005.

8             "The results of the Phase 2 study aren't in yet, but

9    Biogen is starting to think ahead to Phase 3."

10            And this is an email to Dr. O'Neill and others, and

11   you can see everyone still understands the commercial

12   constraint.  720 milligrams is the only viable dose from a

13   commercial perspective.  But they recognize -- they

14   recognize -- that they may have a problem on their hands if the

15   Phase 2 trial results show efficacy at 360 milligrams.  If that

16   happens, regulatory agencies might make them go with the lower

17   dose.

18            So the upshot, Your Honor, is that Biogen's DMF

19   dosing strategy is being driven by commercial concerns.  And we

20   think the evidence will make that clear.

21            Now, let me talk about the Phase 3 trials of DMF in

22   MS.

23            You'll hear from Biogen that they always planned --

24   they always planned to include a 480-milligram dose of DMF in

25   their Phase 3 trials.  We think the evidence will show

1   otherwise.  They excluded that dose from the Phase 2 trial for

2   economic reasons.  They were aiming for a 720-milligram dose in

3   MS because it would mean more profits.

4            Now, they did make plans to include a 480-milligram

5   dose in the Phase 3 trials but only as a contingency.  You'll

6   see that referred to as a contingency plan in the event they

7   came to the conclusion that the FDA would require it.

8            In preparation for Biogen's end-of-Phase-2 meeting

9   with FDA -- and the Court will hear the parties refer to that

10  as the EOP2 meeting -- to discuss Phase 3 studies, Biogen

11  submitted Phase 3 proposals that did not include a

12  480-milligram daily dose.  And we see they asked the FDA here

13  on this slide "Is our dose selection appropriate?"

14           But in response FDA told Biogen that it should

15  consider testing intermediate doses in the Phase 3 study, e.g.,

16  240 milligrams BID.  So that's 480 milligrams a day or

17  120 milligrams three times a day.  FDA noted that such dosing

18  regimens could increase patient compliance and minimize side

19  effects.

20           Nevertheless, at the bottom of the page, we see that

21  in the EOP2 meeting Biogen continued to insist that

22  720 milligrams a day was the best choice for the Phase 3

23  studies.

24           Now, ultimately, Your Honor, Biogen relented.  After

25  its meeting with FDA, it agreed to add a 480-milligram arm to

1   the Phase 3 studies.

2          Now, when the Phase 3 study results come in in 2011

3   and they showed a positive result for the 480-milligram dose,

4   Biogen finds itself in a bit of a bind.  They need a patent

5   application to cover that dose, but they need it to have an

6   earlier priority date than 2011.  They need an earlier date

7   that will, because it's earlier, avoid a lot of the prior art.

8          So what do they do?  They identify a provisional

9   patent application filed back in 2007 that is titled "NRF2

10  Screening Assays and Related Methods and Composition."  It's

11  directed to screening tests to be used to identify new

12  molecules or compounds to treat neurological diseases.  We see

13  that rationale here.

14         Fumaric acid esters, such as DMF, have been proposed

15  for the treatment of MS.  They cite the Schimrigk study for

16  that proposition.  Then it goes on:

17         "The finding that DMF activates the NRF2 pathway in

18  conjunction with the neuroprotective effects of DMF further

19  offers a rationale for identification of structurally and/or

20  mechanistically related molecules that would be expected to be

21  therapeutically effective for the treatment of neurological

22  disorders, such as, e.g., MS."

23         The patent is speaking of screening for new drugs

24  that act in a similar fashion to DMF for the treatment of MS

25  and other neurological diseases.

1          This is the PCT application.  We see original Claim 1

2    here.  It's a method for evaluating neuroprotective properties

3    of a test compound.  Again, the patent is directed to methods

4    for identifying new compounds not using DMF to treat MS.

5          Now, we also see here that, as originally filed, the

6    application names a single inventor, a Biogen employee named

7    Matvey Lukashev.  You'll hear from Dr. Lukashev in this case.

8    He's not a medical doctor.  His job at Biogen was doing drug

9    discovery research and studying DMF's mechanism of action.  He

10   did not have direct involvement with clinical trials.  And this

11   patent application, as initially filed, had no claims to the

12   use of DMF to treat a disease and no claims to any specific

13   amounts of DMF.

14         But in June 2011 the Phase 3 results are out.  And

15   Biogen effectively takes the Lukashev patent application, and

16   they repurpose it.  They give it a new title.  You see that in

17   the bottom box here.  "NRF2 Screening Assays and Related

18   Methods and Compositions" struck out.  New title, "Treatment

19   for Multiple Sclerosis."

20         They add new claims.  You see that here as well.  To

21   a 480-milligram-per-day dose of DMF to treat MS.  And in

22   October 2011 they amend the patent to add Dr. O'Neill for the

23   first time as an inventor.

24         Now, they can't add new material to the specification

25   at this point because, if they do that, they lose the 2007

1     priority date.  So they can amend the claims; they can add an

2     inventor; but they're stuck with the Lukashev specification.

3            Now, Your Honor, we fully acknowledge -- fully

4     acknowledge -- that a single patent can claim multiple

5     inventions and a specification can disclose multiple

6     inventions.  We don't dispute that at all.  But what is also

7     indisputable is that each invention claimed must satisfy the

8     written description and enablement requirements.  And, because

9     the '514 patent specification was never drafted to cover

10    methods of treatment claims using a specific therapeutically

11    effective DMF dose of 480 milligrams per day to treat MS, it

12    has no written description for those claims.

13           Now, again, the Court, I know, is familiar with the

14    law.  So I'll just touch briefly on it.

15           The written description requirement is satisfied only

16    if the inventor conveys with reasonable clarity to those

17    skilled in the art that, as of the filing date sought, he or

18    she was in possession of the invention and demonstrates that by

19    disclosure in the specification of the patent.  That's the Nuvo

20    v. Dr. Reddy's case from the federal circuit last year.

21           And, as the Nuvo case makes clear -- and we think

22    it's an important case, Your Honor, and it's one you will see,

23    I think, quite frequently in the posttrial briefing.  This is

24    particularly true where an inventor expressly claims

25    therapeutic efficacy for a particular pharmaceutical compound

1    as the inventors do here.  You don't necessarily need clinical

2    data or a specific theory explaining efficacy, but here the

3    therapeutic efficacy of the specific 480-milligram dose has to

4    be supported by specific disclosure in the specification, and

5    it's not.

6            One other case, Your Honor, important principle from

7    the federal circuit, "written description requires something

8    more than that which would render a claim obvious."  Another

9    important principle to keep in mind.

10           Now, I said we'd hear from Dr. Lukashev in the case.

11   He'll testify by deposition.  They are not bringing him to

12   testify live.  But he will confirm that the data in the

13   examples in the patent specification do not shed light on

14   whether DMF will be effective in treating MS in humans.

15           Now, I've mentioned before, 480 milligrams appears

16   once in the specification, the entire specification.  There are

17   three examples, four figures, 28 columns of disclosure; and

18   480 milligrams appears once.  That's in Column 18 and in the

19   paragraph that starts at line 52 and runs through 64.

20           And that paragraph contains multiple broad ranges of

21   DMF doses.  It does not mention MS.  And it includes doses like

22   100 milligrams and 200 milligrams per day that skilled artisans

23   would assume could not be intended for the treatment of MS

24   because the prior art suggested they would be ineffective.

25           480 milligrams in the '514 patent specification is

1    nothing more -- nothing more -- than one of seven bookends to

2    four broad ranges with no indication whatsoever that it would

3    be therapeutically effective in the treatment of MS.

4            Now, Your Honor, Biogen knew how to file a patent

5    application adequately describing the use of a 480-milligram

6    dose of DMF to treat MS.  They did so in May 2011 by filing a

7    provisional patent application after they had the results of

8    the Phase 3 trial.

9            And the specification in that application discloses

10   the design of the Phase 3 trial in detail.  It describes the

11   dosing regimens tested.  It includes the trial data.  And it

12   reports the trial results.  It names Katherine Dawson, Gilmore

13   O'Neill, and Alfred Sandrock, another Biogen clinician, as

14   inventors.

15           But Biogen abandoned it, presumably because they

16   wanted an earlier priority date.  So they repurposed the

17   Lukashev compound screening application with its inadequate

18   disclosure of a 480-milligram dose.

19           Now, the enablement issues, Your Honor, largely

20   overlap with written description.  So I'm not going to go into

21   them in any more detail, but for many of the same reasons the

22   '514 patent claims are not enabled.

23           So, fundamentally, Your Honor, our argument is that

24   Biogen's positions are untenable here.  If all the information

25   available to skilled artisans in the prior art related to the

 1    use of DMF to treat MS and the known effective dose range that

 2    includes 480 milligrams is not enough to render the '514 patent

 3    claims obvious, if the therapeutic efficacy of that specific

 4    dose was truly surprising and totally unexpected, then there is

 5    simply no way that this patent specification's skimpy

 6    disclosure demonstrate with reasonable clarity that the

 7    inventors were in possession of a therapeutically effective

 8    method of treating MS with a 480-milligram gram dose of DMF.

 9            I thank the Court for listening to a long opening,

10    and we look forward to presenting the evidence to you.

11            THE COURT:  Thank you very much.

12            I'm sure that Biogen's opening will probably be of

13    equal length.  I suggest we take a 15-minute recess.  I'm also

14    going to see if I can do something about the temperature in

15    this courtroom.  I know it's extremely warm.  I had no idea it

16    would be like this.  We'll see what we can do.

17            So we'll resume at 5 after 11:00, and we'll go

18    straight through and take our noon -- our lunch after you're

19    finished.

20            (Recess taken, 10:58 to 11:08.)

21            THE COURT:  Are things getting better tempwise?

22            MR. MONROE:  Yes.  Thank you, Your Honor.

23            THE COURT:  We can all thank the longtime court

24    security officer here who apparently knows how to do it, get

25    things set.  I think right now we're on air-conditioning.

1          Okay.  Happy to hear from you.

2          MR. MONROE:  Thank you.  May I approach with the

3    demonstratives?

4          THE COURT:  Yes.

5          MR. MONROE:  Good morning, Your Honor.

6          As the Court is aware, patents are presumed valid,

7    and Mylan has the burden of establishing invalidity by clear

8    and convincing evidence.  This, it cannot do.  The issues in

9    this case were not as simple as Mylan presented in its pretrial

10   filings or this morning, and Mylan's depiction of the prior art

11   and the history of events regarding the claimed invention are

12   inaccurate and ignore the significant development efforts led

13   by Dr. O'Neill that ultimately led to the claimed invention

14   and, ultimately, the Biogen Tecfidera product.

15         I would like to focus this morning on certain key

16   issues to help guide the Court in its assessment of the

17   evidence during the course of this trial.  Specifically, Biogen

18   will present testimony and documents establishing that Mylan

19   has failed to meet its burden in at least the following ways,

20   which are identified on Slide 2, Your Honor.

21         With respect to nonobviousness, the claimed invention

22   is not prima facie obvious in view of the alleged prior art

23   because, as you heard, Your Honor, there's a dispute about

24   certain items being prior art.

25         With respect to that, the materials that Mylan points

1   to include publications of Biogen's Phase 2 study that

2   represent Dr. O'Neill's own work and thus cannot constitute

3   prior art for purposes of an invalidity challenge to the

4   patent.

5            Moreover, Dr. O'Neill's claimed invention of using

6   480 milligrams per day of DMF to treat MS exhibited an

7   unexpected magnitude of efficacy rendering the claimed method

8   nonobvious on this basis alone.  Indeed, unexpected results is

9   a cornerstone of nonobviousness.

10           And, finally, Mylan's baseline imbalance argument is

11  scientifically invalid -- and you'll hear testimony about this,

12  Your Honor -- and it cannot be used to rewrite the conclusions

13  specifically taught in the references that Mylan relies on.

14           With respect to Mylan's challenges based on 35 U.S.C.

15  112, the evidence and document will show -- evidence and

16  documents produced in this trial will show that the '514 patent

17  describes and enables the claimed invention.

18           Now, I'd like to turn briefly to the claims at issue.

19  You saw these earlier, Your Honor.  The '514 patent contains

20  several claims, both independent and dependent claims.  For

21  today's discussion, I will focus on Independent Claim 15 and

22  Dependent Claim 16.  And, as shown on Slide 3, Independent

23  Claim 15 is directed to a method of treating a subject in need

24  of treatment for multiple sclerosis comprising orally

25  administering dimethyl fumarate in an amount of about

1    480 milligrams per day.

2              Now, Your Honor, I have highlighted certain terms of

3    the claim in order to prepare us for the discussion regarding

4    written description because we have -- as we go through the

5    patent to show that the patent provides written description,

6    it's helpful to be able to see how all of the elements are --

7    exist throughout the patent.

8              As for Claim 16, Dependent Claim 16, that is a

9    dependent claim that provides the dimethyl fumarate is

10   administered in two equal doses.

11             Now, these claims read directly on Biogen's Tecfidera

12   product, and I don't believe there is any dispute about that.

13   Tecfidera is Biogen's disease-modifying therapy that has

14   changed the lives of thousands and thousands of patients.  This

15   therapy involves taking a specific amount of the compound

16   dimethyl fumarate, namely 480 milligrams per day, in two equal

17   doses of about 240 milligrams.

18             Now, Tecfidera was approved by the FDA on March 27th,

19   2013, and is now the most prescribed oral disease-modifying

20   therapy for MS.  This therapy has been so successful that it

21   overtook the market for oral MS treatments when it entered the

22   market and has maintained that position ever since.

23             For example, as shown on Slide 5, Tecfidera became

24   the most prescribed oral therapy for relapsing forms of

25   multiple sclerosis six months after its launch.  To be clear,

1    and to assist the Court, because the green line represents

2    Tecfidera sales once it launched, and the other two lines

3    represent the competitive products, Gilenya and Aubagio.  And,

4    as you can see, as soon as Tecfidera launched, one of those

5    products dropped significantly in the market; the other product

6    never really made much of an impact into the market.

7            Now, Tecfidera's success has, in turn, attracted the

8    attention of an unusually large number of generics.  We were at

9    25 plus.  Your Honor, this case only involves one of them,

10   Mylan.  And they're all attempting to take the benefit of

11   Biogen's discovery.

12           As you hear the evidence, it is important to keep in

13   mind one of the several reasons Tecfidera has been so

14   successful; namely, MS is a highly complex disease and is

15   difficult to treat.  And we heard about some of those issues

16   this morning, and we agree with some of the representations

17   regarding the difficulty of treating MS and how bad it is for

18   patients.  And on Slide 6 we've tried to highlight why this is

19   such a difficult disease to treat.

20           The pathology of MS is highly complex and poorly

21   understood even today.  We have therapies, disease-modifying

22   therapies, but we still don't really know what is causing it

23   and how to cure it.  We can simply treat it.

24           In addition, MS worsens over time, and it's

25   devastating and irreversible.  That's particularly important,

 1  Your Honor, because, with respect to MS, once you have damage,

 2  it doesn't go away.  It exists.  It stays.  The sort of items

 3  that opposing counsel is referencing continue to be

 4  debilitating impacts on the patient.

 5          In addition, MS patients go into various relapse and

 6  remissions.  And, therefore, you don't always know what

 7  condition they're in, and it can be sort of an invisible

 8  disease.  If you were tested during a remission, you wouldn't

 9  know the state of their MS.  In addition, disease progression

10  varies considerably among patients.  And, as I note, it could

11  be invisible when you're doing testing.

12          For all of these reasons, it's very important that

13  you have a long-term therapy that shows effectiveness over a

14  large number of patients.  Tecfidera, the commercial embodiment

15  of Dr. O'Neill's invention claimed in the '514 patent, has

16  satisfied that need.

17          I would now like to turn to Mylan's obviousness

18  allegations, which fail for many reasons.  For example, they do

19  not reflect how the skilled artisan would have viewed the prior

20  art in 2007 at the time of the filing of the patent application

21  that led to the '514 patent.  Indeed, Mylan has stretched so

22  far to find some basis for its position, but it has taken the

23  extreme step of rewriting the unambiguous teachings of the

24  primary references that it relies upon instead of going with

25  those express teachings.

1          In addition, Mylan's rewriting of history based on --

2    is based entirely on hindsight and, similarly, that hindsight

3    has affected the combinations of references that Mylan has put

4    forth in support of its positions.  The law is very clear that

5    type of hindsight approach to obviousness is legally improper.

6          Finally, as Mylan noted, Biogen will present evidence

7    during trial that serves as substantial objective indicia of

8    the nonobviousness of the claimed invention.  This includes

9    evidence regarding unexpected results, long-felt need that's

10   been now met, copying, and commercial success.

11         Now, we expect Mylan's invalidity positions to be

12   focused on through hindsight on four general categories of

13   information, and I think that the presentation this morning

14   touched on some of those, but I believe they will present

15   additional evidence during their presentation of their expert.

16         The first, as shown on Slide 8, which I will address

17   in more detail later, includes information regarding Biogen's

18   Phase 2 MS study.  And Mylan sometimes refers to this Phase 2

19   study and these Phase 2 materials as the Kappos abstract, the

20   Kappos presentation, the Kappos slides.

21         For ease of consistency and to avoid any confusion

22   about which documents we're talking about during this trial, we

23   will adopt that moniker of saying "Kappos abstract" or "Kappos

24   presentation," but we vigorously disagree and will present

25   evidence that those are his abstracts and presentations.

1          Dr. Kappos is the first listed author, but by

2     convention Dr. O'Neill is the last listed author, which puts

3     him as the lead author on the publication.  And we'll present

4     evidence that you will hear, Your Honor, that he actually

5     drafted the materials that are now being characterized as

6     Kappos materials.

7          Because they represent his own work, they could not

8     constitute prior art against his claimed invention under

9     102(a).

10         The second type of art that Mylan points to is the

11     use of Fumaderm, discussed in the article that they referred to

12     as Schimrigk.  Fumaderm, however, is a mixture of four active

13     ingredients and, at most, teaches that one might consider using

14     1290 milligrams per day of those four active ingredients to

15     treat MS.  There is nothing that would lead the skilled artisan

16     to 360 milligrams per day or 720 milligrams per day of DMF

17     alone.  And you'll hear arguments, as you heard arguments

18     already, Your Honor.  They're saying Schimrigk showed some sort

19     of dose range of DMF from 360 to 720.

20         Well, no.  First, it's showing -- it's all about a

21     mixture of components, not about DMF alone.  And you'll hear a

22     lot of evidence about that, Your Honor.

23         Secondly, one skilled in the art would not have had

24     any reasonable expectation of success, which is the standard,

25     that dosing information -- this really is about the dose

```
 1    again -- is that the dosing information for a mixture of four
 2    active ingredients could be extrapolated to dosing for a
 3    different formulation containing only one of those four active
 4    ingredients.
 5           The third category of art shown on Slide 8 relates to
 6    the use of various fumarates to treat psoriasis.  One skilled
 7    in the art, as you will hear, Your Honor, would not have had
 8    any reasonable expectation of success that dosing protocols for
 9    one disease, like psoriasis, would be equally applicable to
10    other diseases, like MS.
11           Finally, the fourth category is an assortment of
12    items that do nothing to address the deficiencies of the first
13    three categories.  Accordingly, for today, I am going to focus
14    on the first three categories of information that you will hear
15    evidence during trial on the others.
16           But before I move on, I would like to point out that
17    all of the art that has been identified by Mylan was considered
18    by the patent office during prosecution of the '514 patent.
19           Now, I'd now like to provide a little more detail
20    regarding the category of material regarding Biogen's Phase 2
21    study.
22           As shown on Slide 10, the Biogen's Phase 2 study had
23    four dosing arms.  One was an inactive dosing arm, the placebo
24    arm -- which I would like to stress, Your Honor, the importance
25    of having a placebo arm when you're doing a clinical trial.
```

1   That placebo arm is used as a comparator for the three active

2   dosing arms in Phase 2.  And those -- as we heard already, Your

3   Honor, those other dosing arms were 120 milligrams per day,

4   360 milligrams per day, and 720 milligrams per day of DMF.

5           Now, one focus of this study was to use MRI to

6   evaluate the reduction of lesions compared to placebo, and

7   another was to evaluate the reduction of the annualized relapse

8   rate compared to placebo.

9           At the end of the study, it was reported that only

10  one dose, the 720-milligram-per-day, had a statistically

11  significant effect.  The 120- and 360-milligram-per-day doses

12  were reported to not have a statistically significant effect

13  compared to placebo.  There does not appear to be a dispute

14  that the express teaching of the reports that they're relying

15  upon state that only 720 had a statistically significant

16  effect.

17          And to illustrate this point, I'd like to show on

18  Slide 11 certain excerpts from what they refer to as the Kappos

19  presentation.  And these are excerpts showing the results.

20  And, if you look at the excerpt on the left of the slide, Your

21  Honor, that is reporting on the number of new Gd+ lesions,

22  which you've heard about previously, from weeks 12 to 24.  And

23  that was a prespecified primary end point.  So the design was

24  focused on having this be a primary end point for the study.

25          And, as you heard earlier, Your Honor, the column on

1    the left is the placebo.  The column on -- to the next of it,

2    to the right, is 120 milligrams per day.  The column on the

3    right after that is the 360 milligrams per day.  And the last

4    column on the right is the 720-milligrams-per-day dose.  And

5    that's the dose that the authors pointed out, through the

6    bracket that you can see, had a 69 percent reduction in new Gd+

7    lesions.

8          We've also provided additional slides -- excerpts on

9    this slide, Your Honor, showing other end points that were used

10   during the course of this study.  Specifically, the middle

11   slide shows the results for new Gd+ lesions from weeks 4 to

12   24 -- so a different period -- and that was a secondary end

13   point.  And, again, using the bracket on the right, the authors

14   pointed out that only 720 milligrams per day had a

15   statistically significant effect.  And in this case it was

16   44 percent.

17         And then finally the slide on the right identifies

18   the results of another secondary MRI end point, mainly new or

19   newly enlarging T2 lesions.  That's another type of lesion that

20   is important to monitor.  And here it is reported that again

21   the 720-milligram-per-day dose was the only one that showed a

22   statistically significant effect for that end point.

23         Now, as I noted, these are from the -- what's

24   referred to as the Kappos presentation.  And Dr. O'Neill is the

25   lead author on that presentation, and it reflects his work.

1          Now, the summary on Slide 12 that I'd like to direct

2     your attention to, that is an excerpt providing a summary of

3     the results of the Phase 2 study.  And, again, this represents

4     in text the results that I just showed to you graphically.

5          And this highlights the focus that the 69 percent

6     reduction in Gd+ lesions, the 48 percent reduction for new or

7     enlarging T2 lesions, and the 32 percent reduction on

8     annualized relapse rate were things that made BG-12, which was

9     the -- otherwise, Tecfidera, associated with a trend toward

10    reduced -- with a unique profile for purposes of the results of

11    the Phase 2 study.

12         I referred to BG-12 there as Tecfidera, but for

13    clarity for the Court, Your Honor, at the time of the Phase 2

14    study, as we discussed, they were testing 120, 360, 720 of DMF

15    alone.  And BG-12 was the code name used for DMF alone for

16    experimental purposes.

17         Ultimately, as you've already heard, Your Honor, in

18    the Phase 3 trials, the 480-milligram-per-day dose of DMF alone

19    was also called BG-12.  And it's actually the

20    480-milligram-per-day dose that is contained in Tecfidera.

21         Now, notwithstanding the positive results of the

22    720-milligram-per-day testing compared to the other doses,

23    these results were unimpressive compared to existing MS

24    therapies.

25         For example, the Court will be provided with

1   testimony and evidence establishing that the 48 percent

2   reduction of new enlarging T2 lesions, that was the slide that

3   was on the far right of what I just showed you, was lower than

4   approved therapies available at that time.

5           And the 32 percent reduction in relapse rate puts

6   720 milligrams per day of DMF in what the skilled artisan

7   called a low-efficacy category.  Accordingly, although these

8   results were promising, the lackluster performance of the

9   720-milligram-per-day dose would have motivated a skilled

10  artisan to pursue doses higher than the 720-milligram-per-day

11  dose to increase efficacy.

12          This is especially so given that the presentation

13  also reported that the 720-milligram-per-day dose was, quote,

14  generally safe and well tolerated.  And we've provided on

15  Slide 14, Your Honor, additional excerpts from this same

16  presentation which show that the adverse event information with

17  respect to all dosing arms was very similar and unremarkable

18  and led the authors to conclude, based on the results, that

19  BG-12 was generally safe and well tolerated.

20          And if you look at this slide excerpt that's on the

21  left of Slide 14, we've highlighted with a red box the total

22  number of serious adverse events.  And you can see, looking

23  across those columns, that the 720-milligram-per-day dose is

24  very similar -- well, exactly the same as the

25  360-milligram-per-day dose and very similar to even the

1   placebo.

2          Similarly, on the right side of the slide, Your

3   Honor, we have identified information regarding

4   discontinuations of -- during the course of the study based on

5   adverse events.  And on there, you will see, Your Honor, that

6   the discontinuation numbers for the 360-milligram-per-day and

7   720-milligram-per-day doses were the same and only slightly

8   higher than that for 120 milligrams per day.

9          Accordingly, one skilled in the art seeing the

10  720 milligrams per day had a lackluster efficacy but also was

11  generally well tolerated, a skilled artisan would have been

12  motivated to go higher and look for a more efficacious dose for

13  treating MS.

14         This is because maximizing efficacy is a top priority

15  for MS therapy, for many of the reasons I discussed earlier.

16  And as I just walked through, we believe that the skilled

17  artisan would have targeted going higher than 720 milligrams

18  per day to achieve a higher efficacy given the seriousness of

19  MS.

20         But as I noted earlier, Your Honor, Mylan cannot rely

21  on the reports of Biogen's Phase 2 study results in the first

22  place because these materials represent Dr. O'Neill's own work.

23         I will not go too far into the case law this morning,

24  Your Honor, but I would like to point out, as shown on

25  Slide 17, that the law is clear that, under 35 U.S.C. 102(a),

1    that an inventor's own work published less than one year before

2    patent filing date is not prior art.  And there doesn't seem to

3    be any disagreement on that given what we heard from Mylan this

4    morning.

5            In addition, Dr. O'Neill's own work was published

6    less than one year before the '514 patent's filing date, and

7    therefore it doesn't constitute prior art.  Obviously, Mylan

8    has continued to argue that it is prior art and that it is not

9    the work of Dr. O'Neill, but there doesn't seem to be any

10   dispute that it was published within a year of the filing date

11   of the application, and therefore, if it is his work, it can't

12   be used against him for their invalidity case.

13           I'd like to highlight just some of the evidence that

14   you're going to hear during the course of the trial regarding

15   why this is his work.  Some of it has already been identified

16   to you by Mylan.  In particular, I'd like to show on Slide 18,

17   Your Honor.

18           This is a presentation that Dr. O'Neill provided in

19   February of 2004 in which he laid out various dosing options

20   that he would propose Biogen consider for testing DMF alone for

21   MS.  And in this presentation he provided the four options.

22   And it is correct that the first two, using 480 milligrams per

23   day, were his preferred options because he believed from the

24   very beginning that 480 milligrams per day would be a dose that

25   would be effective.

1           Based on his own insight, based on his own evaluation

2  of confidential information -- and you'll hear about this, Your

3  Honor -- he believed that was a very important dose and,

4  therefore, included it in his top two options.

5           But he also included an option that didn't have it

6  because, for completeness, he included Option 3.  And it's

7  important to note, when you look at Option 3, that it is the

8  Phase 2 study.  It is 120 milligrams, 360, and 720.  So that

9  was Dr. O'Neill proposing that in February of 2004.

10          We've heard discussions about what the FDA may have

11  done or what commercial may have thought about these things.

12  The CTRB may have thought about what should be dosed.  At the

13  end of the day what matters is Dr. O'Neill proposed the 120,

14  360, and 720 dosing protocol that formed the basis of Phase 2.,

15  and therefore that is his work identifying the protocol to be

16  used in Phase 2.

17          Similarly, Dr. O'Neill was responsible for all

18  aspects of the Phase 2 study.  He was responsible from design

19  and execution to analysis and reporting of the results.  He

20  designed the dosing protocols.  And Biogen selected, as we just

21  discussed, Option 3 to move forward into Phase 2.  But then he

22  supervised and directed Biogen's employees and external

23  investigators on execution of Phase 2.

24          In addition, the Phase 2 trial data was unlocked and

25  analyzed by Biogen's statistician under his direction.  And

1    what I mean by that, Your Honor, is this was a blinded study.

2    The external investigators conducting the study had no idea

3    whether they had the placebo or they had the 360 or the 720 or

4    the 120.  And he oversaw, using Biogen's statisticians, the

5    unlocking and analyzing of the data.

6             And the fact that he was the one analyzing the data

7    and reaching conclusions will be shown through evidence

8    regarding how those conclusions were summarized and then

9    transmitted and provided to Dr. Kappos, which -- Mylan always

10   focuses on Dr. Kappos, but if you look, for example, at

11   Slide 20, Your Honor, this shows a comparison of two abstracts.

12            The one on the right is the one that Dr. Kappos was

13   included on that was published in May of 2006.  And this

14   reported on a summary of some of the results of the Phase 2

15   study.

16            And if you look to your left, that is the draft

17   abstract that Dr. O'Neill prepared in January of 2006.  And

18   they are essentially the same.  Dr. O'Neill prepared the

19   summary of the results and then provided it to Dr. Kappos to

20   see if he had any comments, because he was a chief investigator

21   on the study.  And he made insubstantial changes to the

22   abstract before its publication.

23            So the fact that -- if they want to rely on this

24   piece of evidence, not every single aspect of the Phase 2

25   study -- obviously, large clinical trials require a number of

1    people to carry them out.  But if you want to focus on who

2    designed the study, who oversaw it being carried out, and then

3    who analyzed the results and summarized them, this shows it was

4    Dr. O'Neill who summarized those results.  And this piece of

5    prior art contains his work -- his dosing of 120, 360, 720 --

6    and then his conclusions regarding that study.

7            The same analysis applies to the -- what they called

8    the Kappos presentation that we've been talking about.  And

9    this is shown -- an example of this is shown on Slide 21, Your

10   Honor.

11           Here, we have on the right-hand side the summary

12   slide I showed you earlier summarizing some of the key findings

13   from the study.  In particular, the 69 percent reduction in Gd+

14   lesions and the 32 percent reduction in the annualized relapse

15   rate.

16           Well, if you look on your left, Your Honor, that is

17   the presentation that Dr. O'Neill prepared in January and

18   February of 2006 for certain confidential presentations that he

19   gave.  And he then provided -- and you'll hear testimony.  He

20   provided that slide set to Dr. Kappos so Dr. Kappos could give

21   the same presentation at a meeting later in May of 2006.  So

22   the evidence will again establish, if Mylan wants to focus on

23   that presentation, that it was actually Dr. O'Neill who

24   prepared that presentation.

25           Now I'd like to switch to a different topic, Your

1  Honor, which is the unexpected results shown by the Phase 3

2  study.

3  Even if the Kappos materials were prior art, Biogen

4  did the opposite of what one skilled in the art would have

5  done.  Instead of looking to higher doses to obtain better

6  efficacy than the lackluster 720-milligram-per-day dose, Biogen

7  added the 480-milligram-per-day dose.

8  That is because Dr. O'Neill, as I mentioned, his idea

9  from the very beginning was to use 480.  And he always believed

10  that Biogen should ultimately use that in the Phase 3.  To be

11  clear, this was a risky move on Biogen's part, given that 720

12  only had lackluster efficacy and he was going downward.

13  But, in addition, large Phase 3 trials, as you heard,

14  they're very large and they're very expensive and take a very

15  long time to complete.  And this was an especially risky move

16  on Biogen's part given that the additional dose, as I noted,

17  was lower than 720 and closer to the 360 dose that had been

18  established to not be statistically significant for purposes of

19  MS.

20  But Biogen took this risk based on Dr. O'Neill's

21  insight, and doing so paid off.  The Phase 3 results

22  unexpectedly showed that the 480-milligram-per-day dose of DMF

23  was not only efficacious but also had a similar effect to that

24  of the 720-milligram-per-day dose.  And the result of that is

25  now the public and the MS community, they reap the rewards of

1    that insight by Dr. O'Neill such that they're now being treated
2    with the 480-milligram-per-day dose.
3         Now, I'd like to show on Slide 24 an excerpt from a
4    report of the Phase 3 results.  This shows graphically what was
5    such a surprise to everybody when the results came out.  We've
6    added some red underlining and some highlighting just to make
7    it clear, because it's not -- the two lines, the one for twice
8    daily and the one for thrice daily -- in other words, the 480
9    and the 720 -- they're right on top of each other.  Nobody
10   expected that.  That was a very surprising result.
11        And when I say no one, other internal Biogen people
12   were very surprised that that was the result, and also the
13   outside community was very surprised with that result.
14        As to the public perception, you'll hear from
15   Dr. Duddy, who is one of our experts and is an MS expert.  And
16   he will provide you with some background on contemporaneous
17   evidence that he created at the time of the release of the
18   results for the Phase 2 and Phase 3 study.  And so these are
19   contemporaneously created documents before this litigation ever
20   occurred.
21        The chart on the left represents Dr. Duddy's views in
22   September of 2009 after the Phase 2 results were published.
23   And you will see that he has placed BG-12, based on the Phase 2
24   results, in the bottom left quadrant as being a low-efficacy,
25   low-risk drug.

1          But then skip forward a few years.  After the Phase 3

2    results come out, Dr. Duddy recategorized his view with respect

3    to BG-12.  And he put it in the high-efficacy, low-risk

4    quadrant.  And it's the only drug in that quadrant.  And you'll

5    hear more about why he did that during his testimony, Your

6    Honor.

7          Now, given this evidence and the unambiguous

8    teachings of the Phase 2 study, Mylan has turned to the --

9    rewriting history, as I call it, with respect to those results.

10         Specifically, Dr. Greenberg argues that the skilled

11   artisan would have believed that the 360-milligram-per-day dose

12   of DMF was also efficacious despite the express teachings to

13   the contrary.

14         Dr. Greenberg bases this conjecture on the

15   unsupported assertion that the skilled artisan would have been

16   motivated to recalculate the Phase 2 study results due to an

17   alleged imbalance in the Gd+ lesions for the

18   360-milligram-per-day group.  And keep in mind that all was

19   reported at this time were mean values.  They weren't

20   individual patient data, which you need in order to do that

21   sort of calculation.  And you'll hear more about that, Your

22   Honor.

23         But at the end of the day, his argument fails for

24   multiple reasons.

25         First, all of the baseline characteristics in the

1   Biogen Phase 2 study were well balanced.

2           Second, Dr. Greenberg's hindsight recalculation lacks

3   statistical significance and, therefore, is unreliable.

4           Third, Dr. Greenberg alters Biogen's Phase 2 design

5   by disregarding the placebo arm.  Again, the placebo arm is one

6   of the most important elements of the design because you're

7   comparing the effects of your drug to the placebo effect.

8           And, in the same fashion, his redesign ignores the

9   temporary nature of lesions.

10          And if I could direct your attention, Your Honor, to

11  Slide 28, this contains an excerpt again of the Kappos Phase 2

12  results that Mylan characterizes that way.  And this shows that

13  the baseline patient characteristics for all four of the items

14  that were monitored -- the age; relapse history; the disability

15  score, known as EDSS; and the number of Gd+ lesions -- were all

16  well balanced.

17          And Dr. Duddy will testify that one skilled in the

18  art looking at this information would find and believe that the

19  range of baseline Gd+ lesions were unremarkable and typical.

20          Mylan has done some math with respect to how you can

21  multiply one by another.  You can -- that the .8 placebo is a

22  third of the 120 milligrams three times a day, but that's not

23  what the skilled artisan looks at.  The skilled artisan looks

24  at whether this would be a typical variation with respect to

25  baseline lesions.  And you'll hear testimony and see evidence

1    that the skilled artisan would view it that way.

2           And I think corroborating that evidence that you're

3    going to hear, Your Honor, is that nobody identified any

4    imbalance in the baseline Gd+ lesions during the Phase 2 study

5    or before the 480-milligram-per-day was tested in the Phase 3

6    studies.

7           Indeed, if we could point -- go to Slide 29, Your

8    Honor, I would like to point out one of Dr. Greenberg's own

9    publications in 2008 in which he was reporting on the Phase 2

10   results.  And he did not identify any imbalance in the baseline

11   Gd+ lesions.

12          Instead, he called out in particular the

13   720-milligram-per-day dose as being the effective dose in

14   Biogen's Phase 2 study.  And he did not characterize

15   360 milligrams per day as an effective dose.  And he didn't

16   identify, when reporting on the study, any imbalance in

17   baseline Gd+ lesions.

18          It's only now that we're in this trial, in this

19   litigation, that we're hearing from Dr. Greenberg that he now

20   believes, in hindsight, that there was some sort of error in

21   the Kappos reporting.

22          And with respect to that, we heard this morning, Your

23   Honor, a few comments about postfiling publications.  And

24   Mylan's taken the position that those items that they admit are

25   not prior art somehow confirm that 360 milligrams per day

1  likely achieved efficacy.

2           That argument fails because, first, they're not prior

3  art.  They were published after the knowledge of the testing of

4  the 480-milligram-per-day dose and its surprising results.

5  Keep in mind the 2008 article included authors who knew what

6  was being tested in the Phase 3 study and therefore had

7  information that others did not.

8           Second, these references simply hypothesized that

9  small differences in baseline lesions might have had an impact,

10  but this was -- never been proven.  This has never been proven.

11  And they didn't reach that conclusion ultimately.

12           I'd now like to turn to the issue of Fumaderm, Your

13  Honor.  And I think we need to spend just a little bit of time

14  on that issue.

15           Schimrigk is the main reference that Mylan is relying

16  upon if they are not able to rely upon the 102(a) art.  And

17  this was an open-label small study, as they noted, of just ten

18  patients.  And three patients dropped out in the first three

19  weeks, and therefore the study design of this small study

20  cannot be used to reach any conclusions regarding efficacy.

21  And in particular there's no placebo control.  Again, during

22  this small study, the patients could be in remission when they

23  were undergoing examination.

24           In addition, the Schimrigk abstract notes that

25  Schimrigk used Fumaderm.  Fumaderm is a combination of four

1    active ingredients.  And it was approved -- it was a product --

2    just to give you some background, Your Honor, Fumaderm was a

3    product approved for psoriasis treatment in Germany.

4            And if you look at the label for Fumaderm -- and I've

5    shown that on Slide 33, Your Honor -- the label shows that all

6    four components are active components.  It specifically states

7    that all four are active ingredients for treating psoriasis.

8    Obviously, this says nothing about MS.  This is all about

9    treating psoriasis.  And they say all four are active

10   ingredients.

11           Therefore, one skilled in the art who was using

12   Fumaderm would believe that all four were active ingredients

13   for psoriasis.  And they'd have no reason to believe that you

14   could separate out one of those individual components and that

15   it would, on its own, be efficacious.

16           Now, Mylan has argued that Schimrigk somehow admits

17   that it's the -- 720 is the only active ingredient for purposes

18   of -- the testing in his study.  Schimrigk does not say that.

19   Schimrigk does note that 720 had the larger amount of drug in

20   the mixture, but amount does not equal more activity or

21   activity.

22           And it's somewhat misleading, Your Honor, when Mylan

23   will refer to Schimrigk's study and say it used 720 milligrams

24   Fumaderm -- 720 milligrams DMF dosed as Fumaderm.  Schimrigk

25   doesn't say it's dosing DMF for purposes of the study; it's

1    using the mixture, and it's trying to see what results that

2    mixture has.

3            And another aspect of Fumaderm that I think is worth

4    spending a small amount of time on, Your Honor, is that the

5    label for Fumaderm for treating psoriasis specifically tells

6    one to go up to a dose -- daily dose of 1290 milligrams per

7    day.  And that's what Schimrigk used.

8            So Schimrigk did follow the guidance to use

9    1290 milligrams per day of this four-active-ingredient mixture.

10   So one skilled in the art looking at Schimrigk would have had

11   no reason to believe that they should separate out the DMF as

12   an individual component or that they should use lower amounts

13   of that individual component.  And that's really what Mylan's

14   position is.  And there is no support in that in the art that

15   they cite.

16           I would now like to address briefly Mylan's third

17   category of art.  That's the psoriasis art.  Well, as we just

18   talked about, the Fumaderm label and what we know about

19   Fumaderm, it was psoriasis art.  But a skilled artisan would

20   not have believed that one could adopt a particular dosing

21   protocol for one disease like MS merely because that same dose

22   was used for another disease like psoriasis, let alone with any

23   reasonable expectation of success.

24           And I think it's important to note the differences --

25   the significant differences between these two drugs.  Mylan

 1   would suggest that they're just all the same.  There's some --

 2   one little mechanism underlying both that's the same, and

 3   therefore you just know you can treat them the same.

 4          The evidence will establish, one, that they're wrong

 5   on the -- there's just this one underlying mechanism; and, two,

 6   even if they were, that does not inform your decision with

 7   respect to dosing.

 8          And that's because, when you look at these diseases,

 9   they're very different, as shown in Slide 36.  Psoriasis

10   manifests primarily on the skin, whereas MS manifests in the

11   central nervous system.  Those are very different things.  The

12   result of that is the treatment effects, when you're treating

13   psoriasis, can be immediately ascertained.  You know whether

14   you're having an effect.  MS, you don't.  You can only

15   ascertain effectiveness for MS over years of treatment by

16   monitoring things like lesions and symptoms.  You can't just

17   immediately know a drug had an impact.

18          Similarly, psoriasis patients can cycle on and off

19   treatment.  That goes back to lesions for psoriasis on the skin

20   can be temporary, and therefore you see an effect immediately

21   after use of the drug, whereas MS treatment requires

22   continuous, life-long therapy.

23          And that goes back to the point I made earlier, Your

24   Honor, about how sometimes it's an invisible disease and you

25   can't see what's really happening inside the body.  And, on top

1    of that, once the damage occurs, it cannot be undone.  So your

2    goal is to make sure you stop it before it happens or at least

3    diminish it from happening.

4                And, as a result, you can individually titrate

5    patients for psoriasis, but you cannot, do not, and should not

6    individually dose titrate MS therapies.

7                Indeed, this is another reason that one cannot

8    extrapolate dosing from one disease to another.  Indeed, just

9    by way of example -- you'll hear during trial, Your Honor -- is

10   a drug that may work for one disease may make another disease

11   with a similar underlying mechanism even worse.

12               Lenercept is an example of a Th1 inhibitor, and they

13   referred earlier to a Th1 inhibitor.  It actually makes MS

14   worse.  And you'll hear more about that during this trial, Your

15   Honor.

16               Now, Mylan points to a couple of psoriasis

17   publications.  And Biogen's position is that those publications

18   actually teach away from using DMF alone even for psoriasis,

19   let alone using 480 milligrams per day of DMF for treating MS.

20               First and foremost, neither one of them has anything

21   to do with MS.  And for the reasons I discussed, one skilled in

22   the art would not believe you could extrapolate dosing from a

23   psoriasis teaching to another.

24               And, secondly, they specifically provide disclosures

25   about how mixtures of fumarates performed better than DMF used

 1  alone.  And excerpts from those publications are shown on

 2  Slide 37.  For example, Kolbach 1992, it noted that the

 3  Fumaderm-type mixture it was using was significantly superior

 4  to using DMF alone.

 5        But, ultimately, the most important issue is that it

 6  says nothing about MS.  And even if you were to try to apply

 7  the teachings to treating MS, you would have been led to use

 8  the mixtures of Fumaderm of four active ingredients in doses up

 9  to 1290 milligrams per day, similar to the conclusion that the

10  skilled artisan would have reached in looking at the Phase 2

11  study results.

12        Now, we heard this morning certain arguments about,

13  quote, optimization.  I would like to just note that it's not

14  optimization to remove three active ingredients from a

15  four-active-ingredient mixture.  That cannot constitute

16  optimization, to take out the three active ingredients that

17  were in the Schimrigk mixture.

18        It's not optimization to extrapolate one dosing

19  protocol from one disease to another.  That's switching disease

20  categories entirely; that's not optimization.  And it's not

21  optimization to disregard the express teachings of a reference

22  such as the Kappos 2 results and try to recalculate what they

23  specifically tell you the results were.

24        Your Honor, I'd like to touch briefly on one of the

25  additional items that they've mentioned, which is the WO '342

1   publication.  We believe we will hear about that during this

2   case.

3            I think it's important to note that this patent

4   application was the subject of an interference with the '514

5   patent.  The PTAB, the board of the patent office, found that

6   the WO '342 publication "Does not indicate 480 milligrams per

7   day as a therapeutically effective dose" for MS or any other

8   disease.

9            In addition, that then went on appeal to the federal

10  circuit.  And the federal circuit agreed with the patent

11  office, agreed that the '342 publication did not disclose the

12  invention claimed in the '514 patent.  So the federal circuit

13  looked at the '514 patent claimed invention and decided and

14  concluded that the WO '342 patent did not disclose that

15  invention.

16           In addition, the Court, in doing that analysis, noted

17  that "The prior art does not teach the key limitation of the

18  count, the 480-milligram daily dose."

19           So I think it's important to keep in mind that WO

20  '342 does not provide any motivation to test for 180 milligrams

21  per day for MS and let alone with any reasonable expectation of

22  success.  And that issue has already been decided by both the

23  patent office and the federal circuit.

24           I'd now like to turn to Mylan's written description

25  of enablement tags.

 1            First, as a reminder, the law is very clear that the

 2    written description inquiry is whether the specification of a

 3    patent describes the claimed invention such that a person of

 4    ordinary skill in the art would understand that the inventor

 5    was in possession of it at the time of filing.

 6            Again, the focus is on the patent specification and

 7    whether it provides support for what the inventor claimed.  In

 8    this case, each element of the asserted claims of the '514

 9    patent is found and described in the written description of the

10    patent as part of an integrated whole.  And we'll show that to

11    you, Your Honor.

12            This demonstrates that Dr. O'Neill was in possession

13    of the subject matter of the '514 patent claims at the time of

14    filing.  That ends any reasonable inquiry under 35 U.S.C. 112.

15            As to enablement, the proper inquiry is whether one

16    of ordinary skill in the art reading a patent would be able to

17    "make and use the claimed invention without undue

18    experimentation."

19            That is clearly the case here.  And as Mylan's

20    counsel noted, their positions or arguments with respect to

21    enablement are not really any different than their arguments

22    with respect to written description.  And so we will only

23    spend -- I'll only spend a little bit of time on that this

24    morning.

25            But I'd first like to turn to the patent because

1  that's what we're supposed to focus on for the written

2  description analysis, not a lot of other information, which

3  I'll address shortly, Your Honor, that they pointed to.  But

4  you have to look at the patent.

5         Mylan is correct that the '514 patent contains and

6  describes two groups of inventions.  And we've color-coded

7  those.  The purple methods, 1 through 3, represent the

8  screening method that Dr. Lukashev, which Mylan showed you

9  earlier, that he contributed to this patent.  He was not a

10 clinician, and his focus was on the methods of screening for

11 compounds.  And that is what this portion of the patent deals

12 with.

13        Shown in green are the claimed methods of treating

14 neurological diseases.  And those are the parts of the

15 application that Dr. O'Neill contributed to.  That is his

16 invention, is treating neurological diseases.

17        And it's not unusual for patents to contain

18 disclosures for two different inventions.  It's not unusual for

19 the claims to change during the course of prosecution, to focus

20 on one invention or on another.

21        And it's a requirement that, if your claims do

22 change, that the subject matter of your claims changes, you

23 always need to make sure inventorship is correct; and,

24 therefore, you will need to file a correction of inventorship

25 and add an inventor to the claims -- to the patent or remove an

1    inventor if the claims changed such that the inventorship

2    changes.

3            In this case there are three claims, Your Honor, I'm

4    not going to talk about, Claims 17 to 19.  Those are

5    Dr. Lukashev's -- those relate to Dr. Lukashev's aspect of the

6    patent, and therefore he's a proper inventor on this patent

7    because there are claims directed to portions of the

8    description that he contributed to.

9            The other claims are the method of treatment claims,

10   and those are Dr. O'Neill's invention.

11           Now, I'd like to note on Slide 42, right below the

12   disclosure of the five methods, it notes that in some

13   embodiments the neurological disease is MS or another

14   demyelinating neurological disease.  So it's pointing out

15   specifically, and as a preferred neurological disease, that you

16   want to focus on MS or some other demyelinating neurological

17   disease.  So even in this portion of the patent that's talking

18   about the methods, it's directing a skilled artisan in

19   particular to MS.

20           This is not surprising because, if you go to the very

21   beginning of the patent -- and I will note for Your Honor that,

22   when Mylan's counsel pointed to the beginning of the patent,

23   they skipped from paragraph 1 clear down to, like, paragraph 31

24   or 33.  I've forgotten the exact paragraph.  I think it was 31.

25   They left out this portion of the patent which is at the very,

1    very beginning.

2            Here at the very beginning of the patent it says, in

3    the very first substantive paragraph -- and I think this is

4    very important.  The first paragraph is simply procedural

5    history of patent application filings, timeline of filings.

6    The first substantive paragraph says "Provided are certain

7    compounds for treating neurological diseases, including

8    demyelinating neurological diseases, such as, e.g., multiple

9    sclerosis."

10           So the first paragraph of the patent, at its time of

11   filing, said its focus is on treating multiple sclerosis.  And

12   to further establish that, you only have to go to the very next

13   paragraph.

14           The very next paragraph, the patent goes on to

15   further explain multiple sclerosis and what it is, that it's an

16   autoimmune disease, and what its characteristics are, that "the

17   disease is characterized by inflammation in parts of the CNS

18   leading to the loss of the myelin sheathing around the neuronal

19   axons (demyelination), loss of axons, and the eventual death of

20   neurons."

21           For purposes of our discussion this morning, I'm not

22   going to get into what all of those things are other than to

23   say you'll hear testimony and evidence that those are

24   characteristics of MS.  And so the patent is telling you that

25   the preferred focus of our treatment is MS and these are the

1    types of characteristics that we're focused on with respect to

2    MS for treating an MS patient.

3            And then if you go to Method 4 -- remember, there

4    were the five methods that I discussed earlier -- Method 4,

5    which is a method for treating a neurological disease by

6    administering to the subject at least one compound that is

7    structurally similar to DMF or MMF, that's found at the '514

8    patent at Column 3, lines 1 through 4.  And the patent goes on

9    to discuss this method for -- in multiple places.

10            For example, if you look in the callout that's on the

11   left of this slide in the middle, it says "In some embodiments

12   Method 4 comprises administering an amount of at least one

13   neuroprotective compound having a formula" -- and it lists

14   several formulas.  But then it stops and specifically points

15   out and puts in parentheticals EG, DMF, or MMF.

16            So at this point the patent is specifically teaching

17   you that, for the method of treating MS, you should be using

18   DMF or MMF as a preferred way of treating the patient.

19            And I won't get into all of this this morning either,

20   Your Honor, but, as a point of reference, DMF is a compound

21   that, when you administer it to the patient, it very quickly

22   converts to MMF so that what is in the system of the patient

23   that's being -- having the effect is the MMF.  And that is why

24   you'll see the patent is always referred to DMF or MMF to

25   ensure that it captures and protects this unique method of

1    using DMF to treat MS.

2            And if you then go to another portion of the patent,

3    which is shown at column -- shown on the last callout on the

4    left side, again, this is the patent saying that, for the five

5    methods, that neurological disease can also be multiple

6    sclerosis, calling that out again.  But, more importantly, I'd

7    like to direct your attention to the callout on the right side

8    of this, Your Honor, where the Method 4 is being specifically

9    discussed.  The patent specifically tells you again focus on

10   the DMF or MMF and to use a therapeutically effective amount of

11   that DMF or MMF.

12           And, again, right below that, it -- this is why we've

13   used the color-coding, Your Honor.  Right below that in green

14   it's repeating again the same sort of characteristics that are

15   associated with MS and that the focus on using DMF and using a

16   therapeutically effective amount is on trying to impact those

17   characteristics of MS.

18           So then that takes you to the question of what is a

19   therapeutically effective amount?

20           Well, as shown in Slide 45, the '514 patent

21   specifically tells the skilled artisan.  It says "A

22   therapeutically effective dose or therapeutically effective

23   amount is the amount of the compound which results in at least

24   one of prevention or delay of onset or amelioration of symptoms

25   of a neurological disorder in a subject, or an attainment of a

1    desired biological outcome, such as reduced neurodegeneration,

2    e.g., demyelination, axonal loss, and neuronal death."

3              So again, I'm repeating the same words over and over

4    again, Your Honor, but I think it's important to point out that

5    this same language is used throughout the patent as the

6    characteristics of MS and that the therapeutically effective

7    amount that is being taught here is that for treating MS.

8              I would then like to turn to what is meant -- what

9    the patent tells you is meant by the actual amount that you

10   should be using to treat a neurological disease.

11             If you look at Slide 46, this has a callout from the

12   patent, and you'll see in this paragraph that it says for the

13   Method 4 method of using DMF or MMF, that the effective amount

14   can range from at one point from 1 milligram to 50 milligrams

15   based on weight, and there's discussions about that.

16             But what's particularly important is it says "For

17   example, an effective dose of DMF or MMR" -- that was a typo,

18   Your Honor.  Everybody agrees that should have been MMF -- "for

19   an effective dose of DMF or MMF to be administered to a subject

20   orally can be from about .1 gram to 1 gram per day" -- another

21   typo -- "200 milligrams to about 800 milligrams per day," and

22   then the patent puts in parenthetical and specifically directs

23   the skilled artisan to "e.g., from about 240 milligrams to

24   about 720 milligrams per day, or from about 480 milligrams to

25   about 720 milligrams per day, or about 720 milligrams per day."

1          So what you see here is a disclosure of nested ranges

2    where they're saying here's a broad range for neurological

3    diseases, and then it's focusing in onto these nested ranges

4    falling within each other.  And the smallest range, the

5    narrowest range, is 480 to 720, and 480 is the lower dose --

6    the lowest dose of that nested range.

7          This would direct the skilled artisan that the most

8    preferred dose for purposes of the range showed in the 480 to

9    720 milligram range would be 480.  It goes on to mention the

10   720-milligram-per-day dose.

11         Of note, Your Honor, contrary to the repurposing

12   arguments that we've heard today, the application, when it was

13   filed, Biogen was preparing for its Phase 3 studies.  It knew

14   what it was testing; it knew what to describe.  And that's

15   contained in the patent.  And it includes the 480 linked to the

16   720-milligram-per-day dose that had shown efficacy in the

17   Phase 2 trial.  So it was linking Dr. O'Neill's 480 to the 720

18   that showed efficacy in the trials.

19         Now, this represents all of the blaze marks that one

20   looks at for a written description analysis.  The skilled

21   artisan would see that the patent was telling you MS was the

22   preferred disease to be treated, that DMF was the preferred

23   compound to use, and that you should be using 480-milligram per

24   day as the lowest dose of the narrowest range.

25         Now, Mylan has made several arguments this morning

1  about the FDA, about what Biogen commercial people thought, and

2  another -- the other Biogen patent application.  Biogen

3  disputes each of these characterizations of the evidence, and

4  we'll discuss that in trial.

5          But, ultimately, they are all irrelevant to the 112

6  analysis.  As I noted, what's relevant is what does one skilled

7  in the art believe when they read the patent?  Do they believe

8  that the inventor was in possession of what was claimed?  And

9  all of the blaze marks that I just identified to you, Your

10  Honor, lead the skilled artisan to believe that Dr. O'Neill was

11  in possession of 480 milligrams per day of DMF to treat MS.

12          With respect to enablement, again, I don't want to

13  spend too much time on that, but I do think it's important to

14  note, as shown on Slide 47, that the '514 patent also teaches

15  the skilled artisan how to make the formulation to use in the

16  claimed method.

17          Specifically, at Column 19, line 17 to 28, of the

18  patent, the '514 patent directs the skilled artisan to even

19  examples of formulations.  It notes "Examples of some of the

20  formulations containing DMF and/or MMF are given in, e.g., U.S.

21  Patent Numbers 6,509,376, and 6,436,992."

22          So the '514 patent is telling the skilled artisan you

23  can make formulations to use in the claimed methods according

24  to these patents.  We don't even think that disclosure was

25  necessary, that how to make a DMF-only formulation, a skilled

1     artisan would have known how to prepare.  But, even then, the

2     patent is ensuring that the skilled artisan does know how to

3     prepare it.

4              So in conclusion for this morning, Your Honor, we

5     believe that the evidence that we'll present to you will

6     establish that the '514 patent embodied in Tecfidera should be

7     protected.  The 480-milligram-per-day dose is not obvious over

8     the Biogen Phase 2 results, even if they were prior art.  It's

9     not obvious over Schimrigk, a mixture of four active fumarates.

10    It's not obvious in view of the psoriasis art.  And you can't

11    combine all those together through some sort of hindsight

12    approach to try to arrive at the claimed invention.

13             Because the art that they pointed to with respect to

14    102(b) -- just as a reminder, they've admitted that the Kappos

15    materials are 102(a).  The 102(b) art, they're relying upon

16    Schimrigk.  That's their primary reference, and they're trying

17    to combine that with the press release, which said very little

18    at all.  Skilled artisan wouldn't know what exactly the results

19    were in that press release.

20             So their primary reference that says something in it

21    is Schimrigk.  And, therefore, we contend that their

22    obviousness case, with respect to teachings regarding psoriasis

23    and with respect to Fumaderm and mixtures of fumarates, would

24    not render the claims obvious.

25             More importantly, even if there were a prima facie

1     case of obviousness, which there's not based upon the evidence

2     presented, Biogen has shown unexpected results with respect to

3     the 480-milligram-per-day dose, as I noted, Your Honor.  It

4     exhibited an unexpected magnitude of efficacy.  And, in fact,

5     Mylan likes to point to the fact that at one point, based on a

6     much more limited record, in an earlier IPR, the PTO found

7     prima facie case, but they also found unexpected results.

8            We, obviously, disagreed with the prima facie holding

9     based on that limited record before -- in an IPR proceeding;

10    but, ultimately, they concluded that there were unexpected

11    results shown by the 480-milligram-per-day dose.

12           And, finally, we will show that the baseline

13    imbalance argument is scientifically invalid.  With respect to

14    the written description, as I just noted, we believe you'll

15    conclude, after all of the evidence, that the '514 patent

16    describes and enables the claimed method of treating MS.

17           One last item I'd like to note, Your Honor, there was

18    some reference during Mylan's opening argument to how certain

19    documents would, you know, mention other prior uses of

20    fumarates for other types of diseases, and they've tried to put

21    a lot of weight on that as if somehow the authors of those

22    publications were reaching conclusions that they could use the

23    teachings from those to inform their dosing decisions with

24    respect to MS.

25           There's no evidence of that, Your Honor.  But,

1  rather, these are citations about how DMF had been used in

2  mixtures for long-term therapy.  And, therefore, you do know

3  that, with mixtures of fumarates, that you do have safety and

4  tolerability.  And it's reading way too much into those

5  cross-referencing without any evidence in support of that to

6  suggest that somehow those teachings matter to the dosing issue

7  that we have before, Your Honor.

8             With that, Your Honor, I'm done.  Thank you.

9             THE COURT:  Thank you very much.

10            If we recess for lunch now, how will we -- when we

11 resume, how will it go?  You can start with -- okay.

12            MS. BLOODWORTH:  Good morning.  It's Ms. Bloodworth,

13 Shannon Bloodworth, for Mylan.  We'll be calling Dr. Benjamin

14 Greenberg.  And I expect that his direct testimony will be

15 quite lengthy.

16            THE COURT:  The rest of the day?

17            MS. BLOODWORTH:  Probably, yes, Your Honor.  He'll be

18 testifying affirmatively on Mylan's affirmative case in chief,

19 and we'll likely be calling him back to reply on the unexpected

20 results.

21            THE COURT:  I had understood that you would be doing

22 that.

23            So with regard to the schedule, if -- I don't know

24 what arrangements you all may have made for lunch.  Are you

25 having something delivered here, or do you have other

 1    facilities you're going to?

 2              MR. MONROE:  We have sandwiches in the conference

 3    room, Your Honor.

 4              MR. COPLAND:  We have an arrangement made in the bank

 5    building, Your Honor.

 6              THE COURT:  Oh, okay.  You're in the bank building.

 7    Again, I apologize for this.  I wish it could be otherwise.

 8              And then will 1:15 work for the arrangements that you

 9    have?

10              MR. COPLAND:  Yes, Your Honor.

11              THE COURT:  Are you all ready to go until 5:00 today?

12    Is that how you expect to do it?  No problem with that,

13    Mr. Copland?

14              MR. COPLAND:  None, Your Honor.

15              THE COURT:  The court stands in recess until 1:15,

16    and we'll resume with Mylan's case in chief, and the first

17    witness is Dr. Greenberg.

18              Thank you.

19              (Lunch recess taken, 12:16 p.m.)

20              THE COURT:  Thank you.  Please be seated.

21              I'm actually fine with you all submitting a thumb

22    drive of all the admitted exhibits at the end of the case for

23    purposes of the record.  And then I understand you all submit

24    your own exhibits to the federal circuit, right?

25              MR. COPLAND:  Yes.

```
 1                  THE COURT:  Our clerk's office doesn't do that; is
 2      that right?
 3                  MR. COPLAND:  Yes, Your Honor.
 4                  THE COURT:  Okay.  Well, we're prepared to begin with
 5      Mylan's case in chief.  You may call your first witness.
 6                  MR. ANSTAETT:  Your Honor, may I raise one issue?
 7      Because I just want to make sure --
 8                  THE COURT:  I have to find out where we are.  We have
 9      movable chairs here this afternoon.
10                  MR. ANSTAETT:  Your Honor, David Anstaett.  I just
11      want to be crystal-clear on this because I don't want to screw
12      this up again, and I think I share this understanding with
13      opposing counsel.  But that -- and this impacts disclosures
14      we're going to have to start making before we see Your Honor
15      again.
16                  For cross-examination, you mentioned impeachment.  My
17      understanding is the kind of litmus test is, if you're going to
18      use the adverse witness to try to get the document in evidence,
19      that has to be disclosed in advance.  But beyond that --
20                  THE COURT:  This is not a criminal trial where we
21      surprise you on cross-examination with that criminal record
22      that nobody knew you had but we found it.  That's true
23      impeachment.  You don't have to disclose that ahead of time and
24      all that kind of stuff.
25                  If I were going to default, I'd say disclose, both
```

```
 1   sides.  Just get it all out there.  This is not a case about
 2   surprise.
 3              MR. ANSTAETT:  Understood.
 4              MR. FELDSTEIN:  Your Honor, Mark Feldstein for Mylan
 5   [sic].  I also don't want to screw up anything and just also
 6   want to clarify, what was in the pretrial order for
 7   cross-examination was that the parties agree that exhibits to
 8   be used solely for impeachment and/or cross-examination need
 9   not be included on a list of trial exhibits or disclosure in
10   advance of being used at trial.
11              What I understood Your Honor to clarify this morning
12   was, if you're going to try to admit it through the adverse
13   witness, however, is different and the only thing that
14   changes --
15              THE COURT:  Part of your case in chief.
16              MR. FELDSTEIN:  I'm sorry?
17              THE COURT:  It would be part of your case in chief.
18              MR. FELDSTEIN:  So the only thing that needs to be
19   disclosed for cross-examination is things that are going to be
20   admitted adversely.
21              THE COURT:  I'm going to solve this problem for
22   everybody.  That is no longer the operative rule.  The rule
23   from now on is I want everything disclosed.  Anything that you
24   are going to use, for impeachment purposes or otherwise, you
25   disclose to the other side.
```

BENJAMIN GREENBERG - DIRECT

1        MR. ANSTAETT:  That's fine, Your Honor.  And I think

2   we can work with opposing counsel to figure out a schedule for

3   doing that.

4        THE COURT:  Okay.

5        MR. FELDSTEIN:  Thank you, Your Honor.

6        THE COURT:  You have tomorrow to work it out.

7        MR. ANSTAETT:  Understood, Your Honor.  Thank you.

8        THE COURT:  Thank you.

9        MS. BLOODWORTH:  Thank you, Your Honor.  With all

10  that out of the way, may I please call -- Mylan calls

11  Dr. Benjamin Greenberg.

12        THE COURT:  Dr. Greenberg, would you please approach

13  the clerk, who will administer the oath to you before you take

14  the witness stand.  Thank you.

15        THE CLERK:  The witness is Dr. Benjamin Greenberg,

16  G-R-E-E-N-B-E-R-G.

17        BENJAMIN GREENBERG, **DEFENDANT'S WITNESS**, **SWORN**

18                    DIRECT EXAMINATION

19  BY MS. BLOODWORTH:

20  Q.   Good afternoon, Dr. Greenberg.

21  A.   Good afternoon.

22  Q.   Can you please state and spell your name for the record.

23  A.   Benjamin Greenberg.  B-E-N-J-A-M-I-N.  Last name

24  Greenberg, G-R-E-E-N-B-E-R-G.

25  Q.   Have you been retained as an expert witness in this case?

BENJAMIN GREENBERG - DIRECT

1    A.    Yes.

2    Q.    By which party?

3    A.    Mylan.

4    Q.    And what is your area of expertise?

5    A.    I'm a neurologist with a specialty in neuroimmunology.

6    Q.    And could you please briefly describe for the Court your

7    educational background.

8    A.    Certainly.  I got my bachelor of arts in history in 1997

9    at Johns Hopkins University and at the same time received a

10   master's in microbiology and immunology at the Johns Hopkins

11   School of Public Health.

12       I received my medical degree at Baylor College of Medicine

13   in Houston, Texas, and went on to complete an internal medicine

14   internship in Chicago at Rush-Presbyterian-St. Luke's Hospital,

15   followed by my neurology residency at Johns Hopkins Hospital.

16       In 2005 to 2007, I was a postdoctoral research fellow in

17   microbiology and immunology at the school of public health and

18   at the same time joined the faculty of the department of

19   neurology at Johns Hopkins, achieving the rank of assistant

20   professor before transitioning to my current place of

21   employment, the University of Texas, Southwestern, in Dallas,

22   Texas, where I'm currently a professor within the department of

23   neurology.

24   Q.    And what is your current clinical positions at the

25   University of Texas, Southwestern?

BENJAMIN GREENBERG - DIRECT

1   A.   So, currently, clinically I direct the multiple sclerosis

2   center, the transverse myelitis and neuromyelitis optica

3   program, as well as the pediatric multiple sclerosis and

4   neuroimmunology program called the CONQUER program.

5   Q.   Do you have any current -- currently have any

6   administrative roles?

7   A.   I serve as the fellowship director for both the autoimmune

8   neurology and multiple sclerosis program at the university.

9   I'm the section head for the section of neuroimmunology.   I

10  serve as the vice chair of research for the department of

11  neurology and neurotherapeutics, and I direct a center called

12  Neurosciences Translational Research Center, which is part of

13  our Brain Institute.

14  Q.   And do you currently hold any board certifications?

15  A.   I do.   I'm currently certified by the American Board of

16  Psychiatry and Neurology, and I have a separate certification

17  in rare neuroimmunologic disorders.

18  Q.   Do you currently treat patients with multiple sclerosis?

19  A.   I do.

20  Q.   And I'll refer to that often as MS, if it's okay.

21  A.   Fine by me.

22  Q.   And, approximately, how many patients do you treat with

23  MS?

24  A.   On average, around a thousand in a year.

25  Q.   And do you prescribe any medications to your patients with

BENJAMIN GREENBERG - DIRECT

1   MS?

2   A.   I do.

3   Q.   And approximately how many medications do you prescribe?

4   A.   There are different types of medications we use.  The ones

5   that are indicated to treat multiple sclerosis, anywhere from

6   15 to 20 different medications.

7   Q.   Are you a member of any neurology or MS research

8   organizations?

9   A.   I am.  I am currently a fellow in the American Academy of

10   Neurology, a fellow in the American Neurological Association,

11   and I'm a member of the Texas Neurological Society.

12   Q.   Have you served as a -- in an editorial capacity on any

13   journals relating to MS or neurology?

14   A.   I have.  I was a section editor for JAMA Neurology and

15   have been a reviewer for a number of different journals,

16   including the Journal of Immunology and the Multiple Sclerosis

17   Journal.

18   Q.   Have you authored any abstracts that have been presented

19   at scientific meetings?

20   A.   I have.

21   Q.   Approximately how many?

22   A.   At this point probably over 50.

23   Q.   And have you served as a principal investigator for any

24   clinical trials?

25   A.   I have.

BENJAMIN GREENBERG - DIRECT

1    Q.    And what type of clinical trials?

2    A.    Both observational and interventional trials, and amongst

3    the interventional trials these have included Phase 1, Phase 2,

4    and Phase 3 trials.

5    Q.    We're going to hear about these terms a lot today.  So

6    maybe we could just -- could you just briefly describe what a

7    Phase 2 clinical trial generally is?

8    A.    Certainly.  So in the various phases of clinical trials,

9    they each have different goals, different roles to play.  The

10   Phase 2, being the middle of the three phases, is there both to

11   look at the safety of an agent to help define dose ranges that

12   may be useful in treating a disorder and to determine early on,

13   usually in a small cohort over a short period of time, is there

14   enough of an efficacy signal to move forward with regulatory

15   requirements for larger trials.

16   Q.    And then what is a Phase 3 clinical trial generally?

17   A.    Generally, a Phase 3 trial is a much larger trial that's

18   used by regulatory agencies, such as the FDA or the European

19   EMA, to show that an agent is both safe and effective in the

20   population that you're targeting in order to gain regulatory

21   approval for the purposes of marketing a drug within the U.S.

22   or elsewhere in the world.

23   Q.    And if you could turn in your binder to DTX 1636, and

24   we'll also put it up on the screen.

25        Is DTX 1636 an accurate copy of your curriculum vitae?

BENJAMIN GREENBERG - DIRECT

1  A.    It is, at the time of submission.  The only thing that

2  will be updated is I did give two talks last week that aren't

3  on here.  One was in Ireland, and one was in London, neither of

4  which had anything to do with multiple sclerosis.  They were

5  related to a different condition.

6              MS. BLOODWORTH:  Okay.  And, Your Honor I move to

7  admit DTX 1636.

8              MR. FELDSTEIN:  No objection, Your Honor.

9              THE COURT:  I think under the -- we had agreed that,

10  where there was no objection, they would just come in.  So,

11  yes, admitted.

12             But if you don't want to take up the time on it and

13  you know that there's no objection, I'm happy to let it just

14  come in.  You can just say this is without objection.

15             MS. BLOODWORTH:  Thank you, Your Honor.  We disclosed

16  all of the exhibits last night.  So thank you.

17                  (DTX 1636 was admitted.)

18  BY MS. BLOODWORTH:

19  Q.    Now, Dr. Greenberg, you've submitted two expert reports in

20  this case, correct?

21  A.    Yes.

22  Q.    And, generally, what are your -- what are the opinions

23  you're going to be presenting to the Court during your

24  testimony?

25  A.    So today we're going to be talking about two opinions.

BENJAMIN GREENBERG - DIRECT

1   The first has to do with obviousness, and the second relative

2   to no written description or enablement.

3   Q.   And if we -- let's start with your obviousness opinions.

4   Dr. Greenberg, have you set out a pathway for why the asserted

5   claims are obvious?

6   A.   Yes.

7   Q.   Okay.  And what are those pathways?

8   A.   There is a variety, as shown on the screen, looking at

9   prior art before the priority date, including the January 2006

10  press release from Biogen reporting the results of a Phase 2

11  study, as well as an abstract published by Schimrigk in 2004

12  which reported the impact of using dimethyl fumarate in a

13  multiple sclerosis population in a variety of doses and showing

14  efficacy.

15       Beyond that, we look at the Kappos 2006 presentation in

16  combination with the Schimrigk 2004 abstract; the Kappos 2006

17  abstract in combination with the Schimrigk 2004 abstract; the

18  Kappos 2006 abstract along with WO '342; and, ultimately, the

19  Kappos 2006 abstract combined with the clinical trials

20  document, the Joshi '999 patent, and the ICH guidelines.

21  Q.   So we'll get there.  We'll work through those.

22       Can we take a step back and just -- can you describe what

23  is MS, if we can go through a little bit of the background of

24  the disease here.

25       What is MS?

BENJAMIN GREENBERG - DIRECT

1   A.   Certainly.

2        Multiple sclerosis is when two different parts of the body

3   intersect.  And we have to explain each individually.

4        So most of the time multiple sclerosis very appropriately

5   is defined as a neurologic disorder because that's the part of

6   the body that gets damaged.  And the nervous system is what

7   allows your brain to connect to your body and your body to

8   connect to the brain.  And those connections are, as depicted

9   on the screen, these neurons with coated wires.

10       The coating around the wires is called myelin.  And that

11  coating on the wires is very similar to a speaker wire that you

12  would see in a stereo, so connecting a stereo to a speaker

13  where you want to listen to the music.  And you would turn on

14  the power of the stereo and transmit a signal, and you'd hear

15  the music.

16       If you were to fray the insulation of that speaker wire,

17  the music wouldn't sound so good.  The signal wouldn't get

18  through.  And, as depicted here on the screen, in multiple

19  sclerosis, we see damage to that myelin.  We see fraying of the

20  insulation around the wires such that the signal doesn't get

21  through.

22       If that fraying happens to the wire that controls your

23  right hand, you have difficulty controlling your right hand.

24  If it happens to the wire connecting your eye to your brain,

25  you have blurred vision.  So the symptom an individual with

BENJAMIN GREENBERG - DIRECT

1   multiple sclerosis has depends on which wire gets damaged.

2       But critical to our understanding of multiple sclerosis

3   and why we don't just consider it a neurologic disease, we

4   consider it an autoimmune disease, is based in how the damage

5   occurs.  So why does a person with multiple sclerosis get

6   damage to those insulated wires?  And that's where the immune

7   system comes in.

8   Q.   And so what is the immune system?

9   A.   So the immune system represented here graphically in a

10  very basic but fun way is your body's defense system, a variety

11  of cells that are there to combat the ongoing onslaught of

12  viruses and bacteria that try to get into our body every day of

13  the week, every week of the year.

14      And the immune system has evolved over thousands and

15  millions of years to have lots of specialized parts of the

16  immune system to handle all the different types of invaders we

17  might be exposed to.  On some days, it's a virus; on other

18  days, it's a bacteria.  Sometimes it's a parasite; sometimes

19  our immune system is fighting cancer.  So there's been an

20  evolution of that immune system to fight off these different

21  invaders.

22      The best analogy I use for the immune system, when talking

23  with patients or families about it, is to compare it to a herd

24  of cats, strangely enough.  So if you'll indulge me, cats,

25  fascinating animals.  They are genetically engineered to chase

BENJAMIN GREENBERG - DIRECT

1  mice, chase bugs.  So if you have a cat, and a mouse enters

2  your home, odds are the cat is going to eat or chase away the

3  mouse.

4      And hundreds of years ago, before we had Orkin and

5  pest-control companies, we domesticated a house and called it a

6  house cat.  And that cat was there to walk around our home all

7  day long and protect us from foreign invaders.

8      Fast forward to the 21st century, and sometimes a few of

9  our domesticated cats can get confused and think the drapes or

10  the power cords or the sofa looks like a mouse tail and, by

11  mistake, chew on the home that it's supposed to be defending.

12      That same event can happen within the immune system.

13  Sometimes a breed of cat, Siamese, can get confused about

14  something in the house and be convinced it looks like a virus

15  or bacteria and chew on that target, causing damage.  And

16  that's the definition of autoimmunity, a immune system -- a

17  part of an immune system that thinks it's doing its job but has

18  the wrong target.

19      And when we take all autoimmune diseases and we put them

20  together, immunologically, we separate them by two features:

21  which breed of cat gets confused, and what are they confused

22  about.

23      So if you have a certain breed of cat confused about one

24  part of the house, that's one autoimmune disease.  If that same

25  breed of cat is confused about a different room in the house,

BENJAMIN GREENBERG - DIRECT

1    we classify it differently, but it's still the same part of the

2    immune system that's getting confused.

3        And so when we talk about treating autoimmunity, we focus

4    on which part of the immune system has gotten confused to a

5    significant degree as much or more than what are they confused

6    about.

7    Q.    And so what causes the confusion in MS?

8    A.    So we have a lot of theories as to what triggers the

9    confusion, but we have a lot of data over time to suggest which

10   breed of cat has gotten confused.

11       And as we've heard about, multiple sclerosis is a

12   complicated condition, and I 100 percent agree.  So if I take

13   the population of multiple sclerosis patients as the million or

14   so in the United States with multiple sclerosis, there's

15   multiple different probable types of MS, meaning, for a lot of

16   the patients, it may be the Siamese cat.  And for another

17   group, smaller group, it might be the tabby cat.

18       So there are lots of ways to get to the end organ damage.

19   But over the decades, a wealth of data was generated to suggest

20   that a large part of the population had a derangement in a

21   certain breed, a certain type of cat.  And that captured the

22   attention of most of the field for over 20 years.  And that's

23   depicted here on this slide which is Slide Number 10.

24       And it was referenced in the opening, this notion of Th1

25   and Th2 cells.  So a T cell is a cat that can have multiple

BENJAMIN GREENBERG - DIRECT

1   different breeds.  And depending on the environment it lives in

2   and what it's being asked to do, it can differentiate into a

3   Th1 or Th2 cell.  And they have different properties, and they

4   fight off different infections.

5       In the setting of autoimmunity, in some conditions, it's

6   the Th1 population of cells that expands and ultimately leads

7   to the damage.  And that's what we've found in multiple

8   sclerosis and psoriasis.

9       So while the cats of multiple sclerosis are confused about

10  the brain and spinal cord -- and in psoriasis, they're confused

11  about the skin -- it's the same breed of cat that ultimately

12  needs to be controlled.

13      And the way you control it -- and what was found through

14  scientific studies as well as clinical trials -- was that, if

15  you could expose individuals with these diseases to medications

16  that would shift the cats from that Th1 aggressive immune cell

17  into a Th2 profile, you would essentially put the patient into

18  remission.

19  Q.   So does it matter what organ is being targeted in the

20  immunomodulation?

21  A.   So we always pay attention to what organ is being targeted

22  around designing clinical trials and looking at outcome

23  measures.  But when we're talking about modulating an immune

24  system that is flowing through our blood, whether the confused

25  cat is going to wind up in the brain or the skin, it still

BENJAMIN GREENBERG - DIRECT

1    needs to be retrained.

2         So we group them, from a therapeutic perspective, based on

3    which arm of the immune system is confused more so than what

4    the end organ target of that confusion is.

5    Q.   And you had mentioned remission in Slide 10.  I'm used to

6    hearing that in the context of cancer.

7         What does that mean in MS?

8    A.   So remission, as you state in the context of cancer, is

9    defined when we have no further evidence of cancer cells.   In

10   multiple sclerosis, we don't have the same type of testing that

11   we have in cancer or other diseases like diabetes or

12   hypertension.

13        So remission is defined by a lack of new relapses or using

14   a surrogate measure that we've developed over time, and that's

15   the MRI.  So we look for evidence that an intervention leads to

16   an improvement in these features.

17   Q.   And what tools do clinicians use to get patients into

18   remission?

19   A.   So these tools are globally defined as disease-modifying

20   therapies.  You'll sometimes, if it gets late today and I'm

21   going too fast, I may say DMT.  It stands for disease-modifying

22   therapy.  And that's to distinguish the interventions that are

23   targeting the immune system and inducing remission from other

24   medications I might prescribe to treat symptoms of an MS

25   patient.

BENJAMIN GREENBERG - DIRECT

1  Q.   How do you know whether secondary prevention measures are

2  working?

3  A.   So in multiple sclerosis, as in all conditions where we

4  use a disease-modifying therapy to prevent a future outcome,

5  which is this notion of secondary prevention, much like in a

6  diabetic if I want to prevent a heart attack or a stroke, I

7  manage their blood sugar.  So by managing their blood sugar, I

8  am preventing a secondary outcome.  In multiple sclerosis, by

9  managing the immune system, I am preventing relapses or

10  disability.

11       And so when we're talking about secondary prevention, we

12  have to recognize we use surrogates along the way to predict

13  that ultimate outcome.  So in the example of multiple

14  sclerosis, the surrogate that we use is MRI activity.  Does

15  preventing activity on an MRI have any direct benefit to a

16  patient?

17       That actually hasn't been proven in the moment.  You can

18  have asymptomatic lesions on MRI.  But we know, by changing the

19  MRI, we are going to prevent downstream ultimate disability or

20  symptoms in the future.  And so, similar to other conditions,

21  that's the goal of a disease-modifying therapy.

22  Q.   And who does MS affect?

23  A.   So the most common individual demographically who would be

24  affected by multiple sclerosis is usually young women.  So it's

25  about 3 to 1 women to men, and the average age of diagnosis is

BENJAMIN GREENBERG - DIRECT

1   about 30 years of age.

2   Q.   Thank you.  Now, let's turn to your obviousness opinions

3   in this case.

4   A.   And I forgot to mention, as we were talking about the

5   Th1/Th2 pathway, it's just worth noting -- and I spoke to

6   this -- that the activation of the T cell in autoimmunity, as

7   I'm pointing on Slide 11, happens in the periphery.  And then,

8   once activated, that confused cell crosses over into the

9   central nervous system to cause the damage.

10       I could just as easily swap out "central nervous system"

11  to "skin" to represent psoriasis.  But the immune system and

12  the activation is living in the blood and flowing to the end

13  organ that's going to be targeted.

14  Q.   Thank you.

15       Dr. Greenberg, in creating your obviousness opinions, did

16  you define what a person of ordinary skill in the art is?

17  A.   Yes.

18  Q.   And what is your definition of a person of ordinary skill

19  in the art?

20  A.   And it's worth noting at the outset, my understanding is

21  there were different definitions between Mylan and Biogen.  And

22  this has been the accepted, which I agree with, that you hold

23  at least a medical degree, at least three years of training in

24  neurology, and at least three years of clinical experience

25  treating multiple sclerosis patients.

BENJAMIN GREENBERG - DIRECT

1  Q.   Do your opinions differ whether you used one definition or

2  the other in the case?

3  A.   No.

4  Q.   Did you consider the level of ordinary skill in the art

5  from a particular time period?

6  A.   Yes.

7  Q.   And was that around February 8, 2007?

8  A.   Yes.

9  Q.   And do you understand what factors are considered when

10  evaluating obviousness?

11  A.   Yes.

12  Q.   And what are they?

13  A.   You have to consider the scope and content of the prior

14  art, what's available prior to that important date, the

15  difference between the claimed invention in the prior art to

16  see if there is something uniquely different between what's in

17  the patent versus what's in the prior art, the level of

18  ordinary skill in the art, and then secondary considerations of

19  nonobviousness.

20  Q.   And we're going to hold on the secondary considerations of

21  nonobviousness for today.

22      Do you understand that obviousness must be found here by

23  clear and convincing evidence?

24  A.   Yes.

25  Q.   And did you use this standard when assessing the

BENJAMIN GREENBERG - DIRECT

1  invalidity of the asserted '514 patents?

2  A.   Yes.

3  Q.   Let's turn to the asserted claims if we can.

4       Are you aware that the asserted claims in this case are

5  Claims 1 through 4, 6, 8 through 13, 15, and 16 of the '514

6  patent?

7  A.   Yes.

8  Q.   Okay.  And looking at representative independent Claim 15

9  on Slide 14, what elements does it require?

10 A.   So this claim requires a treatment for multiple sclerosis

11 with a therapeutically effective amount of dimethyl fumarate in

12 a dose of about 480 milligrams per day.

13 Q.   And have you prepared a slide of the representative

14 dependent claims in this case?

15 A.   Yes.

16 Q.   And turning to Slide DDX 1100.15, what are those

17 additional representative dependent claims?

18 A.   As listed here, Number 2 indicated specifically a tablet,

19 a suspension, or a capsule.

20      Dependent Claim 3 specified separate administrations of

21 two, three, four, or six equal doses.

22      Dependent Claim 4 specified separate administrations of

23 two equal doses.

24      And dependent Claim 8 specified administered to the

25 subject for at least 12 weeks.

BENJAMIN GREENBERG - DIRECT

1   Q.   Is two equal doses often referred to as BID dosing?

2   A.   Yes.

3   Q.   And did you create a slide summarizing your opinions?

4   A.   Yes.

5   Q.   And let's turn to Slide 16.  What is your opinion about

6   whether or not the '514 patent asserted claims are obvious?

7   A.   So, first, I think it's important to note that DMF,

8   dimethyl fumarate, was known in the prior art to treat multiple

9   sclerosis.  There had been two different studies published in

10  the prior art showing that it was an effective therapy for

11  multiple sclerosis, the disease that we're specifically

12  targeting here.

13       Furthermore, those prior arts indicated that a dose range

14  between 360 milligrams and 720 milligrams was effective.

15       Thirdly, in that analogous autoimmune disease with the

16  same type of confused-cat psoriasis, there had been studies

17  showing specifically 480 milligrams of dimethyl fumarate a day

18  could shift those cats and lead to a clinical benefit in those

19  patients with psoriasis.

20       Fourthly, the prior art taught that three-times-a-day

21  dosing, sometimes called TID dosing, was not necessary to

22  maintain efficacy, thus an artisan would be free to use BID or

23  twice-daily dosing.

24       And, finally, a person skilled in the arts would be

25  motivated and would have a reasonable expectation of success in

BENJAMIN GREENBERG - DIRECT

1   treating multiple sclerosis patients with 480 milligrams a day

2   of dimethyl fumarate.

3   Q.   So let's start going through the background of the art.

4        You stated that the DMF was already known to treat MS and

5   that was disclosed in the art.  On what references did you rely

6   on for that opinion?

7   A.   So the first reference, as shown here on Slide 17, is a

8   January 2006 press release which came from Biogen Idec

9   announcing the results of a Phase 2 trial using dimethyl

10  fumarate to treat multiple sclerosis.

11  Q.   And we'll hear more about that trial a little bit later,

12  but were there any other references that were known in the art

13  that taught the treatment of dimethyl fumarate for treating MS?

14  A.   Yes.

15  Q.   And what were those?

16  A.   So the next piece of art that was available would be the

17  '376 patent, shown here on the Slide 18.

18  Q.   And that's DTX 1000 for the record.

19       And what did the '376 patent teach a skilled artisan about

20  whether DMF was known for treating multiple sclerosis?

21  A.   So, as outlined here, it indicated that one or more

22  diethyl fumarates could be used for the therapy of autoimmune

23  diseases such as -- and it included multiple sclerosis and

24  specifically indicated dimethyl fumarate as an agent.

25  Q.   And when was the '376 patent filed?

BENJAMIN GREENBERG - DIRECT

1   A.   The date of the patent is January of 2003, with a filing

2   much smaller on my screen, but --

3   Q.   Let me see if we can make that bigger.

4   A.   -- I'm happy to see it larger.

5        It looks like October 29th, 1999.

6   Q.   Great.  And you mentioned that it issued in January 21st,

7   2003.  What did the '376 patent claim?

8   A.   So the '376 patent claimed that you could use a

9   preparation of dimethyl fumarate to treat autoimmune diseases

10  such as multiple sclerosis.

11  Q.   So what did the '376 patent generally teach the skilled

12  artisan as of the priority date of the '514 patent?

13  A.   So the '376 patent teaches a skilled artisan that this

14  agent could be used to shift autoimmune diseases, linking -- it

15  goes on to link -- psoriasis and multiple sclerosis in the same

16  list, indicating it would effectively treat individuals with

17  these types of autoimmune diseases.

18  Q.   Did the '376 patent also teach that the pharmaceutical

19  preparations could be either a tablet or a capsule and include

20  excipients?

21  A.   Yes.

22  Q.   And is there any other references you relied upon for your

23  opinion that DMF was already known to treat multiple sclerosis

24  in the prior art?

25  A.   Yes.

BENJAMIN GREENBERG - DIRECT

1   Q.   And what is that reference?

2   A.   So the next reference would be the '999 patent.  I

3   sometimes refer to it as the Joshi '999 patent.

4   Q.   And that is DTX 1001 for the record.

5        And did you review the 999 patent as a prior art reference

6   in this case?

7   A.   Yes.  The filing date was July 17th, 2002.

8   Q.   And what was the number of the patent application?

9   A.   The patent application was 10,107,077.  That was the

10  original filing.  And the one we're referring to here is

11  7,320,999.

12  Q.   And do you know when the patent published, the PCT

13  application published?

14  A.   So the publication date, the date of patent listed here is

15  January 22nd -- oh, excuse me.  We may need to blow it up.

16  Q.   It's in the upper left.

17  A.   So we have a filing date, and then --

18  Q.   And I was asking about the prior publication date.  Do you

19  know when --

20  A.   Listed here as January 23, 2003.

21  Q.   And when did the '999 patent issue?

22  A.   As listed there, January 22nd, 2008.

23  Q.   And if we could look at Claim 1 of the DTX 1001 patent.

24  What does it claim?

25  A.   So I think we'll put it up on the screen.

BENJAMIN GREENBERG - DIRECT

1   Q.   It's page 7, Column 8.

2   A.   So the '999 patent claims in Claim 1, "A method of

3   treating multiple sclerosis using a pharmaceutical preparation

4   effective for treating said multiple sclerosis wherein the only

5   active ingredient for the treatment of multiple sclerosis is

6   dimethyl fumarate."

7   Q.   Is the claim limited to any specific formulation of

8   dimethyl fumarate?

9   A.   No.

10  Q.   And what did the '999 patent generally teach the skilled

11  artisan as of the priority date of the '514 patent?

12  A.   So this teaches the artisan that dimethyl fumarate as a

13  monotherapy could be used to treat multiple sclerosis.

14  Q.   And so if we can turn back to the slides, on Slide 20

15  we're going to look at the '514 patent again.

16       And so we've gone over the treatment of dimethyl fumarate

17  for multiple sclerosis.  And let's focus on the remaining

18  element, which is the 480-milligram dosing.

19       Did you make a demonstrative to give an overview of the

20  prior art?

21  A.   Yes.

22  Q.   And turning then to Slide 22, what does Slide 22 show?

23  A.   So Slide 22 is a timeline.  It places the February 8th,

24  2007, critical date on the far right.  And then it shows

25  publications that go back approximately 17 years relative to

1    dimethyl fumarate and autoimmune diseases and dosing.

2    Q.    And we talked about, on the upper right-hand corner, the

3    January 2006 press release.

4    A.    Yes.

5    Q.    Which that was the announcement of the Phase 2 clinical

6    trial using DMF for treating multiple sclerosis?

7    A.    It was the announcement of the results of that trial, yes.

8    Q.    And that was DTX 1136 for the record.

9         And so let's look at the far left-hand corner and go back

10   to 1990.  What did the Nieboer -- what is the Nieboer 1990

11   reference?

12   A.    So the Nieboer 1990 reference is to a published paper

13   entitled "Fumaric Acid Therapy in Psoriasis:  A

14   double-Blind Comparison Between Fumaric Acid Compound

15   Therapy and Monotherapy with Dimethylfumaric Acid Ester."

16        It was published by Nieboer and colleagues in the journal

17   Dermatologica in 1990.

18   Q.    For the record it's JTX 2179.

19        What does the Nieboer 1990 reference teach a skilled

20   artisan?

21   A.    So there are several important things that come out of the

22   Nieboer 1990 article.  The first, as was discussed earlier

23   today, there is this notion of Fumaderm, which is a medication

24   that's approved in Germany for psoriasis that is listed to have

25   four active agents.  There's been some discussion on how this

BENJAMIN GREENBERG - DIRECT

1  is different, if at all, from one of those four agents,

2  dimethyl fumarate.

3      And Nieboer and colleagues in 1990, in a study of

4  approximately 45 patients with psoriasis, set out to compare

5  this notion of whether or not dimethyl fumarate was the active

6  agent from an immunologic point of view relative to this

7  autoimmune disease.

8      And so they took patients and they were separated into two

9  groups:  one who received dosing of dimethyl fumarate as a

10  monotherapy and one group who received essentially Fumaderm,

11  which is labeled as FAC.

12      And they looked to see if there was efficacy and safety of

13  these agents and to ask the question what dose would work and

14  was there actually a difference between DMF as a monotherapy or

15  when it's combined with the three other agents in the Fumaderm

16  label.

17  Q.  And what did the Nieboer 1990 reference conclude about

18  whether or not DMF monotherapy -- about the activity of DMF

19  monotherapy with the Fumaderm combination?

20  A.  So what they concluded in this clinical trial was that

21  dimethyl fumarate was the active agent; that, immunologically,

22  the efficacy that patients experienced was being dictated by

23  how much dimethyl fumarate they were exposed to and not how

24  much Fumaderm as a whole they were exposed to.

25  Q.  And where in the Nieboer 1990 reference do you point to

BENJAMIN GREENBERG - DIRECT

1   for that conclusion?

2   A.   So if you turn to Slide 24, DDX 1124, what you see is a

3   paragraph that talks about the conclusions.  And this has led

4   to some concern about the labeling.  But in the end what they

5   say in the abstract and later is that 480 milligrams of DMF

6   given as 240 milligrams twice a day was effective for treating

7   psoriasis.

8   Q.   And just so the record's clear, I think you might have had

9   a little mistake in the slide numbers.

10       So Slide 23 is the Nieboer 1990 reference?

11  A.   Slide 23.  Excuse me.

12  Q.   That's okay.

13       And, again, the conclusion was that --

14  A.   That 480 milligrams a day was effective.

15  Q.   And how frequently was the DMF dosed in that study?

16  A.   So it was dosed in two equal doses, BID dosing of

17  240 milligrams in each dose.

18  Q.   So now we've mentioned Fumaderm.  And can you explain

19  again, what is Fumaderm and how does Fumaderm relate to DMF

20  monotherapy?

21  A.   So Fumaderm had been around for many years and

22  historically was compounded between four different agents.  And

23  for historical reasons and for ease, because it was available,

24  was used in psoriasis for many years and led to approval for

25  its use in Germany for psoriasis.

BENJAMIN GREENBERG - DIRECT

1      Over time, there was evidence mounting, both from basic

2  science studies, studies with cells from human beings, and

3  ultimately clinical trials, that teased out the fact that,

4  despite historically combining these four agents, the

5  immunologically active molecule was dimethyl fumarate.

6      And that became the accepted understanding within the

7  world of autoimmune diseases, leading to studies such as this

8  to prove it and then ultimately taking it almost for granted, I

9  should say, that DMF was the active agent in Fumaderm.

10  Q.   I think you've heard reference, though, that there's

11  other, quote, active, end quote, agents in Fumaderm.

12      As of 2006 or '7, did the skilled artisan still believe

13  that there was any substantive difference between DMF and

14  Fumaderm?

15  A.   From an immunologic activity perspective, no.  I think

16  it's important to note that, when we're using the terms

17  "active" in a patent, we're separating it from excipients.  But

18  in the world of skilled artisans looking to treat patients, the

19  art had already separated out that the clinically active, the

20  immunologically active molecule of Fumaderm was only dimethyl

21  fumarate.

22  Q.   Was there another paper that you relied upon that also

23  noted the activity of dimethyl fumarate in Fumaderm?

24  A.   Yes.

25  Q.   And what was that paper?

BENJAMIN GREENBERG - DIRECT

1   A.   So this is a paper authored by Kolbach and colleagues in

2   1992.

3          MS. BLOODWORTH:   And for the record, the Kolbach 1992

4   paper is JTX 2178.

5   BY MS. BLOODWORTH:

6   Q.   What does Kolbach 1992 teach the skilled artisan?

7   A.   So Kolbach published a paper entitled "Fumaric Acid

8   Therapy in Psoriasis:   Results and Side Effects of Two Years of

9   Treatment."

10         So this is a longer study looking, again, at the question

11   that was posed in Nieboer as to whether or not dimethyl

12   fumarate and at what dose would effectively treat the

13   autoimmune disease psoriasis.

14   Q.   And Biogen claims, actually, that Kolbach says that DMF is

15   not the active ingredient.

16         Do you understand that argument?

17   A.   I do.

18   Q.   Do you agree with it?

19   A.   No.

20   Q.   Why not?

21   A.   I think it misstates what the authors came to conclude.

22   And I understand where the confusion comes from, and I think I

23   can clarify.

24   Q.   Please do.

25   A.   In the paragraph that's on the screen here, which is

BENJAMIN GREENBERG - DIRECT

1   DDX 1100, Slide 24, the first sentence of the paragraph says

2   "FAC treatment was significantly superior to DMF."

3        And reading that in isolation, without context of the

4   entire article, the structure of the trial, or the conclusions,

5   I could understand how one would read that to assume that

6   Fumaderm was a better agent than dimethyl fumarate.

7        But what Kolbach and colleagues are referring to in this

8   sentence are the treatment arms in the trial, not the agents.

9   So when patients came into the trial, they either received

10  dimethyl fumarate on its own as 240 milligrams or they received

11  Fumaderm up to a dose that delivered 480 milligrams of dimethyl

12  fumarate.  So when we're looking at the two arms, what's called

13  the Fumaderm arm had double the dose than the dimethyl fumarate

14  arm.

15       So in this sentence, when they say "FAC treatment was

16  significantly superior to DMF," they're saying the arm that

17  received Fumaderm did better, and they go on to clarify that

18  the amounts of DMF in the FAC therapy were twice that of DMF,

19  and, apparently, a dosage of 480 milligrams of dimethyl

20  fumarate per day is necessary to achieve a satisfactory

21  improvement in approximately 50 percent of patients.

22       And it's in this sentence that we really see how skilled

23  artisans in the time came to recognize DMF was the active

24  agent.  They don't refer to the dose of Fumaderm they received

25  in milligrams; they refer to that arm based on how many

BENJAMIN GREENBERG - DIRECT

1    milligrams of DMF they were exposed to.

2    Q.   And so what does the Kolbach 1992 reference teach the

3    skilled artisan?

4    A.   So there are several takeaways from the Kolbach paper.

5    The first is the generally accepted view that, when looking at

6    Fumaderm literature, you report it based on how much dimethyl

7    fumarate the patient is exposed to, so much so that they start

8    referring to milligram doses not relative to Fumaderm but

9    relative to DMF.

10        Secondly, you find that, over a longer-term study in an

11   autoimmune disease, you found an effective therapy for that

12   confused immune system.  And that was found by dosing

13   480 milligrams a day of dimethyl fumarate.

14   Q.   And what did Kolbach report about the efficacy on

15   psoriasis?

16   A.   Kolbach concluded that it was, at that dose, an

17   efficacious therapy for that autoimmune disease.

18   Q.   Now, did you make a summary slide of additional references

19   that go through and equate the DMF in Fumaderm with the active

20   component of Fumaderm?

21   A.   Yes.

22   Q.   If we could turn to Slide -- DDX 1100, Slide 25.

23        What is on Slide 25, Doctor?

24   A.   So the literature has numerous articles that explore the

25   relationship of DMF to Fumaderm and explore the fact that the

BENJAMIN GREENBERG - DIRECT

1   immunologically active agent within Fumaderm was DMF.  And, as

2   outlined, here are four representative articles from the

3   literature ranging from 1993 to 2004 with conclusions from each

4   of the papers.

5   Q.   And looking first at the Nibbering 1993 article, which is

6   JTX 2216, what does the JTX 2216 teach a skilled artisan?

7   A.   So the Nibbering 1993 article indicated that MMF -- and,

8   as we heard today, this is the active metabolite of DMF -- is

9   the most active metabolite of the new antipsoriasis drug

10  Fumaderm.

11  Q.   Turning to the next, de Jong 1996, which is JTX 2204, what

12  did that article teach a skilled artisan?

13  A.   So in 1996 de Jong wrote that the most effective fumarate

14  metabolite of Fumaderm is monomethyl fumarate, which is formed

15  in the circulation by hydrolysis of dimethyl fumarate.

16  Q.   What did de Jong 1996 teach the skilled artisan?

17  A.   So de Jong taught that, even though we are giving an

18  agent, Fumaderm, that has four different compounds in it, what

19  is effectively impacting the human being is the metabolite of

20  dimethyl fumarate and it doesn't recognize activity -- doesn't

21  note any activity coming from the other three agents that are

22  represented in Fumaderm.

23  Q.   Turning to the third article, the Ockenfels 1998, which is

24  JTX 2233, what did the Ockenfels article teach a skilled

25  artisan in 2004 about the activity of DMF?

BENJAMIN GREENBERG - DIRECT

1   A.   So Ockenfels is in 1998.

2   Q.   1998.  Excuse me.

3   A.   In 1998 noted that dimethyl fumarate, which is metabolized

4   to monomethyl fumarate, is apparently the most potent

5   antipsoriatic substance in Fumaderm.

6   Q.   The last article, turning to Ormerod 2004, which is

7   JTX 2218, again, what did the Ormerod article teach the skilled

8   artisan about the activity of DMF in 2004?

9   A.   So in 2004 Ormerod noted "There is cumulating evidence

10  that dimethyl fumarate, the main ingredient of Fumaderm, is the

11  active compound."

12  Q.   And so, as of the priority date in this case,

13  Dr. Greenberg, what is your opinion about whether or not it was

14  established, as of the priority date, that DMF was the active

15  component in Fumaderm?

16  A.   I think it was firmly established within the literature

17  that dimethyl fumarate was the active substance,

18  immunologically speaking, in Fumaderm, so much so that the

19  literature would refer to Fumaderm based on how many milligram

20  of dimethyl fumarate a patient got.

21  Q.   As opposed to how much was totally administered in the

22  pill, they would only talk about how many milligrams of

23  dimethyl fumarate they received; is that right?

24  A.   Correct.  So, if somebody was taking six pills of

25  Fumaderm, if I was reporting the milligrams of Fumaderm they

BENJAMIN GREENBERG - DIRECT

1  received, you would see a number above 1200 milligrams.  But in

2  the studies of Fumaderm, they report 720 milligrams,

3  referencing just how much dimethyl fumarate they were being

4  exposed to.

5  Q.   You understand that Biogen criticizes the teasing out

6  of -- trying to tease out the active substance of DMF from

7  Fumaderm.

8       Do you understand that they try and make that argument?

9  A.   Yes.

10  Q.   Do you agree with that?

11  A.   No.

12  Q.   Why not?

13  A.   So in multiple clinical trials that are relied upon by

14  Biogen even prior to the priority date, they recognize and cite

15  articles that support DMF as the active agent of Fumaderm.

16      So here in the context of litigation, while it seems

17  different, the record in the literature supports that it was

18  accepted, DMF being the active agent of Fumaderm.

19  Q.   And if we could turn back to the Nieboer 1990 article,

20  which is JTX 2179.  We looked at this, I think, first.  Are you

21  aware that Biogen argues that Nieboer does not support that DMF

22  is the active component because Nieboer reports that, when you

23  consider the patients treated, the improvement percentage was

24  55 percent in the group treated with DMF compared with

25  80 percent in the Fumaderm group?

BENJAMIN GREENBERG - DIRECT

1    A.    Yes.

2    Q.    And it's on page 5 of the article if you want to look at

3    it in your binder.  We can call it up and turn to the

4    discussion section.

5          Do you agree with that criticism?

6    A.    No.

7    Q.    And why not?

8    A.    So, while that reports the second sentence of the

9    paragraph, it leaves off the bottom of the paragraph where the

10   authors conclude "However, this difference was not significant,

11   and the final score in both groups was the same."

12   Q.    I see.  The last sentence in the paragraph.

13   A.    Essentially saying that, when comparing in that trial, DMF

14   to Fumaderm, they were not seeing a significant difference

15   between the two.

16   Q.    Okay.  And now, if we can turn to discussing the

17   Th1-mediated diseases.  We've been talking a lot about

18   psoriasis papers.

19         So why would a skilled artisan care about psoriasis

20   treatment, in your opinion, Dr. Greenberg?

21   A.    So a skilled artisan in multiple sclerosis, while we start

22   off as neurologists, either by choice or by force, we rapidly

23   have to acquire the mindset of an immunologist because, at its

24   core, the autoimmune tenets of multiple sclerosis have been

25   shown for decades.

BENJAMIN GREENBERG - DIRECT

1    And in that setting, we look to other conditions, other

2   autoimmune conditions, that share similar pathogenesis.

3   Q.   And is that similar pathogenesis the Th1/Th2 shift you

4   described in the background of your testimony?

5   A.   In the setting of multiple sclerosis and psoriasis, yes.

6   Q.   Now, isn't it a little bit more complicated than just

7   herding cats?

8   A.   Yes.

9   Q.   For lack of a better pickup on your analogy.

10    Well, then, why would you really just focus in on this

11   shift, this imbalance, shifting imbalance in the immune system?

12   A.   So, while multiple sclerosis and, frankly, all autoimmune

13   diseases are definitely more complicated than how we boil down

14   the simple explanations, we have a preponderance of evidence

15   that, in populations of patients, our simplified versions are

16   driving what they experience clinically.

17    And so while a Th1/Th2 imbalance would never explain all

18   MS in every patient, what we have found is that, when you have

19   therapies that shift the Th1/Th2 profile, patients get a

20   benefit.  In fact, the earliest FDA-approved drugs for multiple

21   sclerosis that predate this agent significantly were studied

22   relative to just that notion, shifting the Th1 and Th2 immune

23   system balance and leading to a clinical benefit.

24   Q.   If I didn't want to take your word for it, was there any

25   papers that were published in the literature that tied together

133

BENJAMIN GREENBERG - DIRECT

1   the Th1/Th2 shifting with MS and psoriasis?

2   A.   Yes.

3   Q.   And let's look at JTX 2204, please.

4        And, again, this is the de Jong 1996 reference.  Does the

5   de Jong 1996 reference disclose a tie between psoriasis and MS?

6   A.   Yes.

7   Q.   What does it disclose?

8   A.   So de Jong, who was writing a paper entitled "Selective

9   Stimulation of T helper 2 Cytokine Responses by the

10  Antipsoriatic Agent Monomethyl Fumarate" -- so this is the

11  derivative, the metabolized form of DMF -- noted first that Th1

12  T cells and cytokines are thought to be involved in the

13  pathogenesis of psoriasis vulgaris and, when going further in

14  the paper, in discussion this notion of balance or imbalance in

15  autoimmune diseases, de Jong and colleagues noted that "An

16  immunopathologic role of polarized Th1 responses has been

17  proposed in organ-specific autoimmune diseases, like

18  experimental allergic encephalomyelitis (EAE)."

19       And EAE is the mouse model of multiple sclerosis.  It is

20  the shorthand that will be used in literature to talk about the

21  immunology of multiple sclerosis.

22  Q.   And so to close out, what does the de Jong 1996 article,

23  JTX 2204, teach a skilled artisan?

24  A.   So de Jong and colleagues in '96 are supporting and in

25  peer-reviewed literature showing the acceptance that a

1  prevailing theory of multiple sclerosis immunology, however

2  complicated we know it is in reality, was that the Th1/Th2

3  imbalance was playing a significant role in both of the

4  conditions, psoriasis and multiple sclerosis.

5  Q.   Are there any other papers that you rely upon to support

6  this point?

7  A.   Yes.

8  Q.   And what is that?

9  A.   So the next paper would be one from Morwitz in 2005.

10  Q.   What does the Morwitz 2005 paper, which is JTX 2214, teach

11  the skilled artisan?

12  A.   So Morwitz in 2005 noted, when looking at pathogenic

13  concepts of psoriasis, that, according to the T cell cytokine

14  expression profile, psoriasis is classified as a Th1-type

15  immune response.

16     They go on to say "Because several other inflammatory

17  diseases" -- and included in this is multiple sclerosis --

18  "follow similar immunological pathways of T cell activation,

19  psoriasis can be regarded as a visible disease model."

20  Q.   What does that mean?

21  A.   So, as referenced earlier today, this notion of

22  visible/invisible diseases, the authors here are laying

23  credence to and reinforcing the notion that immunologists take

24  relative to autoimmune diseases, that there are end organs that

25  are damaged, but what they share at an immunologic perspective

 1   is the same pathway of getting to that damage.

 2        And what Morwitz is saying here is we have an opportunity

 3   with psoriasis to have a visible disease model where you could

 4   test theories about Th1-mediated disease because you can see a

 5   rash come or go.  You can look for clinical efficacy.  It's

 6   useful in the world of autoimmunity.  And perhaps we could

 7   apply this to some of the conditions that might be harder to do

 8   clinical trials in.

 9        They go on to say, beyond just linking multiple sclerosis

10   and psoriasis from an immunologic pathway perspective, to note

11   that fumaric acid, the mechanism of action of fumaric acid in

12   psoriasis might, therefore, be of interest in future use in the

13   treatment of diseases with a pathogenetic background similar to

14   this chronic skin disorder.

15        So Morwitz not only makes the connection immunologically

16   between psoriasis and MS, it makes the connection between

17   taking medications that were shown to be effective in psoriasis

18   and applying it to conditions like multiple sclerosis.

19   Q.   And can we call up JTX 2221 and page 3, please.

20        What is Exhibit JTX 2221?

21   A.   So 2221 is an abstract published by author Schimrigk and

22   colleagues entitled "An Open-Label, Prospective Study of Oral

23   Fumaric Acid Therapy for the Treatment of Relapsing-Remitting

24   Multiple Sclerosis."

25   Q.   And what does the Schimrigk 2004 article teach a skilled

BENJAMIN GREENBERG - DIRECT

1    artisan?

2    A.   So the Schimrigk 2004 article teaches an artisan that

3    dimethyl fumarate dosed to patients with multiple sclerosis

4    would achieve clinical success.

5    Q.   And turning to the background, what does the skilled

6    artisan learn about the inflammatory processes between

7    psoriasis and MS?

8    A.   So in the background they state fumaric acid is an

9    effective and safe therapy for psoriasis.  And they go on to

10   say that, since the inflammatory processes involved in multiple

11   sclerosis are thought to be similar to those of psoriasis,

12   fumaric acid therapy may also be effective in treating MS.

13   Q.   So this is the Schimrigk 2004 abstract.  Did

14   Dr. Schimrigk, in fact, go on and explore the use of fumaric

15   acid in MS therapy in treating MS?

16   A.   Yes.

17   Q.   And so, as of the priority date, the hypothetical link

18   between MS and psoriasis and the Th1/Th2 shift was, in fact, a

19   reality, correct?

20   A.   Correct.

21   Q.   So skilled artisans had actually taken the leap and

22   started clinical trials with MS based on this -- what maybe

23   would have been a hypothesis in the 1990s; is that right?  As

24   of the priority date?

25   A.   So, while there were theories and animal studies and human

BENJAMIN GREENBERG - DIRECT

1    studies showing the immunologic link and while there were

2    clinical trials showing the benefit of this drug in psoriasis,

3    what Schimrigk does is combine all of it and not just theorize

4    on it but act on it.  Take the agent, apply it to patients with

5    multiple sclerosis in a clinical trial format, and measure over

6    time the clinical efficacy of the agent.

7    Q.    Let's look at the Schimrigk study.  And I think the first

8    one will be -- let's look at the poster, which is JTX 2222.

9          And, Dr. Greenberg, briefly, what is the Schimrigk 2004

10   poster, other than very small and hard to read?

11   A.    So the 2004 poster was presented by Schimrigk and

12   colleagues in 2004 at a scientific meeting.

13   Q.    And which scientific meeting was the poster presented?

14   A.    So this would have been the American Academy of Neurology,

15   I believe.  Let me make sure I'm referencing the right one.

16   Q.    Actually, Dr. Greenberg, I think we'll get the answer to

17   that question when we go to the full abstract.  But the poster

18   itself was presented at the meeting --

19   A.    Excuse me.  Go ahead.  Sorry.

20   Q.    That's okay.  And the meeting was held in 2004?

21   A.    Yes.

22   Q.    What does the Schimrigk 2004 poster describe?

23   A.    So it's entitled "A Prospective, Open-Label, Phase II

24   Study of Oral Fumarate Therapy for the Treatment of

25   Relapsing-Remitting Multiple Sclerosis," and it describes a

 1    clinical trial using fumarate therapy to treat multiple

 2    sclerosis.

 3    Q.   If we could try and blow up the introduction in the upper

 4    left-hand corner of the paper.

 5         If you can read it, what does the third bullet point teach

 6    the skilled artisan?

 7    A.   So the third bullet point of the introduction cites that

 8    "Psoriasis is a chronic T-cell-mediated disease in which immune

 9    suppressants have also been found to be effective and similar

10    to multiple sclerosis.  A proinflammatory T helper 1, or Th1,

11    cytokine profile predominates in lymphocytes isolated from

12    psoriatic plaques."

13    Q.   What does the next bullet teach the skilled artisan, if

14    anything?

15    A.   The next bullet references literature specifically noting

16    that "Several open and double-blind clinical studies have shown

17    that oral fumarate therapy is effective in psoriasis."

18    Q.   And has a citation 3 to 7.

19         Are any of those references familiar?

20    A.   Yes.  This includes the Kolbach reference, which we were

21    just discussing.

22    Q.   The Kolbach 1992 reference?

23    A.   Yes.

24    Q.   And does the Schimrigk paper poster discuss the

25    involvement of the immune-mediated responses?

1    A.    It does.  The last bullet of the introduction summarizes

2    the introduction, or makes the point within the introduction,

3    that "Given the involvement of immune mediated responses and

4    predominance of the Th1 cytokine profile in both psoriasis and

5    MS, the objective of this study was to determine if oral

6    fumarate therapy is effective in patients suffering from

7    relapsing-remitting multiple sclerosis."

8    Q.    So the Schimrigk 2004 paper is reporting on an actual

9    clinical trial in patients suffering from MS?

10   A.    Yes.

11   Q.    And what were the -- actually, let's look at the design of

12   the trial, if we can.  We can go back to the slides.

13        What was the design of the Schimrigk study?

14   A.    So this was an open-label study that went on for over

15   70 weeks.  It included -- it went on over 70 weeks.  It

16   included a baseline phase of six weeks, during which patients

17   were followed but no treatment was offered.

18        And then they started the treatment phase of the trial,

19   which the first phase encompassed 18 weeks, during which they

20   were titrated up in their dosing of fumarate.  And, as noted on

21   the slide, they started at a single pill and went up to six

22   pills of fumarate.  And in the slide they reference this by how

23   much dimethyl fumarate the patient received at the end of that

24   titration, which was 720 milligrams of dimethyl fumarate.

25   Q.    So if we can pause there.  So the 720 milligrams above in

BENJAMIN GREENBERG - DIRECT

1    the treatment phase is -- it's Fumaderm is being administered

2    in this study, correct?

3    A.   It is.  But what they're referencing is how much dimethyl

4    fumarate the patient ingested.  If they were referencing the

5    number of milligrams of Fumaderm, it would be over

6    1200 milligrams.

7    Q.   And it was -- the patients didn't start at 720 milligrams,

8    correct?  They gradually moved up in dosage over that first

9    treatment phase of 18 weeks?

10   A.   They did.

11   Q.   And how long did it take them to titrate up to the

12   720 milligrams?

13   A.   It takes approximately nine weeks to go up to the

14   720 milligrams.

15   Q.   So in the first treatment phase, Fumaderm at

16   720 milligrams was given for approximately nine weeks?

17   A.   Correct.

18   Q.   And then what happens?

19   A.   Then the medication was stopped, and they entered what was

20   called a washout period.  So for four weeks, for a month,

21   patients were on no medication whatsoever.  And then they

22   started back on a prolonged treatment phase for 42 weeks using

23   a titration up to a dose of only 360 milligrams a day of

24   dimethyl fumarate, again, dosed via the Fumaderm pill but

25   referencing just the amount of dimethyl fumarate the patients

BENJAMIN GREENBERG - DIRECT

1    ingested.

2    Q.   And approximately how long in the second treatment phase

3    did patients receive 360 milligrams of DMF?

4    A.   So it was for at least nine months of that period of time.

5    Q.   So the Slide X axis is a little truncated.  The longest

6    phase, almost nine months of the 360 milligrams, was given over

7    an extended period of time?

8    A.   Yes.

9    Q.   And approximately how many patients were enrolled in the

10   study?

11   A.   So this was a small study.  It had ten patients enrolled.

12   Q.   And how many completed the study?

13   A.   Seven completed the study.

14   Q.   And what was the primary outcome of the study?

15   A.   So the primary outcome was to use the surrogate measure

16   that was mentioned earlier relative to multiple sclerosis,

17   specifically MRI metrics, to determine whether or not the dose

18   of medication that was being used would lead to a clinical

19   effect.

20   Q.   And if we can turn to Figures 2 and 3 in the poster.  And

21   what were the results of the study?

22   A.   So shown on this slide, which is Slide 30, there are two

23   figures.  The first figure is entitled "Figure 2.  Change in

24   number of gadolinium-enhancing lesions."  And it is a graph

25   showing the average number of lesions in the cohort of patients

BENJAMIN GREENBERG - DIRECT

1    at baseline and then at the prespecified time points for

2    acquiring additional data, weeks 12, 18, 22, and then it goes

3    out to 46 and 70.  And what it shows is there was a decline of

4    gadolinium-enhancing lesions through the course of the study

5    and a sustained reduction between weeks 22 and 70 of that

6    decline.

7    Q.   And what was the dose administered during the sustained

8    reduction?

9    A.   So for the majority of that time, patients were on

10   360 milligrams a day of dimethyl fumarate, dosed as Fumaderm.

11   Q.   And you mentioned gadolinium-enhancing lesions.  We're

12   going to talk about those a lot today.

13        What is a gadolinium-enhancing lesion?

14   A.   So this is going to be an important concept today.  So I

15   prepared just an example, if I can turn to it.

16        So this is Slide DDX 1100.31.  And what I'm showing are

17   two images acquired by an MRI machine.  And, if I can, I'll

18   just walk you through it.

19   Q.   Sure.

20   A.   So when you do an MRI scan, you're actually taking several

21   different pictures.  So the reason people are on the machine

22   for up to an hour, bored out of their mind, is every five to

23   ten minutes we change the programming on the computer to

24   acquire the image in a different way.

25        So it's kind of like your iPhone.  You can take a

1    black-and-white photo or a color photo or a natural photo.  We

2    can take a picture of the brain a lot of different ways because

3    we get different information from the different types of

4    pictures.

5         So on the left-hand side of this slide, what's entitled

6    "T2-weighted," anywhere that you see white is abnormal.  It's

7    scar.  This is a sequence we use to look at all the regions of

8    the brain that had previously suffered an insult from that

9    invading immune system that was chewing on the wires.

10        When I look at the T2-weighted image, I can't tell when

11   that scar formed.  It could have been yesterday, last year, or

12   ten years earlier.  There's no ability to date it.  And that's

13   where the gadolinium-enhanced MRIs come in.

14        And what's shown on the right entitled "A T1-weighted

15   post-gad image" is the type of MRI we get after injecting

16   gadolinium into a person's veins.  And what's supposed to

17   happen is the contrast stays in your blood system.

18        But if those pesky cats, if the immune cells are leaving

19   the blood supply and going into the brain, the gadolinium

20   follows them and highlights that area, and we know that that is

21   an actively inflamed lesion.

22        So when we talk about gad positive or Gd positive or

23   gadolinium-enhancing lesions, what we're referring to, as seen

24   here on this slide, that circle -- pointed out perfectly;

25   you're ready to be a radiologist -- that circle is where the

BENJAMIN GREENBERG - DIRECT

1  gadolinium is accumulating and there's an active lesion going

2  on.  So that gad MRI is there to look at how active a patient

3  is at that moment.

4  Q.   Thank you.  That's helpful.  I have a feeling we're going

5  to talk a lot about gadolinium-enhancing lesions.

6       So what is the conclusion that is drawn -- or what does

7  the totality of the Schimrigk 2004 poster teach the skilled

8  artisan, in your opinion?

9  A.   So the poster teaches several things.  First, it indicates

10 that oral fumarate resulted in a significant improvement in

11 number and volume of gadolinium-enhancing lesions compared to

12 baseline.  It looked at clinical measures both on function and

13 disease progression that were stable so things tracked

14 together.  And they said the positive results of the study

15 suggest that larger trials should be undertaken to look at the

16 efficacy of oral fumarate in MS patients.

17      Beyond these conclusions, they validated and moved into

18 science what had been accepted, that both multiple sclerosis

19 and psoriasis were Th1-mediated diseases with a common

20 immunopathology and that, when using what was available to

21 them, which was Fumaderm, they did the dosing relative to how

22 much dimethyl fumarate the patient would be exposed to.

23 Q.   Great.  And is there also an abstract from the meeting

24 from the poster presentation?

25 A.   There is.

BENJAMIN GREENBERG - DIRECT

1   Q.   Okay.  If we could turn to JTX 2165, please.

2        And on the first page of the exhibit -- the first page, if

3   we could just stay there for a second -- where was the abstract

4   presented -- or where was the meeting?

5   A.   This was at the 20th congress of what's called ECTRIMS,

6   which stands for the European Committee for Treatment and

7   Research in Multiple Sclerosis.

8   Q.   Okay.  And if we could look at the -- it's the next page

9   or the third page, please, page 4.

10       I believe on the bottom right --

11       If we could blow that up, please, bottom right.

12       Is this the beginning of the abstract?

13  A.   It is.

14  Q.   And it has a number under the title "Fumarate."  What does

15  that say?

16  A.   Yes.  It's -- it projects poorly, but it's P642, which

17  correlates to the poster that we just discussed.

18  Q.   And approximately how many people attend the ECTRIMS

19  meetings?

20  A.   So ECTRIMS is one of the largest MS-dedicated

21  international meetings in the world.  And it receives usually

22  thousands of individuals, both clinicians and scientists, who

23  are either doing MS clinical work, clinical trials, or basic

24  science.

25  Q.   And so the poster was available at the meeting.  And what

BENJAMIN GREENBERG - DIRECT

1   does the abstract, which is JTX 2165, teach the skilled artisan

2   about the Schimrigk study?

3   A.   So the abstract notes in the background that oral fumarate

4   was effective and safe for the treatment of psoriasis.  And it

5   says "Similar to psoriasis, the inflammatory process in

6   multiple sclerosis is thought to be mediated by a Th1-type

7   cytokine reaction due to global immune suppression or a

8   Th2-mediated bistandard suppression."

9   Q.   And looking down a couple lines, the dose that was

10  administered of Fumaderm is also reported in terms of the DMF

11  active amount provided?

12  A.   Yes.

13       So when they indicate that all patients were treated with

14  oral fumarate therapy -- and what they had access to and they

15  noted in the abstract was Fumaderm -- that they were titrated

16  to a maximum of six tablets per day.  And in the parentheses

17  the milligram dose they note is not the milligrams of Fumaderm;

18  it's the milligrams of dimethyl fumarate.

19       And then in the second treatment period, when they note

20  that patients were on three tablets a day of Fumaderm, again,

21  in the parentheses, the 360 milligrams that the authors note

22  only refer to how much dimethyl fumarate patients were being

23  exposed to.

24  Q.   And how often were the doses administered in the study?

25  What was the frequency of the dosing?

BENJAMIN GREENBERG - DIRECT

1   A.   And so when they were doing this trial, patients were

2   getting equal doses three times a day.

3   Q.   And if we can look at Slide 33.

4        What were the conclusions of the Schimrigk 2004 abstract?

5   A.   So in the abstract, they note that there were significant

6   reductions from baseline in the number of gadolinium-positive

7   lesions were observed starting after week 12 of treatment with

8   fumarate.  And they associate a P value of less than 0.05 and

9   go on to say "In addition, there were significant reductions

10  from baseline in gad-positive lesion volume starting after week

11  12."  And again they give a P value there of less than 0.01.

12  Q.   What's the -- what is a P value?

13  A.   A P value is a reporting that a statistical test has been

14  applied to the data to determine whether or not the results

15  were observed due to chance alone or whether or not they were

16  likely due to the intervention that was being studied.

17       And when you have a P value of less than .05, it's usually

18  considered to be statistically significant that the outcome

19  that was observed was not due to chance alone.

20  Q.   And so what does the abstract teach the skilled artisan

21  about the effectiveness of the 360-milligram dose of DMF?

22  A.   So in the conclusions, they note that oral fumarate

23  therapy significantly reduced both the number and volume of

24  gad-positive lesions over 70 weeks of treatment.

25       So this was a trial that went on for well over a year.

BENJAMIN GREENBERG - DIRECT

1    And for most of the time when being treated, patients were

2    being dosed with 360 milligrams a day.  And in a statistically

3    significant way, patients were achieving a radiographic

4    remission.  The medication was preventing those confused cats

5    from getting into the brain and causing those

6    gadolinium-enhancing lesions.

7    Q.    Did Schimrigk encourage others to continue looking for

8    treatments for MS?

9    A.    Schimrigk and colleagues ended the conclusion by stating,

10   "These findings indicate that oral fumarates may be a promising

11   new treatment for relapsing-remitting multiple sclerosis."

12   Q.    Would a skilled artisan looking at the Schimrigk 2004

13   study think that the maintenance dose of the 360 milligrams

14   given over nine or ten months would be attributed to the

15   720-milligram amounts given earlier in the study for nine

16   weeks?

17   A.    I'm sorry, ma'am.  Can you repeat that.

18   Q.    Would a skilled artisan attribute the effect of the DMF in

19   the 360-milligram arm to the nine-week earlier treatment of

20   720 milligrams?

21   A.    No.

22   Q.    And why not?

23   A.    So the amount of time that patients were on the

24   720-milligram while in the initial phase was relatively short,

25   followed by a washout period during which patients were on no

BENJAMIN GREENBERG - DIRECT

1    medication, allowing immune systems to start shifting again, if

2    you were.  But then they were maintained on 360 milligrams for

3    the majority of time during the study.  And what we didn't see

4    was a rebound of inflammation.

5         When looking at the baseline scans of these patients, they

6    had a lot of activity.  These were not patients with one or two

7    lesions; they had multiple lesions enhancing at the beginning.

8    And yet they were able to maintain a remission for a long

9    period of time with 360 milligrams of dimethyl fumarate.

10   Q.   And because Fumaderm was administered in the study, would

11   it motivate a skilled artisan to dose higher than

12   720 milligrams?

13   A.   No.

14   Q.   Why not?

15   A.   So there's several reasons.

16        First off is efficacy had been achieved in a statistically

17   significant way with this dose range of 360 and not going

18   higher than 720.

19        And when we think about autoimmune diseases, we are

20   looking to achieve success, shift the immune system, and then

21   stop exploring higher doses, because there are a lot of

22   reasons -- side effects, concerns about the unknown -- that

23   would push us away from going higher than 720.

24        At this time -- and we'll get to it in the literature --

25   the Fumaderm label itself expressly spoke against going beyond

BENJAMIN GREENBERG - DIRECT

1   720.  And Schimrigk's practice clearly identified 360 to 720 as

2   an effective intervention for multiple sclerosis patients.

3   Q.   Does the fact that only a small number of patients

4   finished the study influence your opinion on whether skilled

5   artisans would rely on the conclusions of Schimrigk?

6   A.   No.  I think skilled artisans looking at the literature,

7   when trying to find therapies, are hoping to have a reasonable

8   expectation of success.

9        We're not a regulatory agency.  So I am not proclaiming

10  that an FDA would approve dimethyl fumarate based on a

11  ten-person trial.  But a skilled artisan looking for therapies

12  would look at this study that was over a long period of time

13  with the gold standard of a surrogate measure of activity,

14  specifically, the MRI, and following these patients and showing

15  that prolonged response, that there would be -- that reasonable

16  expectation that dosage in this range would work for MS.

17  Q.   Are you aware that Biogen's experts criticize the

18  Schimrigk study because it's not placebo-controlled?

19  A.   Yes.

20  Q.   Do you agree with that criticism?

21  A.   No.

22  Q.   Why not?

23  A.   For the purposes of obviousness, again -- and not a

24  regulatory agency -- we're looking to see if it was a

25  well-executed and well-designed study.  The point of a control

BENJAMIN GREENBERG - DIRECT

1  is there to determine statistical significance for the FDA to

2  approve, for the EMA to approve.  But when looking for

3  different options to treat our patients, a trial like this

4  would speak to a skilled artisan.

5      We've got patients who respond to different agents.  And

6  as we find ones that have a reasonable expectation of success,

7  we would pursue it.

8  Q.   Does the concept of regression to mean apply in the

9  context of the Schimrigk study?

10 A.   So in the past there's been question relative to the

11 Schimrigk study on the notion of regression to the mean.  And

12 it's important to recognize what that is and how it doesn't

13 apply.

14     So regression to the mean was the statistical issue in

15 multiple sclerosis that really prompted the need for

16 placebo-controlled trials for regulatory agencies to determine

17 the relative efficacy of a given intervention.  And the issue

18 was rooted in clinical events, not MRI events.

19     So if I enrolled 10, 100, 1,000 patients who had all had

20 multiple relapses in the preceding year into a trial and over

21 the next year, with no control, saw the number of relapses

22 decline, the concern would be that it happened due to

23 regression to the mean, that they had an active year followed

24 by an inactive year, and I would inappropriately ascribe their

25 inactive year to my therapeutic intervention.

BENJAMIN GREENBERG - DIRECT

1          And it has to do with how relapses get defined and how we

2     track relapses when somebody is enrolled in a trial.

3          For an MRI outcome, where you get a baseline scan, where

4     you quantify how active they are, we don't see the same

5     phenomenon of regression to the mean over the course of a year

6     or more as seen in the Schimrigk study.

7     Q.   And that's because you actually understand the starting

8     point of the patient's disease state?

9     A.   We're not taking a historical record of what happened over

10    the prior years.  We're not asking how many relapses or

11    inferring.  We have a baseline measure that we can follow over

12    time.

13    Q.   And there's another Schimrigk abstract we can look at, and

14    that's Schimrigk 2005.

15         If we could look at JTX 2221, or Slide 34.

16         Is this another abstract of the same Schimrigk study?

17    A.   Yes.

18    Q.   And, again, Schimrigk is again reporting the results of

19    his study in 2005 at this time; is that correct?

20    A.   Correct.  This happened in April of 2005 at the American

21    Academy of Neurology.

22    Q.   And it also reports on the favorable results of the study?

23    A.   It does.

24    Q.   And if we could look at the Schimrigk 2006 paper.

25         And before we get there, so was the Schimrigk study

BENJAMIN GREENBERG - DIRECT

1  repeated in the art numerous times?

2  A.   Yes.

3  Q.   Approximately how many times does Schimrigk's study get

4  reported?

5  A.   At least three or four.

6  Q.   But they're all the same study?

7  A.   It appears to be so.

8  Q.   Now, looking at the Schimrigk 2006 paper, which I just

9  want to briefly look at.  And it's at the bottom of page 5 to

10  the top of page 6.

11      Are you aware that Biogen's experts rely on the Schimrigk

12  2006 paper to say -- to criticize the design of the Schimrigk

13  study because it was baseline-controlled and therefore there

14  was a possibility that patients have high disease activity?

15  A.   Yes.

16  Q.   And I think -- and where do they draw that criticism from

17  in the 2006 paper?

18  A.   So the criticism is around whether or not having a

19  baseline period would be adequate to control in a small study

20  for the enrolled patients and their course over time.  And so

21  the concern is whether or not it would impact conclusions that

22  are being drawn about the study.

23  Q.   And do you share that concern?

24  A.   I do not.

25  Q.   And why not?

BENJAMIN GREENBERG - DIRECT

1   A.   So as we see highlighted here, the authors call this out

2   even in the publication.  And they say, "Given the

3   baseline-controlled nature of this study, the possibility that

4   patients were recruited during a period of high disease

5   activity must be considered."

6        But they go on to say, "A six-week baseline period was

7   included to control for this possibility."

8        So they were essentially recognizing that, if you didn't

9   have a baseline period, if you just enrolled people on day one,

10  you could get people who were about to have a relapse or about

11  to go a certain way in terms of their condition.  So they

12  specifically brought people in and said, "Don't take any

13  medicine for six weeks" to level the playing field and ensure

14  they weren't enrolling someone who would be uniquely different

15  from the rest of the population.

16  Q.   And so setting aside the Schimrigk 2006 paper which Biogen

17  is relying upon, up until this point in time -- I think we're

18  up to about approximately 2004, 2005 -- what does a skilled

19  artisan know about using DMF in the treatment -- in the

20  clinical setting of patients with MS?

21  A.   So a skilled artisan knows several things.

22       First, that there had been an actual clinical trial of

23  this agent in patients with multiple sclerosis that achieved a

24  statistically significant outcome of success.  So the drug was

25  there, it was efficacious, and the dose range that was used was

BENJAMIN GREENBERG - DIRECT

1   360 to 720, with the majority of time being on 360 milligrams a

2   day.

3       And they were also firm in the knowledge that what had

4   been a theory in terms of multiple sclerosis and psoriasis

5   sharing a similar immunopathology had borne out, because the

6   success that was experienced in multiple sclerosis had already

7   been experienced in psoriasis in multiple large-scale,

8   long-term studies.  And in those studies, a dose of

9   480 milligrams had been shown to be effective in patients with

10  the autoimmune disease psoriasis.

11  Q.   And did the art then move into using DMF as a monotherapy

12  in the clinical setting to treat patients with MS?

13  A.   Yes.

14  Q.   And if we could look at the DTX 1104.

15      And another poster.  And I'm hoping we can blow it up at

16  periods of time.

17      What is the DTX 1104?

18  A.   So this is a poster by colleagues listed there.  The first

19  author is Ludwig Kappos.  The last author is Rebecca Conaghan.

20  And it's entitled "A Randomized Placebo-Controlled Phase 2

21  Trial of a Novel Oral Fumarate, BG00012, in Patients With

22  Relapsing-Remitting Multiple Sclerosis."

23  Q.   And where was this poster presented?

24  A.   So this is a poster that was presented at the 15th meeting

25  of the European Neurological Society.

BENJAMIN GREENBERG - DIRECT

1    Q.   And when was it presented?

2    A.   In June of 2005.

3    Q.   And throughout your testimony today, you'll be referring

4    to Biogen's Phase 2 study using DMF to treat MS as "the Kappos

5    Phase 2 study."

6         Do you understand that?

7    A.   Yes.

8    Q.   Okay.  Who sponsored the study presented in the Kappos

9    2005 poster?

10   A.   So this was sponsored by Biogen Idec and Fumapharm AG.

11   Q.   And does the Kappos 2005 poster also refer to the

12   psoriasis studies?

13   A.   It does.

14   Q.   In what way?

15   A.   So in the introduction right at the beginning of the

16   poster on the top left, the second bullet point states "Fumaric

17   acid esters have been used in Germany for the treatment of

18   psoriasis.  The efficacy of fumaric acid esters in psoriasis is

19   thought to be mediated in part by their immunomodulatory

20   activity, suggesting that these agents may also be effective in

21   multiple sclerosis."

22        They go on to cite the Schimrigk study that we've been

23   referencing, noting that "In an open-label pilot study of ten

24   patients with multiple sclerosis, the fumaric acid ester

25   therapy reduced the number and volume of gadolinium lesions on

BENJAMIN GREENBERG - DIRECT

1   T1-weighted magnetic resonance imaging scans of the brain."

2   Q.    And in this poster does it disclose that the active

3   ingredient administered is BG-12, or dimethyl fumarate?

4   A.    It does.  In Figure 1 of the poster, it has a molecular

5   structure of BG-12, and then the name is dimethyl fumarate.

6   Q.    And what was the design of the Kappos Phase 2 study?

7   A.    So in Figure 2, there's an outline of the design which is

8   a multiarm trial.  The study began with a screening phase,

9   usually to make sure patients meet the inclusion-exclusion

10  criteria as set out by the trial design.  And then they enter

11  the randomization phase before starting one of their, in this

12  case, four different treatment arms.

13  Q.    And how much of DMF was administered in each of the

14  treatment arms?

15  A.    So one of the arms received a placebo, and the other three

16  arms received either 120 milligrams a day, 360 milligrams a

17  day, or 720 milligrams a day.

18  Q.    And, again, this is actually of DMF itself, not the active

19  component of Fumaderm?

20  A.    This is dimethyl fumarate.

21  Q.    And this is in 2005?

22  A.    Yes.

23  Q.    So what does the Kappos -- I'm sorry.

24        What was the primary end point of the study?

25  A.    So the primary end point of the study, as is typical in

BENJAMIN GREENBERG - DIRECT

1    Phase 2 multiple sclerosis trials, was to use MRI outcomes, the

2    gadolinium-enhancing lesions, just as was done by Schimrigk and

3    colleagues.

4    Q.    And so what does, in your opinion, the Kappos 2005 poster

5    teach the skilled artisan?

6    A.    So the Kappos 2005 poster acknowledges the literature

7    that's accessible in the art that multiple sclerosis and

8    psoriasis share a common immunopathogenesis; that fumarates,

9    which have been successful in treating psoriasis, were also

10   known to be successful for treating multiple sclerosis by

11   citing the Schimrigk study.

12        They go on to indicate that BG-12 is dimethyl fumarate

13   such that in the future, when reading literature about BG-12,

14   skilled artisans would know it was referring to DMF.

15   Q.    And there's no confusion about what is the active

16   component in the Kappos study that's being used?

17   A.    None.  They specifically use the dose range of 120 to

18   720 milligrams of just dimethyl fumarate as a monotherapy, not

19   dosed as Fumaderm or anything else.

20   Q.    Did the skilled artisan have any additional information

21   about the Kappos Phase 2 study in 2005?

22   A.    So in 2005, the skilled artisan would know that this dose

23   range was being used and that DMF was the active ingredient in

24   BG-12, coming from an announcement of the trial in a online

25   archive called ClinicalTrials.gov.

BENJAMIN GREENBERG - DIRECT

1  Q.   And turning to ClinicalTrials.gov, that's DTX 1135.

2       And turning to the top, what is the title of the trial?

3  A.   So the title of the trial, the official title is

4  "Double-Blind Placebo-Controlled Dose-Ranging Study to

5  Determine the Efficacy and Safety of BG-12 in Subjects with

6  Relapsing-Remitting Multiple Sclerosis."

7  Q.   And does the ClinicalTrials identify what BG-12 is?

8  A.   It does.  The very first portion of a sentence in the

9  brief summary is "DMF, the active ingredient in BG-12, is an

10 immunomodulator demonstrating definite therapeutic efficacy in

11 psoriasis and possible therapeutic efficacy in multiple

12 sclerosis."

13 Q.   And does the ClinicalTrials provide the dosing regimen for

14 the Kappos Phase 2 study?

15 A.   It does.

16 Q.   And what was it?

17 A.   In the detailed description, they outline the four arms as

18 previously mentioned:  the 120 milligrams a day,

19 360 milligrams a day, 720 milligrams a day, and a placebo arm.

20 Q.   And does the trial -- the ClinicalTrials document provide

21 any instructions to clinicians relating to dose reduction?

22 A.   It does.

23 Q.   Can you look at that on page 2 of DTX 1135, please.

24 A.   And so, as shown on the slide here, which is Slide 38,

25 they indicate that "dose reduction will be allowed for subjects

BENJAMIN GREENBERG - DIRECT

 1  who are unable to tolerate investigational drug."

 2  Q.   What does that mean to a skilled artisan?

 3  A.   So it recognizes -- it's affirming what's been seen in the

 4  field of psoriasis and multiple sclerosis and all of the

 5  fumarate literature, that there are dose-limiting side effects.

 6  And clinicians needed to be aware and be prepared to adjust the

 7  dose of a patient if they were having difficulty tolerating it.

 8       So instead of just removing a patient from the study, they

 9  were allowed to adjust down.

10  Q.   And is the ClinicalTrials information something that

11  skilled artisans typically would consult and rely upon?

12  A.   Yes.

13  Q.   And was there another BG-12 or DMF study by Kappos?

14  A.   Yes.

15  Q.   Is that DTX 1102?

16  A.   Yes.

17  Q.   Okay.  And what is DTX 1102, also titled the Kappos 2005

18  abstract?

19  A.   So this is an abstract in the Journal of Neurology in

20  2005, the supplement.  And it's entitled "A Randomized

21  Placebo-Controlled Phase 2 Trial of a Novel Oral Single-Agent

22  Fumarate Therapy, BG-12, in Patients with Relapsing-Remitting

23  Multiple Sclerosis."

24  Q.   And what does the Kappos 2005 abstract describe?

25  A.   So the background indicates that it's describing the

1   open-label pilot study -- it described "An open-label pilot

2   study demonstrated that a product containing a mixture of

3   fumaric acid esters significantly reduced the number and volume

4   of gad-enhancing lesions in patients with relapsing-remitting

5   multiple sclerosis. BG-12 is being investigated for the

6   treatment of psoriasis and other autoimmune diseases, including

7   multiple sclerosis."

8   Q.   And do you know what study it's referencing in the

9   background, which clinical trial?

10  A.   This would be the Schimrigk study.

11  Q.   And what doses were patients administered in the Kappos

12  Phase 2 study?

13  A.   So in the Phase 2 study, as seen, I believe, on the next

14  slide, which was Slide 40, it outlines the 120-milligram-a-day,

15  360-milligram-a-day, 720-milligram-a-day, and placebo arm of

16  the trial.

17  Q.   And how is this study characterized?

18  A.   So this study is characterized as a dose-ranging study.

19  Q.   And what is a dose-ranging study?

20  A.   So it's not unusual, when we have agents that we have a

21  reasonable expectation of success will work for a patient, that

22  we are looking to find the dose that makes the most sense.  And

23  we're balancing the issues of efficacy, tolerability, patient

24  convenience, and compliance.

25       And so when we do studies, we'll do a dose-ranging study

BENJAMIN GREENBERG - DIRECT

1   to gather data about this and make an assessment.

2   Q.   And so what does the abstract teach a skilled artisan

3   about the Kappos study?

4   A.   So the skilled artisan knows that there's recognition of a

5   successful study of fumarates in multiple sclerosis, there's a

6   recognition that multiple sclerosis and psoriasis are

7   immunopathogenically similar conditions, and that fumarates

8   have worked for psoriasis.  And there's a recognition that,

9   looking at doses in this range -- in this study it was 120 to

10  360 milligrams a day -- were being evaluated to look for

11  efficacy, tolerability, and safety.

12  Q.   Now, as of the end of 2005, do we have any results from

13  the Kappos Phase 2 study?

14  A.   So at the end of 2005, it's over.  But the first release

15  comes the next year.

16  Q.   And let's look at the January 2006 press release, which is

17  DTX 1136.

18       What is being announced here?

19  A.   So this is a press release from January 9th, 2006, in

20  Business Wire.  And it reads, "Biogen Idec and Fumapharm AG

21  today announced that a Phase 2 study designed to evaluate the

22  efficacy and safety of BG-12, an oral fumarate, in patients

23  with relapsing-remitting multiple sclerosis met its primary end

24  point."

25  Q.   And did the skilled artisans understand what BG-12 is by

BENJAMIN GREENBERG - DIRECT

1   January 2006?

2   A.   Yes.

3   Q.   And does the skilled artisan understand, by January 2006,

4   which doses were used in the study?

5   A.   Yes.   That had been disclosed in both the

6   ClinicalTrials.gov, the abstract, and the poster.

7   Q.   And, in your opinion, would a skilled artisan reading the

8   press release in January 2006 know which dose was effective in

9   treating multiple sclerosis?

10  A.   So looking at this, a skilled artisan would know that at

11  least the 720-milligram dose had been effective.

12  Q.   And so as of January 2006, what did the prior art teach a

13  skilled artisan?

14  A.   So as of January 2006, a skilled artisan would know, in a

15  large Phase 2 trial, that at least 720 milligrams of dimethyl

16  fumarate as a monotherapy was effective relative to multiple

17  sclerosis.

18       They would know that, in multiple sclerosis, a trial over

19  70 weeks had shown dose ranges between 360 and 720 to have a

20  clinical effect.

21       They would know that multiple sclerosis and psoriasis were

22  immunologically kindred spirits with a shared pathway, albeit

23  different end organs getting damaged.

24       And they would know, in psoriasis, that the field had

25  coalesced around dimethyl fumarate being the active component

BENJAMIN GREENBERG - DIRECT

1   of Fumaderm.  And when dosed with 480 milligrams a day of

2   dimethyl fumarate, psoriasis patients were able to achieve an

3   immunologic and clinical remission.

4   Q.   And so, as of this time, it's January 2006, and all of the

5   art we've considered up until this point in time is before

6   then; is that correct?

7   A.   That's correct.

8           MS. BLOODWORTH:  And, Your Honor, this is a good time

9   for a break, if that's a good time.

10          THE COURT:  Again, I will see what's happened to our

11  climate control in here, if I can't get that somewhere north of

12  the equator.  Thank you.

13          Thank you, Doctor.  You remain on direct examination

14  and should return to the stand at 10 after 3:00.

15          Wait a minute.  Was that enough time for everybody to

16  use the facilities, or do you need another five minutes?

17          MS. BLOODWORTH:  Maybe 3:15, Your Honor?

18          THE COURT:  3:15 is fine.  Thank you.

19          (Recess taken.  2:56 to 3:16.)

20          THE COURT:  Let me give you a weather report.

21          Thanks to our deputy clerk, Sheree Burlas, things are

22  being checked on.  If you're not here tomorrow, if this does

23  not change this afternoon, there's going to be a service call

24  placed and someone will be in here tomorrow to take care of it.

25  Everything was fine yesterday.  So nobody knows what happened

BENJAMIN GREENBERG - DIRECT

1    other than the weather changed and, apparently, the system

2    doesn't like it.  I don't know.  It's hard for me to say.  But

3    we'll -- if you could bear with us today, we'll -- we hope to

4    have it improved, if not completely fixed, by Thursday.

5            And also, just for purposes of scheduling, would you

6    all be able to and willing to start, say, at 8:30 from now on,

7    since we've been through the first day?  Or, if it's a problem,

8    9:00?

9            MR. FELDSTEIN:  8:30 is fine, Your Honor.

10           MS. BLOODWORTH:  It's fine.

11           THE COURT:  That's great.  I think then we'll be sure

12   to get through all this.

13           MS. BLOODWORTH:  Two housekeeping matters for the

14   testimony we just went over, Your Honor.  First, I failed to

15   officially offer Dr. Greenberg as an expert.  So if I may do

16   so.  Maybe a little late than never.

17           THE COURT:  There hadn't been any objection yet.  So

18   I figured that it was a given.  But go ahead.  In what areas?

19           MS. BLOODWORTH:  I'd like to move -- Mylan offers

20   Dr. Greenberg as an expert with a medical degree and at least

21   three years of training in neurology and at least three years

22   of clinical experience treating multiple sclerosis.  So we'd

23   like to move him as an expert in neurology and multiple

24   sclerosis treatment.

25           THE COURT:  Is there any objection?

BENJAMIN GREENBERG - DIRECT

1              MR. FELDSTEIN:  No objection, Your Honor.

2              THE COURT:  Dr. Greenberg -- the Court accepts

3     Dr. Greenberg as an expert in the areas of neurology and

4     multiple sclerosis treatment and qualified to offer opinions in

5     those areas.

6              You may proceed.

7              MS. BLOODWORTH:  Your Honor, one more housekeeping

8     matter.  I think I was referring to the Kappos 2005 abstract,

9     and I'm told I forgot to mention the exhibit number.  And so,

10    just in case, the Kappos 2005 abstract is DTX 1102.  And so

11    that's the exhibit that testimony right before the break was

12    relating to.

13             THE COURT:  I'm forgetting which one we were on, but

14    I think I circled it.  I saw it.  Thank you.

15             MS. BLOODWORTH:  Thank you, Your Honor.

16    BY MS. BLOODWORTH:

17    Q.   Now, Dr. Greenberg, up until the break, all of the art

18    that we had been focusing on is as of January 2006 or earlier,

19    correct?

20    A.   Correct.

21    Q.   So now I'd like to transition into the next part of the

22    testimony, which is the skilled artisans, whether or not they'd

23    have a motivation or reasonable expectation of success.

24         Did you provide or prepare a demonstrative to discuss

25    motivation?

BENJAMIN GREENBERG - DIRECT

1    A.    I did.

2    Q.    And if we could turn to Slide 42, please.

3    A.    So on Slide 42 it shows the different pieces of data and

4    information and considerations that a person skilled in the art

5    would take into consideration when being motivated to use a

6    dose of 480 milligrams.  And if you start on the outside of the

7    bull's-eye, kind of the guardrails around dosing, we know that

8    doses less than -- 720 milligrams and less have been used

9    effectively to treat multiple sclerosis.  And we know this from

10   Kappos, and we know this from Schimrigk.  And, while we have

11   evidence in psoriasis of a large dose range, even in MS alone

12   we know that 720 works.

13        But you're motivated to look for a regimen that reduces

14   side effects.  And in the world of fumarates, there have been

15   concerns mentioned of dose-dependent side effects.  And you

16   also want to optimize a dose, and that optimization means

17   balancing -- finding a dose that is going to shift the immune

18   system away from that Th1 to a Th2, as evidenced either by

19   basic science or clinical trials, and optimize a dose that

20   would highlight patient compliance.

21        And it's always hard for us to remember to take multiple

22   pills a day, multiple times a day.  So when looking at

23   different dosing regimens, if you can reduce from four to three

24   or ideally three to two or less times a day, you increase

25   compliance among patients.

BENJAMIN GREENBERG - DIRECT

1    So in a world where we have access to pills that come in

2    120 milligram increments and we want to pick a dose in this

3    360-to-720 range and highlight something that's equal doses

4    twice a day, it would motivate us to target 480-milligrams a

5    day.

6    Q.   Thank you.

7        Did you also have a brief summary slide of the points of

8    motivation you just mentioned?

9    A.   I did.  Just on the off-chance that I did a very bad job

10   of explaining my thoughts, there were the bullets that we

11   wanted to reduce side effects, optimized within the range that

12   we know is effective.  We had the trail of 360 to 720 already.

13   So we were within that range.

14       We wanted to optimize compliance, which motivates us to do

15   twice-a-day dosing, and the math was utilizing 120-milligram

16   increments.  And so the dose that fits all of those motivating

17   features is a dose of 240 milligrams twice a day, equaling a

18   total daily dose of 480 milligrams.

19   Q.   And so turning first to reducing side effects, there's --

20   you're aware, of course -- and, actually, if we can go back to

21   the bull's-eye slide on Slide 42, I notice there's a less-than

22   sign in front of the 720.

23   A.   Yes.

24   Q.   And is it your opinion that a skilled artisan would not --

25   would not want to dose higher than 720?

BENJAMIN GREENBERG - DIRECT

1    A.   Correct.

2    Q.   And why not, briefly?

3    A.   So several reasons.  First off, there's already data

4    showing efficacy at 360 to 720.  So just from an immunologic

5    point of view, we have a target within that range.  But beyond

6    that, there are a couple express warnings in the literature

7    relative to going the higher doses.  And they relate to the

8    possibility of side effects at doses as you go up and

9    specifically as you go above 720.

10   Q.   And so if we could look at the Fumaderm label, which is

11   JTX 2158 and page 2.  Are you familiar with the Fumaderm label,

12   Dr. Greenberg?

13   A.   Yes.

14   Q.   And what is the Fumaderm label?

15   A.   So this is the summary of product characteristics that's

16   marketed as Fumaderm and approved in Germany for psoriasis.  It

17   names the medicinal product and the composition of that

18   product.

19   Q.   And if we can look at page 8, when was it dated?

20   A.   So the date of revision of the text is April 2005.

21   Q.   When was its first authorization?

22   A.   The first authorization is in 1994.

23   Q.   And what does the Fumaderm label say about side effects?

24   Again if you look at page 5.

25   A.   So on page 5 it lists the undesirable effects, the side

BENJAMIN GREENBERG - DIRECT

1    effects.  And amongst them it lists facial redness or hot

2    flushes, referring to the experience patients have after

3    swallowing a pill, they feel flushed and hot and uncomfortable;

4    the gastrointestinal disorders, including diarrhea; and

5    abdominal cramps or flatulence; among others.

6    Q.   Why are these type of GI side effects a concern for a

7    skilled artisan?

8    A.   So, first, we don't like to torture our patients with side

9    effects.  So just from a general humanity perspective, we try

10   to be kind about things.

11        But we also have to recognize that, when we are

12   recommending and prescribing medications for patients, that

13   it's always a decision from the patient on taking the medicine

14   as prescribed and being compliant.  And the more side effects

15   go up, naturally, people tend to miss doses or avoid the

16   medication.

17        And so, when we're talking about chronic diseases like

18   multiple sclerosis, for example, where a lot of our patients

19   aren't having any symptoms, they're in between attacks and they

20   feel well, to experience side effects from a medication would

21   definitely have an impact on their quality of life and on

22   whether or not they'd be compliant with the medication.

23   Q.   Does the Fumaderm label contain a warning to physicians

24   about how much to prescribe to patients?

25   A.   It does.

BENJAMIN GREENBERG - DIRECT

1  Q.   And what is that warning?

2  A.   So it expressly states, after going through the titration

3  schedule of Fumaderm, that the maximum daily dosage of 3 by 2

4  gastroresistant Fumaderm tablets must not be exceeded.  And the

5  3 by 2 is referring to 240 milligrams three times a day or a

6  dose of 720 milligrams of DMF in a day.

7  Q.   So what does the Fumaderm label teach a skilled artisan?

8  A.   So the Fumaderm label both explains what the expected side

9  effects would be, discusses the fact that there is a dose

10  dependence to the side effects, and gives a clear warning -- in

11  fact, uses the term "must not exceed" that upper range of

12  dosing, which would include -- which would be at the

13  720 milligram dose of dimethyl fumarate.

14  Q.   Have side effects always been associated with DMF?

15  A.   To my knowledge, in each of the papers I have read talking

16  about this agent relative to humans, they reference side

17  effects.

18  Q.   And if we could look at the JTX 2168, turning to page 4.

19      What is Exhibit 2168?  Maybe we can call up the title,

20  please, and the authors.

21  A.   So the title of this is "Fumaric Acid Therapy for

22  Psoriasis:  A Randomized Double-Blind Placebo-Controlled

23  Study."  The first author is Nugteren-Huying.  This was

24  published in 1990.

25  Q.   And what doses of DMF treatments were administered?  And

BENJAMIN GREENBERG - DIRECT

1   this is to psoriasis patients, correct?

2   A.   This is to psoriasis patients.  And there were groups of

3   patients.  But when looking at the enteric-coated tablets, the

4   Fumaderm, which includes the 120 milligrams of dimethyl

5   fumarate, Group 1 was given those tablets.  And then,

6   ultimately, the dosage schedule called for a gradual increase

7   from one to six tablets daily, so getting to that upper range

8   that's referenced in the Fumaderm label.

9   Q.   And, again, we've discussed how skilled artisans

10  understood Fumaderm to be the equivalent of dimethyl fumarate.

11       What did the article JTX 2168 report about the efficacy of

12  the treatment on psoriasis?

13  A.   So in the discussion they noted that the results of the

14  study show that oral treatment with tablets containing a

15  combination of dimethyl fumarate and monoethyl fumarate may be

16  effective in the treatment of psoriasis.

17  Q.   Did the article talk about the side effects?

18  A.   It does.

19  Q.   What did it say about that?

20  A.   It confirms what we see in the label and other literature,

21  specifically the main side effects of the treatment in the

22  group that received active therapy, Group 1, were flushing,

23  diarrhea, fatigue, and nausea.

24  Q.   And were the side effects also mentioned in the discussion

25  of the paper?

BENJAMIN GREENBERG - DIRECT

1    A.    Yes.

2    Q.    And what did the author discuss about the side effects?

3    A.    They indicated that the drawback of fumaric acid therapy

4    may be its side effects.

5    Q.    And so what does JTX 2168 teach the skilled artisan, in

6    your opinion?

7    A.    So, when looking at the dosing regimens, it's teaching

8    that, as you get to the 720 milligram equivalent dose of DMF,

9    in this case it was as Fumaderm, you see that there are

10   dose-limiting side effects.  And they specifically call out

11   that you should look at regimens that would minimize these

12   problems.

13   Q.    And did these side effects, they reported repeatedly

14   throughout time in your opinion?

15   A.    In my opinion, based on the literature I've read,

16   consistently, these side effects are recognized and reported in

17   clinical trials.

18   Q.    So let's move forward about 15 years to 2005 and look at

19   the Biogen press release, DTX 1133.  We can call up the top

20   part.

21         What is DTX 1133?

22   A.    So DTX 1133 is a press release in BusinessWire from

23   April 7th, 2005, and it was released by Biogen Idec and

24   Fumapharm AG, the title of which is "BG-12 Psoriasis Study

25   Meets Primary Endpoint; Oral Compound Also Being Studied for MS

BENJAMIN GREENBERG - DIRECT

1    in Phase II Trial."

2    Q.    So a skilled artisan understands in 2005 that BG-12 is

3    dimethyl fumarate?

4    A.    Yes.

5    Q.    And this is a study in psoriasis, using BG-12?

6    A.    Correct.

7    Q.    And what does the press release say about the Phase 3

8    trial design?

9    A.    So the trial was a multicenter double-blind

10   placebo-controlled Phase 3 study of 175 patients who had

11   moderate to severe psoriasis, and they were randomized to

12   receive either placebo or 720 milligrams of BG-12 a day for

13   16 weeks.  And then they were followed relative to an outcome

14   measure specific for psoriasis.

15   Q.    Did the press release report on the side effects at all of

16   the study?

17   A.    It did.

18   Q.    And what did it say about that?

19   A.    In the study the most commonly reported adverse events

20   were flushing and diarrhea.  In addition, one patient was

21   hospitalized for pneumonia, and one patient was hospitalized

22   for kidney stones.

23   Q.    Is this consistent with your understanding of the side

24   effects of Fumaderm?

25   A.    Yes.

BENJAMIN GREENBERG - DIRECT

1   Q.   And is it consistent today with the administration of

2   Tecfidera?

3   A.   To my understanding, yes.

4   Q.   And so what does -- so let's look at another reference.

5   Let's look at DTX 1001, which I think is the Joshi patent we

6   talked about earlier already.

7        Did you rely upon the Joshi patent for any teaching

8   relating to the side effects of DMF?

9   A.   Yes.

10  Q.   And what does the Joshi '999 patent say about side

11  effects?

12       We can go to page 6 at Column 5, please, about lines 28.

13  A.   So the Joshi patent notes that "By administration of the

14  diethyl fumarates in the form of microtablets, which is

15  preferred, gastrointestinal irritations and side effects, which

16  are reduced already when conventional tablets are administered,

17  but is still observed."

18  Q.   And is the same text disclosed in the other Joshi patent,

19  the '376 patent, which was DTX 1000?

20  A.   Yes.

21  Q.   And you understand the specification of these two patents

22  to be substantially the same?

23  A.   Yes.

24  Q.   And what would a person of ordinary skill in the art

25  understand from this statement in the Joshi patents?

BENJAMIN GREENBERG - DIRECT

1   A.   So up until this time, looking at the literature of what's

2   been reported in psoriasis with BG-12, what's been reported in

3   studies of psoriasis in MS with different versions of dimethyl

4   fumarate, whether it be Fumaderm or DMF as a monotherapy or

5   specifically DMF as a microtablet, there's a very consistent

6   pattern of side effect profiles that are seen in all of these

7   different formulations of the drug.

8   Q.   And, Dr. Greenberg, are you aware that there's a statement

9   in the '999 patent in DTX 1001 that Biogen asserts would teach

10  a skilled artisan that Joshi ties tolerability of the drug to

11  the high concentration in the GI mucosa, not due to the

12  frequency or the total daily dose?

13  A.   Yes.

14  Q.   And let's see if we can find that statement.  I believe it

15  is Column 5.

16       And do you agree with that interpretation of the Joshi

17  patent?

18  A.   No.

19  Q.   And why not?

20  A.   So what's being indicated here is "The ingredients in the

21  tablet are released in the intestine in a concentration which

22  is too high, causing local irritation of the intestinal mucus

23  membrane."

24       And so when they're talking about side effects, it's

25  relative to that mucous membrane; it's not relative to

BENJAMIN GREENBERG - DIRECT

1    absorption or anything along those lines.

2    Q.   Again, does the skilled artisan, are they aware of any

3    additional -- excuse me.

4        Understanding that criticism or that teaching, supposedly,

5    of the Joshi patent and your understanding of it, what does

6    that actually mean, the GI mucosa that is not absorbed?

7    A.   That, as you're dosing, every time you expose the GI

8    mucosa to the agent, you're risking the side effects.  So part

9    of what this teaches is moving towards the twice-daily dosing

10   versus three-time-a-day dosing, because at three times a day,

11   the experience of the patient will be repeated 50 percent more

12   with than just having that extra dose.

13   Q.   And a little bit before the break we also were looking at

14   the ClinicalTrials.gov website, and that was DTX 1135 on

15   page 2, if we look at the bottom of that page.

16       And what does the ClinicalTrials website explain about the

17   side effects for DMF?

18   A.   So the ClinicalTrials.gov website does two things.  One,

19   it recognizes the types of side effects that patients were

20   being expected to have, similar to what's been seen and

21   described already, the flushing and the nausea and the GI

22   symptoms; and it goes on to say that "Dose reduction will be

23   allowed for subjects who are unable to tolerate the

24   investigational drug."

25   Q.   Now, would you agree that maximizing efficacy is the top

BENJAMIN GREENBERG - DIRECT

1   priority for MS therapy?

2   A.   So it's a complicated question.  So at a philosophical

3   level, it's a great statement that I have to agree with.  It's

4   like my mother and apple pie.  Yes, I want to maximize therapy

5   for multiple sclerosis.

6        But you have to put it into the context of are we talking

7   about at a population level or an individual patient level?

8   And then you also have to put it into context with what the

9   patient experiences relative to side effects.

10       And so could I maximize efficacy in MS by giving every

11  patient a bone marrow transplant?  I could, but that wouldn't

12  seem reasonable in a population level.

13       So when we're talking about maximizing therapy, it's a

14  complicated concept that can't be just whittled down to one

15  statement.  We have to balance effective doses that are

16  effective for the majority of, or at least, I should say, a

17  significant number of the population studied, a meaningful

18  number of the population studied.  And then you have to balance

19  that efficacious dose with are they going to take the drug?

20  Are they going to be compliant?  Are they going to experience

21  side effects?  And put that all together to pick a dose that

22  would work at a global level, even if it doesn't work for every

23  possible person.

24  Q.   And you mentioned compliance.  So let's talk a little bit

25  more about compliance.  What is compliance?

1    A.    So compliance is when we actually follow the prescription

2    as it's prescribed.  So if we're supposed to take a medication

3    at certain times a day or in certain doses or certain

4    frequency, we follow those instructions.

5    Q.    Can the frequency with which a drug has to be taken impact

6    patient compliance?

7    A.    Yes.

8    Q.    How?

9    A.    So there's both literature to suggest, common sense, and

10   my experience, that, as the frequency of dosing increases of

11   any medication, especially in a given day, compliance can go

12   down.

13   Q.    And did you rely on any articles to support this notion

14   that, with less frequent dosing, compliance increases?

15   A.    Yes.

16   Q.    Can we look at DTX 1073?  Or Slide 45, rather.

17         And on Slide 45, I believe, is the cause of the Paes

18   reference.  Are you familiar with that?

19   A.    Yes.

20   Q.    Is this one of the articles you relied upon for

21   compliance?

22   A.    Yes.

23   Q.    What is DTX 1073 as shown on -- in general and also as put

24   up on Slide 45?

25   A.    So this is a peer-reviewed publication published in

BENJAMIN GREENBERG - DIRECT

1   October of 1997 by Paes and colleague entitled "Impact of

2   Dosage Frequency on Patient Compliance."

3   Q.   What did Paes study?

4   A.   Paes looked at the impact of dosage frequency on

5   compliance of patients who were receiving medications from

6   pharmacies.

7   Q.   How frequently were the patients receiving it?

8   A.   Patients could be receiving medications -- could be being

9   prescribed -- excuse me -- medications to take once a day, two

10  times a day, three times a day in various forms.

11  Q.   And what about the Paes 1997 study -- what were the

12  results of it?

13  A.   So what they showed, as highlighted here on the slide,

14  DDX 1100, Slide 45, is in this study the data showed a clear

15  relationship between compliance and the number of daily doses.

16  And they end by saying "The compliance increases with a

17  reduction of the number of doses."

18  Q.   Does that comport with your experience in treating

19  patients with MS?

20  A.   It does.

21  Q.   And you mentioned another article.  If we could turn to

22  the next slide.  It's highlighting an article by Eisen.

23       Did I pronounce that right?

24  A.   I haven't met him personally.  I think it's Eisen.

25  Q.   Dr. Eisen from 1990.

BENJAMIN GREENBERG - DIRECT

1       What is DTX 1039?

2  A.   So this is a publication entitled "The Effect of

3  Prescribed Daily Dose Frequency on Patient Medication

4  Compliance."

5  Q.   In which journal did it appear?

6  A.   So this appeared in the Archives of Internal Medicine.

7  Q.   And what did the results of Eisen 1990 show?

8  A.   So in line with what was concluded in the Paes publication

9  we previously reviewed, Eisen and colleagues indicated that

10  "Compliance improves dramatically as prescribed dose frequency

11  decreases.  Improved compliance" -- it goes on to say "What

12  health care providers can do to improve compliance is to select

13  medications that permit the lowest daily prescribed dose

14  frequency."

15  Q.   And so, in your opinion, is the skilled artisan going to

16  be looking for or motivated to have a more compliant dosing

17  regimen when approving unknown therapies?

18  A.   Absolutely, particularly in multiple sclerosis.  As we've

19  talked about today and even hearing in the openings, this

20  notion of there can be an invisible component to the disease.

21  Anything we can do to improve compliance is a heavily

22  motivating factor when picking a dosing regimen.

23  Q.   And also you had, on your motivation overview, you had

24  mentioned 120-milligram intervals of the drug that was

25  available.  Turning to slide -- the next slide, why are you

1  talking about 120-milligram-a-day intervals?

2  A.   So in the literature, whether we're talking about

3  Fumaderm, studies that looked at DMF as a monotherapy, or

4  studies that specifically looked at BG-12, all prior to 2006,

5  all of the studies utilized increments of 120-milligram doses

6  of DMF.

7       The Fumaderm tablets that would be available to a skilled

8  artisan were available with DMF as 120-milligram dose.  BG-12

9  used capsules in 120 milligram increments, 120, 360, and 720 in

10 the arms taking multiple pills throughout the day.

11      And then in Nieboer, the dosing of DMF was in increments

12 of 120 milligrams at a time.

13 Q.   To your knowledge, has a dose higher than 720 milligram

14 ever been tested?

15 A.   Not to my knowledge.

16 Q.   And so, as of this time -- again, we're probably about

17 2006, earlier than 2006 -- how would a skilled artisan be

18 motivated by compliance and side effects in the 120 milligram

19 intervals?

20 A.   So, as we enter January of 2006, there's a combination of

21 having a strong reasonable expectation of success in this dose

22 range.  That caps off at 720.  And with that cap being dictated

23 by the literature showing side effects in multiple trials

24 amongst multiple formulations of dimethyl fumarate, the

25 Fumaderm label calling out a hard stop indicating that you must

BENJAMIN GREENBERG - DIRECT

1   not go beyond that high dose, and the authors describing side

2   effects constantly indicating that seeking the lowest

3   efficacious dose, trying to avoid side effects, would all be

4   motivating.

5        And when you take all of that in a background of a world

6   where I can prescribe in 120 milligram increments and knowing

7   that I want a twice-daily equal dose, the math, the efficacy,

8   and the side effects would all take me and motivate me to use

9   480 milligrams.  And I would be very reassured by the

10  experience of Schimrigk and Nieboer and Kolbach that I was

11  square-on from an efficacy perspective relative to the immune

12  system.

13  Q.   And if we could turn to reasonable expectation of success.

14  Did you create a slide showing your opinions as to whether the

15  skilled artisan would have a reasonable expectation of success?

16  A.   Yes.

17  Q.   And what is that summary?

18  A.   So I think it's important to note that prior to 2006 the

19  art that was available, the literature that was available,

20  could be broken down into two different ways.

21       First, looking at the autoimmune disease psoriasis and

22  recognizing that the psoriasis literature talks about multiple

23  sclerosis and the multiple sclerosis literature talks about

24  psoriasis, that there was this commonality between the two

25  autoimmune diseases.  There's literature specifically about

BENJAMIN GREENBERG - DIRECT

 1   480-milligrams a day showing a clinical effect to patients.  So

 2   I know I have this marker that that dose in a Th1-predominant

 3   autoimmune disease led to a clinical benefit of patients.

 4        But beyond that, in specific studies relative to multiple

 5   sclerosis, I get ample evidence to suggest that that dose range

 6   of 360 to 720 was efficacious.  Between Schimrigk and the

 7   prolonged exposure to 360 milligrams and then the press release

 8   in light of the abstracts and the posters of Kappos, I would

 9   know that up to 720 milligrams had been efficacious.

10        And, finally, when looking to that autoimmune disease

11   world of psoriasis, there had been twice-daily dosing, BID

12   dosing.  So from an immune system point of view, in order to

13   shift that immune system from a Th1 to a Th2, giving

14   240 milligrams twice a day was able to achieve that goal in

15   actual patients.

16        So putting this all together, I think it's very fair to

17   say I'd have a reasonable expectation of success moving forward

18   with 480 milligrams of dimethyl fumarate in multiple sclerosis.

19   Q.   Is that true even though you're really just trying to sort

20   of cherry-pick some psoriasis 480 milligrams and shove it into

21   the MS theater?

22        I mean, is that really going to provide a skilled artisan

23   with a reasonable expectation of success?

24        As you said, these are complex, very difficult diseases.

25   How can you do that?

1  A.    It's a good question.  And I understand why, on its face,

2  it seems like I'm talking about apples and oranges, because, as

3  has been said, psoriasis is a skin disease; multiple sclerosis

4  is a brain disease.  These don't -- you go to a dermatologist

5  for psoriasis; you go to a neurologist for multiple sclerosis.

6      But the common link between both of them, and what has

7  evolved since the 1980s and 1990s, is recognizing that you go

8  to those clinicians because of the end organ damage.  I know

9  how to manage the symptoms of multiple sclerosis.  I know how

10 to do MRIs.  I don't do biopsies of skin.  I don't do

11 psoriasis.  Dermatologists do that.

12     But what we share in common, even though you wind up at

13 two different clinics, is the autoimmune profile which had been

14 theorized to be similar actually proved to be similar for a lot

15 of patients, not all.  This is a complex disease.  But in the

16 setting of multiple sclerosis, if I can have a reasonable

17 expectation of success that it will benefit an appropriate

18 proportion of a population, a meaningful proportion of a

19 population, then I would definitely take the expertise and the

20 experience from psoriasis and apply it to multiple sclerosis.

21 Q.    And in all of your work in preparing your opinions and

22 everything that went into it, did you ever come across anything

23 that would teach you that 480 milligrams would not work?

24 A.    I'm not aware of anything that would say that.

25 Q.    Were there any prior articles or anything that said you

BENJAMIN GREENBERG - DIRECT

1   got to go to 1500?

2   A.   I'm not aware of any.

3   Q.   Now, even if the psoriasis data is not relevant, even if

4   perhaps the Court disagrees with you and says maybe not

5   psoriasis, too big of a stretch, would you still believe that

6   there was a reasonable expectation of success that

7   480 milligrams would work?

8   A.   I would.

9   Q.   Why?

10  A.   So as we move into specifically multiple sclerosis -- so

11  if I was sitting here today and the only studies that had ever

12  been done were psoriasis, I would still believe that I'd have a

13  reasonable expectation of success because I think the data

14  comparing the two is adequate and convincing.

15       But in the prior art prior to 2006, I have reports of two

16  different studies, one a well-done, over-a-year-and-a-half-long

17  study in a small number of patients and one study in a large

18  number of patients over a short period of time.  So two kind of

19  versions of studies in multiple sclerosis showing efficacy of

20  dimethyl fumarate in this range of 360 to 720.

21       And so even if I knew I wanted to be in that range and

22  minimize side effects and do twice-a-day dosing, I would still

23  get to 480 milligrams.

24  Q.   And so I think that if we can turn to the next slide,

25  Slide 49, just overall looking at your pathways to

BENJAMIN GREENBERG - DIRECT

1    obviousness -- and briefly because we've gone over a lot of

2    things today -- why, in your opinion, would the combination of

3    the January 2006 press release and the Schimrigk 2004 abstract

4    render the claims of the '514 patent obvious?

5    A.    So with just the January 2006 press release and the

6    Schimrigk 2004 abstract, I have on one hand a publicly

7    available piece of art indicating that dimethyl fumarate as a

8    monotherapy reached its end point of treating multiple

9    sclerosis at at least a 720-milligram dose.

10        And on the other hand, I have a well-done trial using

11    dimethyl fumarate dosed as Fumaderm, but in the abstract

12    referencing that Fumaderm relative to the amount of DMF the

13    patient is exposed to, showing a prolonged period of remission

14    of patients at a dose of 360 milligrams.

15        And so putting those two together, I would find a claim

16    that 480 milligrams would be effective to treat MS as an

17    obvious claim in light of these two pieces of work.

18    Q.    Okay.  So let's turn to the second ground.

19            MS. BLOODWORTH:  And, Your Honor, just for education,

20    all of this art up till this point has been 102(b) art.  It's

21    all published one year prior.  So now we're going to move into

22    the Kappos presentation and the Kappos 2004 abstract, the

23    second ground.

24    BY MS. BLOODWORTH:

25    Q.    So, Dr. Greenberg, what is the Kappos presentation?

BENJAMIN GREENBERG - DIRECT

1  A.    So the Kappos 2006 presentation is the presentation of the

2  data from the Phase 2 Biogen-sponsored study of BG-12 in

3  relapsing-remitting multiple sclerosis patients.

4  Q.    And for the record, it is JTX 2153.  And what is the

5  presentation titled?

6  A.    So the title of the presentation is "Efficacy of a Novel

7  Oral Single-Agent Fumarate, BG-12, in Patients with

8  Relapsing-Remitting Multiple Sclerosis:   Results of a Phase 2

9  Study."

10  Q.    And how many authors are on the publication?

11  A.    So there are 14 authors by my quick count.

12  Q.    And are you aware that it was presented at the European

13  Neurological Society meeting?

14  A.    I am.

15  Q.    And approximately how many people attend those meetings?

16  A.    To my understanding, there's, on average, a couple

17  thousand patients at that meeting -- excuse me -- a couple

18  thousand practitioners, not patients.

19  Q.    And who is the first-named author of the presentation?

20  A.    Dr. Kappos.

21  Q.    And what, in your experience with clinical trial, is the

22  first author typically responsible for?

23  A.    So the first author is usually involved in both the

24  design, acquisition, analysis, and critical review of the data

25  in preparing a presentation for a public meeting such as this.

1   Q.   And also in your experience, ethically, if you present a

2   paper or an author on the paper, are there certain obligations

3   on you?

4   A.   We are required to certify that we had access to data,

5   that we are representing the work as us being involved in the

6   work in a meaningful way, meaning I'm not allowed to correct

7   grammar on a paper and be an author.  The standard is that you

8   played a meaningful role in the design, conduct, or analysis of

9   the trial.

10  Q.   And who gave the presentation?

11  A.   To my understanding, it was Dr. Kappos.

12  Q.   And do you have an understanding of Dr. Kappos's role for

13  the Kappos study?

14  A.   My understanding is that he served as a steering committee

15  head for the study.

16  Q.   And let's look at the background of the presentation.  And

17  this is slide -- DDX 1100, Slide 52.

18       What did the Kappos presentation describe?

19  A.   So through this presentation, I'll draw attention to a

20  variety of things that stand out to me.

21       On this slide in the background I think it's worth noting

22  that, when describing -- and I'll point on the screen over

23  there -- the background about fumaric acid esters, it refers to

24  a Th1 to Th2 cytokine profile shift.  And it has a citation

25  cited Number 8, which is an article by Ockenfels.

BENJAMIN GREENBERG - DIRECT

1    And specifically what this says to me is that the authors,

2    including Dr. Kappos, recognized the role of the Th1/Th2 immune

3    system paradigm in multiple sclerosis, and they were pulling

4    from the psoriasis literature of fumarates showing efficacy via

5    shifting a Th1/Th2 cytokine profile.

6    Q.   The Ockenfels reference, Number 8 on Slide 52, that is the

7    Ockenfels 1998 reference that we talked about earlier in your

8    testimony?

9    A.   Yes.

10   Q.   So why do you think Biogen would mention psoriasis studies

11   in the background slide of the Phase 2 study?

12   A.   I think, as you're giving background for any study, you

13   display all of the different things that got you to the point

14   for considering the study.  And this is recognition of what

15   we're identifying in the prior art, that this was a

16   long-standing connection, a known connection between the

17   immunology of psoriasis and multiple sclerosis, and that you

18   could pull from the psoriasis experience into multiple

19   sclerosis.  And that's being based on prior art; it's not being

20   based on data presented here.

21   Q.   Is there a slide on the role of fumaric acid therapy?

22   A.   There is.

23   Q.   If we could turn to Slide 11 of JTX 2153.

24       What does it say about fumaric acid therapy?

25   A.   So the title of the slide was "Fumaric acid therapy has

BENJAMIN GREENBERG - DIRECT

1    shown efficacy in immune disorders."  And after noting that

2    it's orally bioavailable, which is basically just saying we

3    don't need to give a shot, it goes on to note two things and

4    two things only.

5         First is that it has successfully been used for long-term

6    treatment of psoriasis.  And it was successfully used in a

7    trial of relapsing-remitting multiple sclerosis leading to a

8    significantly reduced number of gadolinium-enhancing lesions in

9    ten patients.

10        And that's referencing the Schimrigk paper -- the

11   Schimrigk abstract and poster and body of work that we've

12   previously spoken about.

13   Q.   And so that's reference -- Footnote 4 is the Schimrigk

14   study?

15   A.   Yes.

16   Q.   And it cites the Nieboer article, the Nieboer 1990

17   article, for example, for the point of it being successfully

18   used for long-term treatment of psoriasis?

19   A.   Yes.

20   Q.   And that's the same Nieboer 1990 article that we've

21   discussed a couple times in your testimony?

22   A.   Yes.

23   Q.   So what does the Kappos 2006 presentation say about

24   efficacy of BG-12 and psoriasis?

25   A.   So it starts off, before getting to any of the data about

BENJAMIN GREENBERG - DIRECT

1  what was experienced by patients in this Phase 2 trial, by

2  anchoring dimethyl fumarate as an effective therapy in both

3  psoriasis and multiple sclerosis prior art.

4  Q.   And is it reference -- is reference to the Morwitz 2005

5  article that we've discussed in your testimony?

6  A.   Yes.

7  Q.   And what was the design of the study?

8  A.   So as outlined on this slide, which is DDX 1100, Slide 55,

9  the design of the study was one that would determine the

10  efficacy of BG-12, dimethyl fumarate, on brain lesion activity

11  in relapsing-remitting multiple sclerosis patients.

12       After defining the inclusion criteria, which is standard

13  for these trials, it listed the end points and highlighted what

14  was the primary end point, specifically, the total number of

15  new gad-enhancing lesions on MRI scans performed at weeks 12,

16  16, 20, and 24.

17  Q.   And does the Kappos 2006 presentation provide a schematic

18  of the study design?

19  A.   It does.

20  Q.   If we could turn to Slide 15 of JTX 2153.

21       And what is shown in Slide 15 of the Kappos presentation?

22  A.   So what's shown in Slide 15 of the Kappos presentation and

23  Slide 56 of what we're talking about now is the schematic of

24  what was planned and what was executed for this Phase 2 trial

25  of BG-12 in multiple sclerosis.

BENJAMIN GREENBERG - DIRECT

193

1   Q.   And how many dose -- what were the doses that were

2   administered in this study?

3   A.   So, as had been noted in the past, the study included four

4   arms:  a placebo arm and then three different doses of BG-12,

5   120 milligrams a day, 360 a day, and 720 a day.

6   Q.   And to state the obvious, there was no 480-milligram dose

7   in the study, correct?

8   A.   There was no 480-milligram dose in the study.

9   Q.   Okay.  And what are the little brains on the bottom of the

10  schematic representing?

11  A.   So those graphics represent the time points at which the

12  study would acquire MRI data from patients.  And specifically

13  noting they would get an MRI at week 4, 8, 12, 16, 20, and 24.

14  Q.   So a total of -- is it six scans?

15  A.   Six scans.  It was monthly scans over the six months.

16  Q.   And what does it say about tolerability?

17  A.   And so the bottom of the slide indicates that patients

18  received 120 milligrams TID, which is three times a day, during

19  the first week to determine tolerability.

20  Q.   So was tolerability side effects still an issue with DMF

21  as of the Kappos -- the time of the Kappos presentation, in

22  your opinion?

23  A.   Yes.

24  Q.   Can you please walk us through how patients are typically

25  screened for participation in a study and then how they are

BENJAMIN GREENBERG - DIRECT

1    assigned to different arms?

2    A.   Yes.

3        So the screening phase, as outlined on the schematic,

4    refers to the period of time in a study where we do several

5    things with a patient.

6        First, we review the inclusion-exclusion criteria.  Do

7    they have multiple sclerosis?  Do they meet the criteria of how

8    many relapses they've had?  And then we also look to make sure

9    there aren't any medical comorbidities or other reasons why

10   they wouldn't be able to participate in the trial.

11       Once somebody has, obviously, signed informed consent and

12   passed screening, then we move to the randomization stage of a

13   study, which is a critically important part setting up into

14   motion ultimately the data analysis at the end.

15   Q.   Is this how patients get assigned to be on which arm of

16   the study?

17   A.   It is.  In a nonrandommized trial, if I had ten patients

18   come to me in a nonrandommized trial and there were multiple

19   arms, I could just assign which patient I wanted to go into

20   which arm.  But that's been proven to be problematic from a

21   data interpretation perspective because of biases.  I would

22   naturally pick the sickest patient to go to the highest dose if

23   I thought that was going to be best, for example.

24       And so randomization is there such that, as patients come

25   into a clinical trial center or a clinic, they can be assigned

BENJAMIN GREENBERG - DIRECT

1   an arm in an unbiased fashion such that, when we get to the end

2   of the study and we're comparing the different arms, we're

3   comparing apples to apples, that we didn't just have one type

4   of patient in one arm or another, that it was an equal

5   distribution of patients across the four arms.

6   Q.   And how many patiets were a part of this study?

7   A.   So as outlined on the next slide, which is DDX 1157, there

8   were 309 patients screened.  257 were randomized into one of

9   the four arms.

10  Q.   And looking at Slide 17 of the Kappos presentation,

11  JTX 2153, after the randomization, what does the Kappos

12  presentation tell the skilled artisan about the baseline

13  patient characteristics of each arm?

14  A.   So in a standard fashion for presentations for clinical

15  trials that are randomized, there is a slide like this showing

16  how the randomization occurred and were the patient groups

17  equal.

18       So across the top of the slide, you have the four

19  treatment groups.  And it lists the placebo arm and the three

20  doses and how many patients were in each.  And you see it's

21  about an equal number.  It's 65, 64, 64, and 63.

22       And then the slide goes on to summarize a few

23  characteristics of the patients so that you can compare, just

24  visually sitting there, did the randomization work?  Do you

25  have the same types of patients?

BENJAMIN GREENBERG - DIRECT

1      You want to make sure, for example, in age, that we didn't

2  enroll a lot of 18-year-olds in the 720-milligram group and a

3  bunch of 35-year-olds in the placebo group because maybe age

4  would skew the data.

5      And as we see here, age was very similar across the four

6  groups.  And just by eye, it's obvious that there weren't

7  distinct differences between them.

8      It goes on to compare the patients based on clinical

9  characteristics.  And they picked two, the most common two,

10  which are the relapse history, meaning in the last year or, in

11  this case, last three years, how many relapses had patients

12  had?  Were we enrolling patients who had had ten relapses this

13  past year in one arm versus none in another arm?

14      And what you see are numbers that are very consistent

15  across the four arms.  One relapse in the last year and two or

16  three relapses over the last three years over the arms.  And

17  just by eye, you'd see that these are very balanced four arms

18  for a clinical study.

19      The third criteria that gets used is referred to as the

20  EDSS.  That's an acronym that's defined below, the expanded

21  disability status scale.  And that's a disability score that we

22  use in multiple sclerosis.  It's just a score that's zero to

23  ten.  And the higher your number, the more disabled you are.

24      And so they report the average score so that you could

25  look at the data and say the patients from a disability

BENJAMIN GREENBERG - DIRECT

1   perspective, when they started the study, were or were not

2   similar.  And as you move across the four arms, you see a

3   disability status score average that's very similar, all

4   hovering around 2.5 range, which is very even across the four

5   arms.

6       And then the last criteria that they use is the number of

7   gadolinium-enhancing lesions, the average.  In this one, there

8   is a difference between the arms.

9   Q.   So to recap, the age, relapse history, and EDSS scores --

10  EDSS baseline characteristics are all fairly consistent?

11  A.   Yes.  They look to be very consistent.  And nothing would

12  stand out to me in terms of differences.

13  Q.   And are the groups similar relative to their mean baseline

14  GD-enhancing lesions, in your opinion?

15  A.   They are not.

16  Q.   And why would having a difference in the baseline of the

17  GD-enhancing lesions matter?

18  A.   It matters for several reasons.

19       So the first is -- and the foremost is -- this was the

20  primary end point of the trial.  The data in the a priori

21  decision on data analysis was going to be how many

22  gadolinium-enhancing lesions do people have at the end of the

23  trial.

24       And so if you have a group that is starting off with far

25  fewer or far higher, then you are handicapping them relative to

BENJAMIN GREENBERG - DIRECT

1    the outcome of the trial.  It would be like enrolling patients

2    in a trial for hypertension.

3        And if in one arm the average blood pressure was 200/100

4    and in the other arm the average blood pressure was 140/90,

5    even if the drug worked in both arms, at the end of the study,

6    the people who started at 140/90 are going to look better.  It

7    sets you up for having a discrepancy at the end.

8    Q.   And did you create a demonstrative graphing this

9    discrepancy?

10   A.   Yes, I did.

11   Q.   And if we can look at slide -- DDX 1000, Slide 59, what is

12   depicted here?

13   A.   So what's at the bottom of the slide is just a blowing up

14   of the data from the Kappos trial, just showing the mean number

15   of gadolinium-enhancing lesions in the four patient

16   populations.

17       So the average number of gadolinium-enhancing lesions in

18   the placebo arm was 0.8.  In the arm that was randomized to

19   receive 120 milligrams a day, it was 1.2.  In the group that

20   was randomized to receive 360 milligrams a day, it was 2.5.

21   And then in the 720-milligrams-per-day dosing arm, it was back

22   down to 1.2.

23       So when you just graph this to visually see are these

24   groups similar, are we comparing apples to apples, is everybody

25   starting off from equal footing, visually, you can see that the

BENJAMIN GREENBERG - DIRECT

1   360-milligram arm stands out.

2        And it's important to note, just from the purposes of a

3   skilled artisan, the graph isn't necessary.  I add this just to

4   demonstrate what goes through my mind when I see numbers like

5   that.

6        Because when I look at the placebo arm compared to the

7   360-milligram-a-day arm, the 360-milligram-a-day arm was three

8   times higher than the placebo, but the 720 and 120 were pretty

9   close.  And so if we're going to measure gadolinium-enhancing

10  lesions over the course of the trial, that 360-milligram-a-day

11  arm is being handicapped from the get-go.  The randomization,

12  unfortunately, had what we refer to as a chance bias.

13  Q.   So is -- and I guess maybe I cut you off.

14       But so the imbalance in these baseline lesions, this three

15  times difference over placebo, how does that occur?  I mean,

16  how do you let that occur in a clinical trial?

17  A.   So it's important to note that I actually don't fault the

18  design of the clinical trial.  I don't fault the study

19  personnel.  This is something that can happen in trials.

20       So there's two types of biases that we can have in trials.

21  One is that systematic bias I referred to, which is why we

22  randomized.  Systematic bias is if I take all of the patients

23  with a severe version of disease and I put them into the

24  highest-dose category.  That's a systematic bias.

25       Chance bias is by no fault of the investigator.  As we

BENJAMIN GREENBERG - DIRECT

1   were randomizing in this trial, the investigators didn't use a

2   baseline MRI as one of the characteristics to randomize.  It's

3   not required.  I don't fault them for not doing it.  I think

4   they did a wonderful job in terms of design and execution of

5   the study.

6        But when it comes to chance bias, what the tenets of

7   clinical trial data interpretation indicate is you have to deal

8   with it at data analysis.  You have to correct for the impact

9   of a chance bias in how you interpret the results.

10  Q.   So you're saying this baseline characteristic imbalance,

11  it was caused by bad luck?

12  A.   Literally bad luck.

13  Q.   And is this something that is -- again, can happen in

14  clinical trials?  Is it a known phenomenon?

15  A.   Absolutely.  When we take part in courses training

16  trainees who are learning to be clinical trialists, this is a

17  discussion that gets had and is described throughout the

18  literature of chance bias affecting an unequal randomization.

19  Q.   And what is the significance of unequal randomization on

20  the interpretation of trial data?

21  A.   So it depends on what was unequally randomized.

22       So, for example, if I was doing a trial on multiple

23  sclerosis and I found out in the randomization I had an

24  overrepresentation of left-handed individuals in one treatment

25  arm, I might not care.  That might not be a significant unequal

BENJAMIN GREENBERG - DIRECT

1   randomization to pay attention to.

2        But when the unequal randomization is relative to the

3   primary end point of the trial, it has to be recognized and

4   dealt with in data interpretation.

5   Q.   And so the number of mean gadolinium-enhancing lesions is

6   the primary end point of this trial?

7   A.   The primary end point is the new -- the mean of new

8   gadolinium-enhancing lesions over weeks 12 to 24.  So it is the

9   primary outcome.

10  Q.   And what does the Kappos 2006 presentation report about

11  the results of the primary end point?

12  A.   So on the slide shown here, which is DDX 1100 Slide 60, it

13  shows, as we've seen earlier today, the outcomes as presented

14  by Dr. Kappos at this meeting showing the mean number of new

15  gadolinium-enhancing lesions from weeks 12 to 24, what was

16  called the prespecified primary end point.

17       And so they're basically saying, in the trial design, we

18  said we were going to do X analysis, and here it is, just the

19  data as it was acquired.  And it shows that the placebo arm had

20  the highest number of mean number of new gadolinium-enhancing

21  lesions.  The next arm, 120-day, had lower.  The 360-a-day

22  looked slightly lower.  And then the 720-milligrams-a-day was

23  the lowest.  And they point out that that was a statistically

24  significant reduction of gadolinium-enhancing lesions compared

25  to the placebo arm.

BENJAMIN GREENBERG - DIRECT

1   Q.   Does the data show a trend for the 360-milligram dose, in

2   your opinion?

3   A.   So just visually as you go from left to right, the bars

4   get lower.  They don't talk about statistical analysis or

5   statistical trends.  And so, just visually, you see it getting

6   lower.  But that's all you can say.

7   Q.   And do skilled artisans require statistical perfection

8   before they'll rely on data in a clinical trial?

9   A.   They don't require statistical perfection.  You want

10  people to interpret their data within the bounds of the trial

11  they're doing.  And so you can look to see if you feel as

12  though the analysis was complete or incomplete.  And you can

13  look to see, in the context of the trial, what was the trial

14  powered to look at and how were the conclusions analyzed in the

15  conversation?

16  Q.   And did the Kappos results take into account the baseline

17  imbalance?

18  A.   So as presented here, they did not.

19  Q.   And if we can turn to DDX 1161.

20       What is this comparison?  It looks like it's -- on the

21  bottom box is the baseline characteristics, and the top box is

22  the results.  What is the purpose of this line?

23  A.   So the purpose of this is just to take the data that was

24  presented at baseline characteristics and put it in respect to

25  what's being presented as the prespecified primary end point.

BENJAMIN GREENBERG - DIRECT

1    And to show that that third arm that was getting shorter, was

2    getting smaller as you move from left to right, as that

3    360-milligram was somewhere in between 120 and 720 a day in an

4    unadjusted fashion, that it's that arm that suffered from being

5    unequally randomized.

6         They started off twice as active in terms of their MRI as

7    the 120-a-day or 720-a-day.  They started off three times as

8    active compared to placebo.  And yet despite that handicap at

9    the baseline, they were still in between the 120- and

10   720-a-day.

11   Q.   And does the Kappos presentation report anything about

12   relapse rates?

13   A.   It does.  As had been described in the trial description

14   previously, they were going to report on what are called

15   secondary outcomes.  So the study will routinely look at what's

16   called an annualized relapse rate in an MS population and

17   report the data.

18   Q.   And what is an annualized relapse rate?

19   A.   So an annualized relapse rate is basically counting how

20   many relapses are happening per year in a population of

21   patients.

22        So you take a group of patients, you follow them for a

23   year.  Let's say it was ten patients.  If, amongst them, there

24   were ten relapses over the year, the annualized relapse rate

25   would be one.  On average, there was one relapse per year in

BENJAMIN GREENBERG - DIRECT

1    this population.

2        And it's a data point that gets used by regulatory

3    agencies when considering FDA approval for disease-modifying

4    therapies.

5    Q.    And how long was the Kappos Phase 2 study?

6    A.    So this was a Phase 2 study which was designed to be

7    short.  It was only six months, and hence used MRI as a primary

8    outcome, not annualized relapse rate.

9    Q.    And what was reported about the annualized relapse rates

10   in the Kappos presentation?

11   A.    So in this slide -- which again is DDX 1100, Slide 62,

12   which is just a recreation.  We didn't add circles or boxes or

13   anything.  This is the original presentation -- they report out

14   the numbers in terms of the annualized relapse rates between

15   the four arms.  And they circle the 720-milligram-a-day arm and

16   the annual -- the placebo arm, noting that the 720-milligram

17   arm had an annualized relapse rate of .44 and the placebo arm

18   had one of .66.

19       And at the bottom of the slide in the bottom left in very

20   small print, they do the math to say that this is a 32 percent

21   reduction versus placebo.

22   Q.    And what about -- so let's back up.

23       How did each arm do in the annualized relapse rate?

24   A.    So these are, in terms of annualized relapse rate,

25   relatively similar.  There's not a degree of magnitude,

BENJAMIN GREENBERG - DIRECT

1   dramatic magnitude difference in the arms.  What's notable, as

2   you move from left to right, the placebo had an annualized

3   relapse rate of .66.

4        The 120-milligram-a-day arm actually had the lowest

5   annualized relapse rate of all the doses.  It was 0.42 and

6   would actually have the highest percent reduction compared to

7   placebo even greater than what was seen in 720 milligrams a

8   day.

9        In the 360-milligram-a-day arm, it's in the same range.

10  It is the highest at 0.78 but still within the range of all the

11  other arms.

12       In the 720-a-day was 0.44.  But I have to caution, as the

13  authors do and as the trial outline does, this study is not

14  powered to make statistical conclusions relative to annualized

15  relapse rate.

16       So this is a teaser, if you will, to skilled artisans.

17  It's to give a sense of about what the annualized relapse rate

18  is while on drug, and it can help with thinking about trials or

19  studies in the future, but it's not a conclusive study relative

20  to relapse rate.

21  Q.   So reading the Kappos presentation and the 32 percent

22  reduction in relapse rates, would you find that underwhelming?

23  A.   No.

24  Q.   Why not?

25  A.   So 32 percent reduction versus placebo, when you take what

BENJAMIN GREENBERG - DIRECT

1   you're seeing in entirety, the primary end point and the

2   secondary end point, tells us that we're in the right range for

3   treating patients.

4       In a Phase 2 trial, which is short, it is very difficult

5   to look at annualized relapse rate and get excited or depressed

6   or up or down.  The point of the Phase 2 trial is to help with

7   dosing, dose selections, it's going to look for safety signals,

8   and to get the hint of efficacy from the MRI data which was

9   their primary end point.

10  Q.   So the 32 percent reduction rate wouldn't prompt you, as a

11  skilled artisan, to dose higher than 720 milligrams?

12  A.   No.  So in this study, which was a dose-ranging study that

13  went from 120 to 720, I'm seeing a efficacy signal -- if that

14  is a sign, if you will, if I'm supposed to look at annualized

15  relapse rate as a way, in a Phase 2 study, to point the way,

16  then I have to ask why didn't we circle the 120-milligram arm?

17  It has the lowest annualized relapse rate.

18      The point of this slide is to demonstrate that we're

19  seeing this change, but it's to remind us that we're not

20  powered to do this.  But we are seeing efficacy on the primary

21  end point in the 360 and the 720 arm.  So if I know I'm getting

22  efficacy in the 360-milligram arm, there's nothing to teach me

23  to go higher than 720.

24  Q.   And so just as the 32 percent doesn't encourage you to go

25  higher, conversely, the results of the 120-milligram arm you're

BENJAMIN GREENBERG - DIRECT

1   not relying upon for why you should dose lower?

2   A.   No, again, because I stick by that mantra.  It's designed

3   around the gadolinium-enhancing lesions.  So I have to start

4   there, form a conclusion, and then consider the other data.

5        And when you correct for that imbalance that was there, it

6   becomes pretty obvious that, in that dose range of 360 to 720,

7   that's where we're seeing efficacy.

8   Q.   And does this imbalance in the baseline permeate the other

9   end points in the study?

10  A.   No.  So, when we're talking about the imbalance, it was

11  very specific to the primary outcomes.  So the primary outcomes

12  was gad-enhancing lesions, and that's where the imbalance was.

13  Q.   If we can turn to the summary of the study.  I'm a little

14  out of order.  I skipped to Slide 65, real fast.  You had

15  mentioned that the annualized relapse rate in the study was

16  disclosed as not being powered.

17       And so in the summary slide, does it address that?  Does

18  it inform you of that information?

19  A.   It does.  The very last sentence that the authors leave

20  the audience with of the entire study is "The study was not

21  powered for this end point," and it's referring to annualized

22  relapse rate.

23       The other just noteworthy point relative to the summary

24  slide is the first sentence, which references that BG-12 was

25  effective reducing brain lesion activity as measured by MRI in

BENJAMIN GREENBERG - DIRECT

1    a dose-dependent manner.

2    Q.    What does that mean, in a dose-dependent manner?

3    A.    This is telling a person skilled in the arts what we

4    observed, that, as you increase the dose, the efficacy

5    improved, that there was a dose relationship.  And as you --

6    what's not on this slide but would be obvious to a person

7    skilled in the arts is that that 360-milligram arm behaved very

8    similarly to the 720.  And so there wouldn't be anything

9    pushing me to go past the 720.  I'd be looking within these

10   ranges to optimize and pick a final dose.

11   Q.    Do you agree with Biogen's expert's interpretation of

12   dose-dependent manner, that that just means the 720 works?

13   A.    That's not the usual and customary use of the term

14   "dose-dependent manner."  We're usually talking about a

15   relationship, as you move from doses, a change in efficacy.

16   Q.    Would a skilled artisan think that in particular in a

17   trial that has multiple active arms?

18   A.    They would think because, otherwise, you'd say the drug

19   worked at and name the dose that it worked.  Using the term

20   "dose-dependent manner" has a different connotation than just

21   saying which dose worked.

22   Q.    Okay.  I'm going to turn back now to Slide 63.  Slight

23   deviation.

24        What did the presentation report about side effects?

25   A.    So the presentation had two slides talking about side

1    effects, one entitled "Serious Adverse Events," which is what

2    we're looking at now in Slide 63, where it records how many

3    patients experienced an adverse event that led to the need for

4    additional medical therapy or hospitalization.  So these are

5    considered the most serious of complications that can occur

6    during the course of a trial.

7    Q.   And were nonserious adverse events also reported?

8    A.   Yes.  And that's in the next slide, which is DDX 1100,

9    Slide 64.  The adverse events reported out by treatment group

10   is basically a tally of how many patients at any point during

11   the trial came in and reported to a study investigator some

12   adverse event.

13   Q.   After reviewing the adverse events and the serious adverse

14   events data, do you still believe that side effects are an

15   issue for the skilled artisan?

16   A.   I do.  These numbers are very much in line with all of the

17   teaching we've gotten from psoriasis trials, previous MS

18   trials, the labels and patents, and all of the art leading up

19   to this.  And this would be in line with side effects that we

20   see from dimethyl fumarate.

21   Q.   And now we've discussed the failure of randomization.  So

22   let's go back and look a little bit more about that in your

23   opinions on the impact of the Gd-enhancing lesion baseline.

24        Sitting in the audience of the Kappos 2006 presentation,

25   what would the skilled artisan's reaction be to the baseline

BENJAMIN GREENBERG - DIRECT

1   characteristics?

2   A.   So while the slide looks complicated, it's actually, in my

3   mind, a pretty simple two-step reaction, sitting in the

4   audience.

5        So step number one is seeing the imbalance between the

6   arms, seeing that the 360-milligram arm at baseline had a

7   distinctly different number of gadolinium-enhancing lesions.

8   And then, flipping to the need to say, given that it's a

9   primary outcome, I need to correct for that.  And then taking

10  steps to correct for that.

11  Q.   If you didn't, as a skilled artisan, actually do the math

12  to do the correction for it, would you still have a general

13  takeaway from the Kappos 2006 presentation?

14  A.   Absolutely.  And the point of the slide earlier, where you

15  take the baseline and show it relative to the prespecified

16  outcomes, it just gives you that intellectual reassurance that,

17  if you just want to eyeball it, if you will, that the 360 was

18  going to be significantly better than the placebo and the 120.

19       But you could go further with -- and this slide has

20  demonstrated here -- that, despite there being more than twice

21  as many baseline gad lesions for the 360 arm compared to 120,

22  it was doing better than 120; and despite having three times as

23  many as the placebo arm, it was doing better than placebo.

24       And so you really walk away with a very firm sense that

25  360 a day of dimethyl fumarate is effective for treating MS

1    patients based on this outcome.

2         You could go further and do some math to try and sort out

3    if your hunch and if your eyeballing is, indeed, accurate.  And

4    that's what's shown here.

5    Q.   And so can you just -- let's walk through this slide.  And

6    this is DDX 1066.  And if we look up at the top box, can you

7    explain what is in the top box.

8    A.   So this top table has four columns to it, the treatment

9    group, and then Column Number 2 is entitled the "Mean Number of

10   New Gadolinium-Enhancing Lesions, Week 12 to 24."

11        This is basically the primary -- the prespecified primary

12   outcome of the study.  And it's the data to just say at the end

13   of the study of these four arms, when they counted up the

14   number of lesions and did the average over the population,

15   these were, as reported by the authors, the mean number of new

16   gadolinium-enhancing lesions.

17        The line next to that, which comes, again, straight from

18   the abstract, is what we saw at the baseline.  And it's there

19   to show that, as you move from placebo to 120, you go from 0.8

20   to 1.2; very similar.  But then, as you get to 360, it more

21   than doubles before going back down for the 720-milligram-a-day

22   arm at 1.2.

23        So those two arms are basically just taking the data from

24   Kappos and putting it in a tabular format.  What we're seeing

25   is the imbalance expressed in the randomization on that third

BENJAMIN GREENBERG - DIRECT

1   column.

2        And then you get to the math part, which is the fourth.

3   And it's basically saying let's correct for the imbalance.  So

4   let's just subtract -- if you started with 0.8 lesions and you

5   ended with 4.5, let's just get rid of the 0.8 and see really,

6   during the course of the trial, what were the lesions that

7   formed while you were on the arm you were randomized to; let's

8   not carry whatever baggage you had at baseline forward in the

9   study.

10       So when you subtract 0.8 from 4.5, you get 3.7.  So as you

11  move through that math, the corrected, the adjusted number of

12  mean gadolinium-enhancing lesions between weeks 12 and 24 that

13  occurred independent of the baseline is 3.7 in the placebo arm,

14  2.1 in the 120-milligram-a-day arm, 0.6 in the

15  360-milligram-a-day arm, and 0.2 in the 720-milligram-a-day

16  arm.

17       What's represented below it is a graph just showing those

18  numbers to, again, visualize that 360 and 720 were behaving

19  very similarly and really reinforce this notion of a

20  dose-dependent efficacy relative to dimethyl fumarate and

21  multiple sclerosis.

22  Q.   If I understand this correctly, you subtracted the

23  baseline lesions out of each of the arms, so not just the

24  360-milligram?

25  A.   No.  I corrected each within their own group, you're

BENJAMIN GREENBERG - DIRECT

1    correct.  It was the placebo got corrected, the 120 got

2    corrected, the 360 got corrected, the 720 got corrected in a

3    unbiased, non-cherry-picking fashion.  So it's just saying, if

4    I'm going to correct the 360, I have to do it for placebo, I

5    have to do it for 120, I have to do it for 720, and then

6    compare.

7         If those corrections led to the bars on the graph looking

8    very similar to the original presentation, which was the

9    prespecified end point, an uncorrected, unadjusted data set,

10   then you'd say, well, maybe correcting for the baseline

11   wouldn't change my conclusions.

12        But that's not what happens here.  You can really

13   visualize the impact of that unequal randomization and show

14   that 360 and 720 are, in this study, clearly outperforming

15   placebo or the 120 milligram-a-day arm.

16   Q.   And so what is the resulting takeaway of the trend in the

17   efficacy of the various arms from the Kappos 2006 presentation?

18   A.   So when looking at this and correcting, it's reaffirming

19   of a lot of prior art, even before we get to here, which is,

20   when treating an autoimmune disease like multiple sclerosis, a

21   dose range of 360 to 720 milligrams works.  It is going to be

22   effective.

23        And so, when we walk away and analyze the data

24   appropriately in the context of clinical trial data analysis

25   guidance, we find that the conclusion of the study was -- the

BENJAMIN GREENBERG - DIRECT

1  conclusions reached were incomplete.  That, even though

2  720 milligrams worked -- and I don't dispute that conclusion at

3  all -- we see that there was a lower dose that was working as

4  well.

5  Q.    And would the skilled artisan need a statistical result of

6  the 360-milligram arm before they'd have a reasonable

7  expectation of success that it was being effective to treat MS?

8  A.    No.

9  Q.    And, obviously, Biogen's experts have some criticisms of

10 this, and one of which is that you just sort of, you know, did

11 some hocus-pocus hindsight and subtracted patients and you have

12 no idea what patients you were subtracting and how on earth

13 could you do this in any type of neutral or effective fashion.

14      Do you have any thoughts of that?

15 A.    I'm aware and respectfully disagree.

16 Q.    Why do you disagree?

17 A.    So in the context of a population study, when we're

18 correcting for averages in the population, you don't have to

19 correct each individual patient to themselves.  You take the

20 average and can do the correction just on the means.  So not

21 having access to the individual patient data is not required.

22      Secondly, to suggest that a correction isn't required

23 breaks one of the fundamental tenets of clinical trial data

24 analysis on how to handle unequal randomization when a primary

25 end point is in play, particularly when a primary end point is

BENJAMIN GREENBERG - DIRECT

1   in play.

2       And then, finally, while I am not a Ph.D. statistician,

3   the correction based on subtracting the baseline regions in an

4   unbiased fashion, correcting all four arms, not just correcting

5   the 360 and saying, look, it was the best, but correcting each

6   one independently to their baseline is honoring the fidelity of

7   keeping each group to themselves.

8       I'm not creating a new coefficient or a new model.  I'm

9   doing relatively simple math.  They may say it's too simple,

10  but it's an accurate and acceptable and unbiased approach to

11  correcting for this unequal randomization.

12  Q.   Now, you were here for the opening arguments, I believe?

13  A.   Yes.

14  Q.   And you heard in the opening arguments that you didn't do

15  this until you were hired for this litigation.  You published a

16  paper, in fact, that didn't have this baseline correction to

17  it.

18      If this was so obvious, why didn't you put this in your

19  paper?

20  A.   Yeah.  It's -- on its face, it's a good question, and I

21  can understand why it would beg credibility of why are we doing

22  it now?

23      If you look at the entirety of that paper, the point of

24  the paper was not analysis of clinical trial outcomes.  If you

25  take the scope of the whole paper, it's kind of a review to

BENJAMIN GREENBERG - DIRECT

 1  clinicians of "Here are the different drugs that are in

 2  different stages of development."  It's a CliffsNotes version

 3  of different molecules that clinicians should be aware of, and

 4  it talks to the future and what we want to develop.

 5      And so the point of the publication was not to reanalyze

 6  data or suggest that it was a broad paragraph to say "This is a

 7  drug; it looks like it's going to be effective; be aware;

 8  coming soon to a theater near you" kind of thing.

 9      And so if I had been asked at the time to write a paper on

10  data analysis of the clinical trials, this would have been one

11  of the first things we would have identified when analyzing

12  this trial.

13  Q.   And is there another standard way of correcting for the

14  baseline imbalance that you also calculated?

15  A.   There is another way.

16  Q.   And let's go to DDX 1000, Slide 67.

17      Is this the other method you used to correct for the

18  imbalance?

19  A.   Yes.  So this is another method that was used, and it's a

20  little different, and division is always harder than

21  subtraction.  So it takes a little more time to explain, but I

22  can walk through it.

23  Q.   Let's focus on the top box and just show what it was --

24  what was the actual data input -- at data inputs and the

25  calculations you did.

BENJAMIN GREENBERG - DIRECT

1    A.    So the -- what is the second column of the table, the one

2    that has -- the first one with numbers in it, with data in it,

3    you see that we took the mean number of new

4    gadolinium-enhancing lesions -- again, this is the primary end

5    point of the trial.  And one of the things to recall is this

6    was averaged over four scans.

7        So what the investigators did was at weeks 12, 16, 20, and

8    24, they did an MRI, they counted up all of the lesions over

9    four scans, and they said here was the average over those four

10   scans.

11       So what's done in the first column is to say let's look at

12   the average number of new lesions per scan.  So if you had 4.5

13   lesions over the course of four scans in the placebo arm, when

14   you divide by 4, the average was 1.13 new lesions per scan.

15   And so it, basically, is saying let's look at the activity of

16   these patients on a per-scan basis instead of amortizing over

17   several months of the trial.

18       And then in the last column you still -- you're looking

19   for a method to correct for the unequal randomization.  And so

20   in this situation, since the baseline scan was a single scan --

21   it wasn't an average over multiple; it was just one -- you can

22   create the ratio.  And you can basically say how much more or

23   less active were patients on subsequent scans compared to their

24   baseline?

25       So, for example, in the placebo arm, it was -- the

BENJAMIN GREENBERG - DIRECT

1    patients were 1.4 lesions more active per scan over the study

2    compared to the baseline.  And, as you move down, you see that

3    those numbers drop.  They go to .69 for the 120-milligram

4    dosing arm, .31 for the 360-milligram arm, and .3 for the

5    720-milligram arm.

6         And so what it says is that the 360 milligrams a day and

7    720 milligrams a day were noticeably less active over the

8    course of the trial compared to their baseline study.

9    Q.   So did both of these calculations on Slides 66 and 67 just

10   affirm your sitting-in-the-audience view,

11   watching-the-Kappos-presentation sort of takeaway of the data?

12   A.   Yeah.  And so it's worth it, if I may, to look at this

13   again.  This is DDX 1000, Slide 68.

14        So this is taking the primary end point data -- so how

15   many new gadolinium-enhancing lesions were seen over the weeks

16   of the study -- and putting below it what the baseline number

17   of scans were, what I have referred to as that handicap for the

18   360-milligram arm.

19        And so just looking at this, doing no math, no

20   subtraction, no division, no calculation, there is an obvious

21   need and potential impact of the unequal randomization that

22   occurred relative to the primary end point of the trial.

23        If the baseline of the gadolinium-enhancing lesions was

24   double that of the 720, it's going to have an impact.  Doing

25   the math, taking the extra step, confirms what you see just by

1  gestalt, if you will, sitting in and looking at the

2  presentation.

3  Q.   Do you understand that Biogen's experts argue that this

4  baseline patient characteristics of number of Gd-enhancing

5  lesions is just fine?  There's no problem?  That you're the one

6  who's picking out a problem and trying to gerrymander some good

7  arguments?

8  A.   I'm aware of that.

9  Q.   And what do you think about that argument?  Do you agree

10  with it?

11  A.   I vehemently disagree with it.  It's, as I've said, a

12  fundamental concept in clinical trials that an unequal

13  randomization should be recognized and accounted for in your

14  data analysis.  It happens -- again, I don't fault the

15  investigators in any way, shape, or form relative to the

16  conduct of the trial.  I just note that it is something that

17  should be noted in the data analysis and corrected for.

18  Q.   Now, does it matter to you, though, that there were

19  dropouts during this study?  Because, again, the baseline

20  lesion scan is a little bit of a different data set than the

21  end-of-the-day folks who were getting scanned.

22      Does that impact your opinions?

23  A.   So at a broad level, we always consider the dropout rate

24  when we're trying to make conclusions relative to a trial.  And

25  so you would look to the number of patients who dropped out and

BENJAMIN GREENBERG - DIRECT

1   see if there were dramatic differences between the arms, which

2   in this study there were not.

3        And so given the fact that it was a relatively equal

4   completion rate amongst the four arms, it doesn't sway my

5   conclusion relative to needing to correct for the impact of

6   that correction on the baseline characteristics.

7   Q.   Now, let's look -- we're still looking at Slide DDX 1000,

8   Slide 68.  Looking at the reports on the 360-milligram arm, it

9   says "2.5 (4.22)."

10       And do you understand that the 4.22 is the standard

11  deviation for the mean number?

12  A.   Yes.

13  Q.   Does that have any impact on your opinions?

14  A.   So in this setting it's definitely taken into account in

15  my opinion.  You have to recognize the standard deviation

16  across these groups.  When you look at the standard deviation

17  of that 360-milligram arm and the 720-milligram arm, which is

18  one of the important parts of anchoring, they're relatively

19  similar.  The 720-milligram arm had a standard deviation of

20  3.52, which is in a very close proximity to the standard

21  deviation of the 360.

22       So I note it but recognize that it's not an anomaly that

23  would change my conclusions.

24  Q.   But couldn't the standard deviation value represent a

25  bunch of outliers in the study?

BENJAMIN GREENBERG - DIRECT

1   A.   Yes, it could.

2   Q.   What is an outlier?

3   A.   An outlier is, if I enroll 60 patients into a study and

4   one of them behaves extremely difficult -- not difficult;

5   excuse me -- extremely differently, it can be difficult to

6   understand how do they relate to the larger group.

7   Q.   And so you're not aware, though, that there are no

8   outliers, right?

9   A.   There is always going to be a spread.  And so, if you take

10  your 60 patients and take any characteristic -- their height,

11  their weight, their gad-enhancing lesions -- there's always

12  going to be somebody at the end of that range and at the bottom

13  of that range.  And the question is is the degree of

14  outliers -- and we get a sense of that with the standard

15  deviation -- enough to dissuade us from making a conclusion?

16       And given the fact that those two arms had standard

17  deviations that approximate each other, it doesn't change my

18  conclusion.

19  Q.   Now, the Gd-enhancing lesions are at baseline.  And then,

20  again -- and then the scans are taken at four-week intervals

21  following the baseline scan, 12, 16, 20, and 24, I believe?

22  A.   Yes.

23  Q.   Now, what is the impact of the fact that Gd-enhancing

24  lesions, if any -- what is the impact, if any, if Gd-enhancing

25  lesions may disappear over time?

BENJAMIN GREENBERG - DIRECT

1    A.   I'm aware that that argument is being made, and it is

2    factually accurate that, when a patient has an enhancing

3    lesion, most of the time, if not always over time, it

4    disappears.  It, as a single lesion, disappears.

5         But what that argument ignores is the significance of

6    gad-enhancing lesions on an MRI in MS as a prognostic factor

7    over the course of a study in terms of predicting future

8    gad-enhancing lesions.

9         So even though that one lesion may disappear, if you have

10   a population that has an obviously higher number of

11   gad-enhancing lesions, the data and the studies would suggest

12   that they would go on to have more lesions.

13        And that's what pushing a skilled artisan to correct for

14   the imbalance, because it's not an ignorable data point.  It's

15   going to have an impact on the data interpretation.

16   Q.   And so is it -- colloquially, would it be called the

17   patients on the 360-milligram arm are just more sick?  They're

18   worse off when they're starting the study?

19   A.   Especially in this primary end point, they were worse at

20   the beginning.  And, when you look at the data in multiple

21   sclerosis, you would predict that they would be worse at the

22   end.

23        And so the fact that they weren't getting worse, the fact

24   that 360 kept them better than 120 and better than placebo

25   tells a skilled artisan that that dose is working.

BENJAMIN GREENBERG - DIRECT

1    Q.    And you mentioned a paper.  Do you have a paper that

2    discusses this -- if you're sicker at the start, it's

3    prognostic of more disease state?

4    A.    Yes.

5    Q.    And let's look at JTX 2167.  And I am not going to put the

6    name of the first-named author on the record because I don't

7    know how to pronounce it.

8          Why don't you do that, Dr. Greenberg.

9    A.    The last name of the first author is Koudriavtseva, and

10   that's my best approximation.  It is a paper that is published

11   in the Journal of Neurology, Neurosurgery, and Psychiatry in

12   1997, and the title is "Gadolinium-Enhanced MRI Predicts

13   Clinical and MRI Disease Activity in Relapsing-Remitting

14   Multiple Sclerosis."

15   Q.    And what does the -- what does JTX 2167 teach a skilled

16   artisan, in your opinion?

17   A.    So, as shown on the slide here, Slide 69, the authors

18   found that "The number of enhancing lesions on the baseline

19   scan predicts the mean number of total and new enhancing

20   lesions during the follow-up period.  The study suggests that

21   the number and volume of gad-enhancing lesions at a single

22   examination are strong, short-term predictors of subsequent

23   clinical and MRI activity."

24   Q.    And so how is this relevant to your analysis of the

25   baseline imbalance in the Kappos presentation?

BENJAMIN GREENBERG - DIRECT

1   A.   So, if you take the first sentence of the conclusion, that

2   they find in the study that at baseline the number of lesions

3   you have will predict how many more lesions you're going to

4   have, and I enroll in a study two groups, one of whom has twice

5   as many baseline lesions at the beginning, assuming no impact

6   of drug or anything else, they're going to have more lesions at

7   the end.

8        And so from a clinical trials perspective, given that that

9   end number is your primary end point, you couldn't avoid

10  correcting for it.  A skilled artisan would have to take that

11  into account when interpreting the conclusions of this

12  presentation.

13  Q.   So did the 360-milligram arm in the Kappos presentation

14  just have an uphill battle?

15  A.   They did.  They were a different group of patients.  They

16  were a more active group of patients at the point that they

17  were randomized into the study.

18  Q.   So let's turn to JTX 2235, which is the Kappos 2006.

19       Dr. Greenberg, what is JTX 2235 shown on DDX 1100,

20  Slide 70?

21  A.   So this is an abstract that was published in the Journal

22  of Neurology in 2006, Supplement 2, and it's entitled "Efficacy

23  of a Novel Oral Single-Agent Fumarate, BG-12, in Patients with

24  Relapsing-Remitting Multiple Sclerosis:  Results of a Phase 2

25  Study."

BENJAMIN GREENBERG - DIRECT

1    Q.   And was this abstract published at the journal -- for the

2    Journal of Neurology meeting for the 16th Meeting of the

3    European Neurological Society on May 27th through 31st?

4    A.   Yes, this is the abstract that correlates with that

5    meeting.

6    Q.   And who is the first named author?

7    A.   Dr. Kappos.

8    Q.   And who sponsored the study?

9    A.   This is the study as sponsored by Biogen Idec and

10   Fumapharm AG.

11   Q.   And when was it published?

12   A.   In 2006.

13   Q.   And what does the Kappos 2006 abstract describe?

14   A.   So the Kappos 2006 abstract describes the results of this

15   Phase 2 study that included four arms:  a placebo and three

16   treatment arms of BG-12.

17   Q.   And what does the abstract say about the results of the

18   Kappos Phase 2?

19   A.   So it notes that "BG-12 at 720 milligrams a day

20   significantly reduced the mean number of new gad lesions (the

21   primary end point) compared with placebo."  And goes on to say

22   "BG-12 significantly reduces brain lesion activity in a

23   dose-dependent manner as measured by MRI."

24   Q.   And so when it refers to brain lesion activity, that's the

25   Gd-enhancing lesions?

BENJAMIN GREENBERG - DIRECT

1   A.   Yes.

2   Q.   And, again, what does it mean when the abstract describes

3   the activity in a dose dependent manner?

4   A.   So reading in an abstract like this, which the study had

5   indicated there were going to be multiple dosing arms tested

6   going from low dose to high dose -- in this case, 120 to

7   720 milligrams a day.  When it describes a dose-dependent

8   manner, a skilled artisan takes away that, as the dose goes up,

9   incremental increases in efficacy occur.  And at this point,

10   the highest dose that was used, 720, met its primary end point.

11   Q.   Now, are you aware of Biogen's argument that, because

12   480 milligrams is numerically closer to 360 milligrams than

13   720 milligrams, that you would not have reasonable expectation

14   of success that the 480-milligram dose would work?

15   A.   I'm aware of this.

16   Q.   Did you prepare a slide to discuss or explain this

17   argument?

18   A.   Yes.

19   Q.   Well, do you agree with the argument?

20   A.   I don't.

21        So if I may?

22   Q.   Yes, please.  Why not?  Yes.

23   A.   Okay.  So when talking about dose-response curves, what's

24   being suggested by Biogen in response to our argument is what's

25   known as a linear dose-response curve -- it's shown on the

BENJAMIN GREENBERG - DIRECT

1    left -- where, for every milligram I add, I get more efficacy.

2    And it's -- what I sometimes worry my patients will do, well,

3    10 milligrams was good, 20 will be better.  And they increase

4    the dose.  And that's usually not a good idea across the board.

5         But in terms of what we're talking about today,

6    immunologically, the dose-response curve -- and for many

7    conditions -- is not linear.  That when you're dosing a

8    medication, there comes a point where each additional milligram

9    of the medication no longer adds any efficacy; you only add

10   risk of side effects.

11        And the reason for this has to do with the target of the

12   medication.  So to bring it home to dimethyl fumarate, the

13   target of the medication is the immune system.  The target, as

14   understood by skilled artisans, as presented by Dr. Kappos in

15   the presentation, is this Th1 to Th2 shift.

16        Once I reach a dose on this curve that has shifted the

17   immune system, I don't need to shift any more.  I have achieved

18   a dose that will lead to a clinically meaningful response in a

19   significant proportion of the population.  It doesn't have to

20   be all the population because you have to balance the risks.

21        To get that very last patient into remission, if you had

22   to pick a dose that subjected all the other patients to side

23   effects with no additional benefit, you would not move to the

24   right on this curve.  You would sit squarely in a place where

25   you had turned the corner and were seeing efficacy.

BENJAMIN GREENBERG - DIRECT

1     Since, in multiple sclerosis, we don't have a blood test

2  to measure the immune system activity to pick where we are on

3  this dose-response curve, we use the clinical trial data.  We

4  look for doses in the art to tell us at what range do you turn

5  the corner, do you get to the flat part of the curve?

6     Even without Kappos, if we just looked to Schimrigk, we

7  knew that, between 360 and 720, we were on that point of the

8  curve.  Kappos confirms that.  Kappos goes further in the study

9  to show us 360 to 720 work.

10     And if we take at its core that pretty much everybody was

11  accepting psoriasis and multiple sclerosis shared an

12  immunopathology, we have a wealth of psoriasis literature to

13  say we meet the clinical end point we want at this point of the

14  curve at 480.

15     And so whether 480 is closer to 360, that is

16  mathematically correct, but the fact that it would teach a

17  skilled artisan to go over here on the curve is incorrect.

18  Q.   Thank you.

19          MS. BLOODWORTH:  Your Honor, this is kind of a good

20  stopping point.  Is that okay?

21          THE COURT:  Yes.  I agree.  I agree.

22          Can you estimate how much longer you have with

23  Dr. Greenberg tomorrow?

24          MS. BLOODWORTH:  I believe we will probably go for

25  about an hour and a half.

BENJAMIN GREENBERG - DIRECT

1          THE COURT:  Okay.  And then on cross-examination, the
2   rest of the day, or might we get through another witness?
3          MR. FELDSTEIN:  We might get through another witness.
4   And I think we may need to discuss with Mylan's counsel --
5          THE COURT:  I should have said this is Wednesday,
6   not --
7          MR. FELDSTEIN:  Yeah, Wednesday.  You're right.
8          We have some scheduling issues with one witness, and
9   we need to make sure that we get him on the stand before he has
10  to go back.
11         THE COURT:  Right.  Well, as I've said before, if we
12  have to interrupt, we'll do it to make that happen.
13         MS. BLOODWORTH:  We'll discuss that, sure.
14         THE COURT:  Okay.  Are you up for a question?
15         MR. MONROE:  I just wanted to make sure on the --
16  this is Tuesday.  And tomorrow we were supposed to be off.  I
17  just want to make sure we're talking about Thursday now.  Is
18  that correct?
19         THE COURT:  That's right.
20         MR. MONROE:  I just wanted to make sure.
21         THE COURT:  It's 5:00.  It's about 100 degrees in
22  here.  You can tell me what day it is.
23         Yes, that's right.  So we're not in here tomorrow.
24  We are back here on Thursday.  Very good.  I'll be here.
25         Thank you, Dr. Greenberg.  You're free to step down.

BENJAMIN GREENBERG - DIRECT

1              And we will get back to you all with the status of

2     the temperature in here.  And if we're like this again when we

3     resume, you don't have to keep your jackets on.  This is pretty

4     horrible.  So we'll see what we can do.  Okay?

5              Thank you.

6              Court stands adjourned.

7              Oh, and we're going to resume -- when we do resume,

8     it's 8:30.  Okay?  Very good.

9              (Proceedings concluded at 4:59 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BENJAMIN GREENBERG - DIRECT

1                          CERTIFICATE

2          I, Cindy L. Knecht, Registered Professional Reporter

3   and Official Reporter of the United States District Court for

4   the Northern District of West Virginia, do hereby certify that

5   the foregoing is a true and correct transcript of the

6   proceedings had in the above-styled action on February 4, 2020,

7   as reported by me in stenotypy.

8          I certify that the transcript fees and format comply

9   with those prescribed by the Court and the Judicial Conference

10  of the United States.

11         Given under my hand this 4th day of February 2020.

12                              /s/Cindy L. Knecht
                                _____
13                              Cindy L. Knecht, RMR/CRR
                                Official reporter, United States
14                              District Court for the Northern
                                District of West Virginia
15

16

17

18

19

20

21

22

23

24

25